## The Guale Yamasse Sui Juris Consular Court



obtained from the originator who conducted business with an indigenous national, were not authorized by the Trustee. Tribal Juris Consultant, Rhashea Lynn Harmon-El, who is also the Trustee to mortgage collateral held in Trust and therefore owned by the Trust. These BAR member agents, further have completely refused and with the approval of their Court's jurisdiction to Notice and Communicate with the Trustee, as a power of attorney representative of the Nationals, and as an interested party respondent. Allative members of the Tribe fall under Tribal Trusts and are beneficiaries for their protection and the protection of the Tribe/Clan's assets.

**Through**, this Official International Letter Rogatory and International *Amicus Curia*, Wee annul all nexus contracts stemmed from the 1933 bankruptcy and Wars Powers Act 50 U.S.C. 1541-1548 that were established from the Vatican Papal Bulls at the beginning as well as the *Dum Diversas*, consigning Indigenous Peoples to 'perpetual servitude' and slavery of the colonial occupiers and ensue an Intense Investigation of all documents, data, and parties who create and are involved, establish and assert unlawful contractual nexuses with our Nationals through *Actio De DoLo MaLo* and Unconscionableness.

**Wee,** come in peace and as international friends without arms, and we come for your assistance, first, although this matter is of imminent "National Security".

**Wee,** therefore leaving us without any other choice, do inform you that the State Department shall be contacted to intervene in this matter despite its other international worldly present issues.

**Wee,** the Tribal Council have resolved that:

1) Tribal Juris Consultant Rhashea Lynn Harmon-El must not be impeded from performing her duties on behalf of the Guale Yamassee Nation,
2) A United States Administrative permanent Cease and Desist, Restraining Order, shall be executed and sealed by the Key Holder or Supreme Consular Bench of the Guale Yamassee Courts;
3) An investigation into the Terrorist Acts Committed against our Nationals, mentioned herein, and others who have been injured under similar or same circumstances shall ensue;
4) Anti-Fraud and Anti-Human Rights and Anti-Terrorism Courses shall be required for allative Judicial Officers and Officials within the Philadelphia Judicial Community, since this is the jurisdiction presently at issue before us, to eliminate intentional and unintentional international human rights and Indigenous discriminatory rights violations.

**Wee,** shall remain in communication without arms.

**Wee,** shall remain vigilant in asserting our rights and our national's rights as indigenous.

**Wee,** thank you in advance for your attention and notice of this Letter Rogatory Transmittal Commercial Communication.

10 | P a g e

# The Guale Damasse Sui Juris Consular Court



Unanimously Resolved and Agreed on The New Fleur De Lis Crescent Moon on the Last Day of Ramaadan, June 3, 2019 A.D. in the Year of the Elohiym 1439 MCY

Droit. Droit.

Unanimous Tribal Council Decision

Supreme Grand Council
Marie-Antoinette White Feather El
Co-Supreme rand Council
Charlie No Curse El
Grand Council
Lamp De Vipor El
Grand Council
Snail Biter Bey
Grand Council
Michael De Angeli El

End of Communication.





*All Commercial Transactions and Trade and Notes are Backed by Indigenous Specie*

Rhashea Lynn Harmon El
Chief Juris Consul

Marie Poppi White Feather El
First Assistant Juris Consul

# GUALE YAMASSEE MBC/INAAN
# JURIS CONSUL OFFICE

JurisConsulOffice@GualeYamasseeCourt.org
Phone/Fax: 1.833.482.5333

July 26, 2019
Fixed Leo, Era of Aquarius
Saturn and Pluto Capricorn (Retrograde)

Worcester County Superior Court
Attention: Dennis McManus, Esq.
d/b/a Worcester County Clerk Magistrate
225 Main Street, Room 1008
Worcester, Massachusetts Territory [01608]
Uniform Postal Union Treaty Effective

RE:   **Derivative Account: 1785CV00127D**

Greetings:

Enclosed please find an Order dated 07.09.2019 from the Guale Yamassee Sui Juris Consular Court regarding the above matter docketed as such in your Court.

Wee, appreciate your attention to this matter.

Engaged,

By:_____
Rhashea Lynn Harmon-El, Esquire
Chief Juirs Consul
All Rights Reserved

cc:
United States Department of the Treasury
United States Internal Revenue Service
Guale Yamassee Compliance and Auditing

Non-Transferrable Bond of Guale Yamassee Nation
Copyright©2019



# 𝕿𝖍𝖊 𝕲𝖚𝖆𝖑𝖊 𝖄𝖆𝖒𝖆𝖘𝖘𝖊 𝕾𝖚𝖎 𝕵𝖚𝖗𝖎𝖘 𝕮𝖔𝖓𝖘𝖚𝖑𝖆𝖗 𝕮𝖔𝖚𝖗𝖙

| | |
|---|---|
| Rhashea Lynn Harmon El, Trustee of Harris Private Foreign- International Charitable Sanctuary Trust, and Harold Harris IV, Indigenous Sui Juris<br>　　　　　　　　Petitioners, | : <br> : <br> : <br> : <br> : <br> : <br> : | **EMERGENCY MOTION**<br>**FOR REVIEW AND RELIEF ORDER** <br><br> **Summer Term**<br>**Filed: 01072019F** |
| Vs.<br>The Commonwealth of Massachusetts Court,<br>Worchester County, Superior Court,<br>And<br><br>ANTHONY N. RENZI<br>And<br><br>Agents d/b/a<br>Attorneys for allative Corporations known<br>and Unknown | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | <br><br>**Docket: 01072019F** |

Foreign Respondents.

## SPECIAL ORDER *SUA SPONTE*

AND NOW, upon REVIEW of the file presented by Plaintiffs occurring before the Commonwealth of Massachusetts, County of Worcester, Superior Court Civil Action Number: 1785CV00127D operating within the jurisdiction of the United States of America, *en* North America,

AND

UPON, PETITION and FILING OF EMERGENCY MOTION, submitted on July 01, 2019; AND

UPON, FINDING that the Guale Yamassee Sui Juris Consular Court possesses ORIGINAL JURISDICTION over the disputed foreclosure matter;

WEE, THEREFORE, GRANT through SUA SPONTE ORDER Plaintiffs' EMERGENCY MOTION for the following:

i)     REMOVAL OF Civil Action Number: 1785CV00127D to Guale Yamassee Jurisdiction;

ii)     INJUNCTION AGAINST FORECLOSURE;

iii)    Permanent Restraining Order (PRO) against all parties and agents representing or appointed to represent allative parties listed and/or to be designated and/or appointed from further engaging in injurious acts towards Petitioners;

Copyright©2019<br>All Rights Reserved<br>*Kima Amma assblh  Harold Gaule Yamasee Consnm*



# The Guale Yamasse Sui Juris Consular Court



**AND**

**FURTHER,** through **SUA SPONTE ORDER** under Guale Yamassee Nation's Constitutional Right incorporating The Rights of Indigenous Peoples and International Human Rights Laws to protect its Nationals and this Court's Constitutional Authority to uphold the Guale Yamassee Nation's Constitution and uphold Justice through enforcement of The Rights of Indigenous Peoples individually and Collectively,

**WEE,** the Guale Yamassee *Sui Juris* Consular Court,  **AUTHORIZE** Petitioners through this ORDER, to:

    i)      File Liens in the amounts of costs presented to the Court including interests; and

    ii)     Attachments of derivative accounts against allative foreign agents, which includes attorney BAR membership numbers.

**NOTICE** of this **SUA SPONTE ORDER** along with the liens filed against allative parties, entities and individuals, shall be forwarded to allative Foreign Respondents and the United States Department of Justice and the Internal Revenue Service as per International comity by United States Postal Service as this is an International commerce issue and falls within the Jurisdiction of the UPU and therefore its legal protections.

**THEREAFTER,** within ten (10) days, an ORDER to enforce the Judgments including a summary of all liens may be filed with this COURT along with proof of USPS mailings.

**THERE SHALL BE NO FURTHER ACTIONTO ENFORCE THE JUDGMENT UNLESS AND UNTIL THE ORDER AUTHORIZING IS ISSUED.**

GRANTED AND SEALED

Supreme Juris

**END OF ORDER**

Copyright©2019
All Rights Reserved



  

# Affidavit of Intent to File Derivative Action
# Based on Juridical and Commercial Bank Fraud
# Committed by the Philadelphia Government Acting as
# Market Participants in Collusion with
# Barrister "Baron" Agents and Corporate Banks
# Era of Aquarius, Saturn in Capricorn and Pluto, Moon in
# Gemini, of the 2020 Year of The Most High, 07 de Janvier
# Account: 170503419
# Regarding Aboriginal Title to 1361 S. 46th Street,
# [Philadelphia, Pennsylvania United States Territory,
# PA19143-0101]

## Greetings from the Guale Yamassee Chief Juris Consul Office of the Official Guale Yamassee Government.

As per the attached Errata which remains unrebutted by All who possess knowledge of the following facts and Conclusions of Law:

Wee are the true and original Divine Living Beings who charted the Oceans and Sea prior to and subsequent to safely arriving in what is now known as America.

Our ancestors shared our knowledge and information with you as you began to learn and understand the sciences that governed our existence.

You took that information and used it to divide the knowledge and information, splicing and issuing degrees in incomplete forms through Universities throughout the planet.

Through the Principles established by our ancestors, governing and navigating commercial trade according to those Principles, Banking was established and provided for the unfettered engagement in trade and commerce regardless of religious beliefs. The wise King Solomon followed these very Principles.

During the Revolutions (British and American) the Divine Living Beings were scribed and labeled as "Assets".

1

  

These Divine Living Beings who possessed bestowed upon them of Genesis I Nobility were then stripped through perversion, of Principles their ancestors created and shared with the "strange people from afar" and therefore fraudulently and deceptively denied of their rightful titles as the true Hebrews of Nobility and Autochthonous of the Land. Being Genesis I and the chosen people of The Most High prior relationships with kingdoms and empires recognized this Truth and established Treaties and Agreements with family recognized of the 12 Tribes upon arrival.

The Church through its Priest, Bishops *et cetera* are responsible for maintaining the organizational structure and control of the affairs that occur administratively for commercial trade and therefore banking (internationally) to continue. Further, the Church knows as mentioned in the attached document from the Seat of Saint Peter that, the Divine Living Being is not the alter ego created as a legal fiction with the same Appellation in all caps upon Pauper Certificates known as "Birth Certificates".

From sea to shining sea subsequent 1787 and with the assistance and permission of those Hebrews who were already here upon the lands known as and called the Americas prior to even 1213 to all Intelligent Divine Living Beings, the Laws of the Sea were brought upon land and Banking was Incorporated Into every facet of the daily regime, including the operations of the courts.

The Conclusions of Law remaining unrebutted and placing all persons and agents of persons involved in the matter(s) herein addressed are in violation of;

Under United States Code Title 25 §177 Purchases or grants of lands from Indians "Indian" matters not exclusively within the Jurisdiction of the Indian Courts, fall under the exclusive jurisdiction of the United States Federal Government and its territories. Allative Barrister "Land Barons" Agents and Judge Barristers were unequivocally aware of these facts and laws and willingly and deliberately ignored them to the detriment of the indigenous Nationals identified under the Account 170503419 as "Defendants".

Wee, are a Foreign International Nation of Divine Living Beneficiaries, enjoying the same status, immunities and privileges as set-fort at the International Organizations Immunities Act (IOIA-Public Law 79-291 Title 1 §2, 59 United States Statutes at Large 669, House Resolution 4489, enacted December 29, 1945) possessing the capacity to contract, to acquire and dispose of real and personal property and to institute legal proceedings.

Allative Persons, Barristers "Land Barons" attached, identified and named in the herein matter, primary PHELAN HALLINAN, LLP, are private foreign agents. Guale Yamassee Nation and its Nationals are a separate Nation and comprises of indigenous (Indians) going back more than 10,000 years.

All persons and agents of persons, therefore, are in direct violation of United States Code §288a Privileges, Exemptions, Immunities of International Organizations and numerous *Jus Cogens* violations.

When dealing with Indigenous Nationals, all state and civilian laws are inapplicable because the states as united in 1787 became subject to the newly created and incorporated United States of America, as *E Pluribus Unum*. In this Account 170503419 all participants intentionally chose to ignore the facts and *jus*

2






*cogens* and Treaty *laws* which remain in effect and therefore any State Court decisions or State Court interference is a violation as a matter of law.

The continued denial of rights to  Indigenous Nations and its Nationals of any rights, including to representation of its own authority, regarding accusations of International breach of banking laws to control and monopolize the Land and Assets through legal Civiliter Mortuus scriptions is a direct violation of Guale Yamassee Constitution, 15 United States Code, and Jus Cogens.

An unrebutted affidavit according to the Principles governing Banking Laws and all other Jus Cogens Laws governing Trade and Commerce stands as Truth.

Remove 1361 S. 46th Street, [PA19143-0101] as per United States Territory from the pending Sheriff Sale listed to occur January 07, 2020. Done.

Wee Seal:

Rebiew of Account Obserbed Taken at:

MBC-INAAN (Guale Yamassee Gobernment)
The Council of 12

To Be Submitted and Serbed by:
Attention: Chief Juris Consult and Clerk of Court
C/O RIH Ma'at Law & The Rights of Indigenous Peoples
1315 Walnut Street, Suite 320
Philadelphia, Pennsylbania [PA19143-0101]
America Turtle Island



Faxed:

PHELAN HALLINAN, LLP ((215) 563-5534, 215-574-0699)
Department of Justice Housing ( 202 514.1116)

Cc'd
International Financial Times (HongKong) et allative International and National News Media
Papal Legate Charles J. Chaput




*All Commercial Transactions and Trade and Notes are Backed by Indigenous Specie*

# FROM THE DESK OF THE GUALE YAMASSEE TRIBUNAL
### *"Notice to Principal is Notice to Agent; Notice to Agent is Notice to Principal"*
### August 21, 2019 GC
### Fixed Leo 28₂8' Moon Taurus, Era of Aquarius, Saturn and Pluto Rx Capricorn Rx

To Whom It May Concern[1]

This *Sui Juris Judicum Errata Corrige* is presented and NOTICED to clarify the misunderstanding that has taken place for several centuries regarding us, the Indigenous People.

The enactment of Colonial Laws and Acts mislabeled Indigenous People as the following; Black, Slave, Negro, Coloured, African-American and a list of other denationalizing categories. This has caused to present day, substantial injuries, commercially creating an insurmountable amount of debt owed the Indigenous. The Papal Bulls, Noir Codes, and Non-Intercourse Act led to a myriad of other codes, including Penal Codes. Resultingly, centuries of pain and suffering was inflicted upon the Indigenous who were promised and assured the protection of the united states.

The Autochthonous connection to our Indigenous Land, speaks life into the truth of our reality, reflective in our rich and diverse culture across the planet. Through our planetary imprint and historical records, it is further reflected in your Coat of Arms, Seals, Code of Ethics, Military Codes, Corporate Seals, Corporate Symbols, and other Fellowships, including the Sun Book known as the Bible.

The display and use of our Indigenous symbols and the significance of their continued use, is imperative for the survival of all; this is a Commonality; an Agreement; a Contract; a Covenant.

This *Errata Corrige* is presented to correct the mislabeling categories. Denationalizing documents and actions resulting therefrom, have proximately caused the ongoing and continued human rights violations and material Agreement breaches committed against Indigenous People; thus far having a negative impact in the form of *Commercial Civil Liter Mortus* for Indigenous Peoples.

The Papal Bulls have expired that sparked the mislabeling lasting several centuries. Wee are not assets and the agreements remain. In aggregation with all formentioned commercial obstructions, there is a debt that has been created that is substantially increasing with each day of non-compensation that is owed and over-due to Indigenous People.

In honour of our ancestors, the opportunity for dialogue to work towards remedy has presented itself. On behalf of Indigenous People, this Tribunal serves as Creditor and Representative to receive all remedies entitled for distribution and required for the necessary healing process never received, as a result of the manifest violation of treaty, due to continuous ignored demands of justice, and refusal to cure and compensate through continuous displays of hostilities upon the Indigenous. Wee remain in honour. DONE.................
*End of Bonded Note backed by Indigenous Specie.*

---

[1] Art. 9 For the benefit and comfort of the [Indigenous] and for the prevention of injuries or oppressions on the part of the citizens or [indigenous the United States in Congress assembled shall have the sole and exclusive right of regulating the trade with the [indigenous] and managing all their affairs in such manners as they think proper. *Art. 9 Hopewell On the KeoWee Definitive Treaty.*

....................................*Non-Transferrable Bond of Guale Yamassee Nation*....................................
Copyright©2019
All International and National Rights Reserved

 

A communication from

# The Chair of Saint Peter
Keeper of the Extraordinary Seal of Saint Peter

## Letters Patent ex cathedra
* EMERGENCE *

By the Grace of the One Divine Spirit, to all to whom these Presents shall come, Greeting:

With the cooperative assistance of the Vatican and the Chair of Saint Peter rehabilitation of the paupers has taken a giant step forward setting the world on a bold new course. The entire world has been granted absolution and released from Bankruptcy, the Divine Spirit Incarnate returned to solvency!

On July 1, 2013, as the Divine Spirit is awakening from the illusion of want and lack to realize a world of abundance and prosperity for the co-creation of heaven on earth for all living beings the global absolution and remission of sins gave rise to global debt forgiveness, settlement of all claims and accounts for the emergence from bankruptcy returning the Divine Estate to value and substance.

All liens, claims and attachments on the 'pledged' property of the Divine Estate by the legal fiction creations of the world of commerce have been satisfied and released to facilitate the return of the Divine Estate to original jurisdiction for the best and highest of the All.

Now is the time to forge forward with the habilitation of the people to facilitate the realization of their divineness and the return of the property for their divine right of use as we assist them in Be-coming good stewards while creating a world free from homelessness. Education of the people and the legal fiction corporations/governments is the answer to a smooth, timely and efficient transition.

All Deeds, Titles and/or Certificates issued against the property of the divine estate and held by the legal fiction entities to secure their lien right have been released and shall be immediately surrendered upon tender of a claim as it has been determined that alien ownership and control of the property is adversely affecting the divine estate and the living beneficiaries thereof.

Claims on the property shall be issued and recorded by the Chair of Saint Peter as a "Notice of Escheat" charging the release and return of the property to the Chair of Saint Peter for immediate possession for use by the living beneficiary by special grant. Upon "Notice of Escheat" and return of the 'Certificate/Deed/Title the church, under pains of excommunication, shall immediately surrender the property, and any/all control over said property, and adjust their records to reflect the seizure and return of the property to the possession and control of the Chair of Saint Peter.

The Office of the Chair of Saint Peter shall provide appropriate documentation and clearly mark property as under the jurisdiction of the 'Chair of Saint Peter' and NOT under the jurisdiction of the world of commerce.

The church, under pains of excommunication, shall take a spirited roll in the education of the people and the legal fiction entities of the world of commerce. The church shall work to ensure the freedom from the unlawful restrictions on the liberties of the Divine Spirit Incarnate, freedom from the fraudulent prosecution of claims already settled and facilitate the continued habilitation of the people to a state of grace, abundance and prosperity.

Being the perfectly imperfect Beings that we are a typo has escaped our detection and now must be set right. "Letters Patent Restoration of Peace" should read .... New technology "shall be used for the betterment of the whole and shall NOT be employed for military purposes."

In witness whereof We have caused these Our Letters to be made Patent, and for the greater testimony and validity thereof, We have caused Our Great Seal of Peter to be affixed to these presents, which We have signed with Our Royal Hand.

Given the 18th day of July in the Year of Our Lord

BY HIS COMMAND





*Original*

Certified True Copy

MIN #: 100159969203365484

Notary Public

## NOTE

9-30-02
[Date]

Vienna
[City]

Virginia
[State]

5981 Callie Furnace Court, Manassas, VA  20112
[Property Address]

**1. BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $ 371,400.00          (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is  Branch Banking and Trust Company

I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled
to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate
of          6.250 %.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of
this Note.

**3. PAYMENTS**
(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the   1st      day of each month beginning on  November 1, 2002     . I will
make these payments every month until I have  paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before
Principal. If, on   October 1, 2032          . I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."
I will make my monthly payments at  223 West Nash Street, Wilson, NC  27893
or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments
My monthly payment will be in the amount of U.S. $ 2,286.77

**4. BORROWER'S RIGHT TO PREPAY**
I have  the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment
as a Prepayment if I have not made all the monthly payments due under the Note.
I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment
to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the
Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the
Note Holder agrees in writing to those changes.

DOC #:516751          APPL #:7000153391          LOAN #:6920336548
VIRGINIA FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-6N(VA) (0003)          Form 3247 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3          Initials: ABC DBC

This Presentment is "Accepted for Value" front and back,
And is Returned for Settlement and Closure of the Escrow.
I do not consent to the conditions of your contract.
By                      agent UCC 3-403 (b)(1)
Dated: 12-3-2013



**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    Fifteen       calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be                5.000    % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor and waive the benefit of the homestead exemption as to the Property described in the Security Instrument (as defined below). "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

Form 3247 1/01

Initials: _ABCBBC_

This Presentment is "Accepted for Value" front and back, And is Returned for Settlement and Closure of the Escrow. I do not consent to the conditions of your contract. By: _____ agent UCC 3-403 (b)(1) Dated: 12-3-2013



**10. UNIFORM SECURED NOTE**

    This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)   _____ (Seal)
Akua Gyimah Chin         -Borrower    Benedic B. Chin        -Borrower

_____ (Seal)   _____ (Seal)
                 -Borrower                     -Borrower

_____ (Seal)   _____ (Seal)
                 -Borrower                     -Borrower

_____ (Seal)   _____ (Seal)
                 -Borrower                     -Borrower

*[Sign Original Only]*

    This is to certify that this is the Note described in and secured by a Deed of Trust dated 9/30/02 on the Property located in  Prince William    Virginia.

My Commission Expires: 9-30-03

                                      Amy B. Headlee
                                      Notary Public

DOC #:516753          APPL #:7000153391           LOAN #:6920336548         Form 3247 1/01

  -5N(VA) (0005)                       Page 3 of 3

(Notary seal: AMY B. HUSE / COMMONWEALTH OF VIRGINIA / NOTARY PUBLIC)

**I WAS COMMISSIONED**
**AS AMY B. HUSE**

This Presentment is "Accepted for Value" front and back,
And is Returned for Settlement And Closure of the Escrow.
I do not consent to the conditions of your contract.
By: _____ agent UCC 3-403 (b)(1)
Dated: 12-3-2013

28

Instr:200210010120646, Pg: 1 OF 19
Prince William County, VA
10/01/2002 2:25.05PM
David C. Mabie, Clerk

Return To:

Prepared By:

Tax Map Reference #:

RPC/Parcel ID #:

———————————— [Space Above This Line For Recording Data] ————————————

# DEED OF TRUST

MIN 100159969203365484

The following information, as further defined below, is provided in accordance with Virginia law:

This Deed of Trust is given by   Akua Gyimah Chin, Benedic B. Chin

Borrower (trustor), to David F. Skaff, 1308 Devil's Reach Rd., Suite 200, Woodbridge, VA 22192 and Carol F. Ordess, 2809 Emerywood Parkway, Richmond, VA 23385 , as

Trustee, for the benefit of Mortgage Electronic Registration Systems, Inc. as beneficiary. , as

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

DOC  #:524871                         APPL #:7000153391              LOAN #:6920336548
VIRGINIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3047 1/01
(logo) -6A(VA) (0102)    UR50 0107.05        Initials: AC BBC
Page 1 of 16
VMP MORTGAGE FORMS - (800)521-7291

This Presentment is "Accepted for Value" front and back, And is Returned for Settlement and Closure of the Escrow. I do not consent to the conditions of your contract. By _____ agent UCC 3-403 (b)(1) Dated: 12-3-2013



Instr#:20321001G120646
Page: 2 OF 19

(A) "Security Instrument" means this document, which is dated together with all Riders to this document.

(B) "Borrower" is Akua Gyimah Chin, Benedic B. Chin

Borrower is the trustor under this Security Instrument.

(C) "Lender" is Branch Banking and Trust Company

Lender is a Corporation
organized and existing under the laws of North Carolina
Lender's address is 223 West Nash Street, Wilson, NC 27893

(D) "Trustee" is David F. Skaff

Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered corporation whose principal office is located in Virginia. Trustee's address is 1308 Devil's Reach Rd., Suite 200, Woodbridge, VA 22192
"Trustee" is Carol F. Ordess

Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered corporation whose principal office is located in Virginia. Trustee's address is 2809 Emerywood Parkway, Richmond, VA 23285

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated as of the date hereof
The Note states that Borrower owes Lender Three Hundred Seventy One Thousand Four Hundred and No/100 Dollars
(U.S. $ 371,400.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than October 1, 2032 . The interest rate stated in the Note is Six and One Quarter
percent ( 6.250 %).
If this Security Instrument is an adjustable rate mortgage loan, this initial rate is subject to change in accordance with the attached Adjustable Rate Rider.

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

DOC #:524872          APPL #:7000153391          LOAN #:6920336540
VMP-6A(VA) (0102)          Page 2 of 18          Initials: AGC BBC          Form 3047 1/01

This Presentment is "Accepted For Value" front and back,
And is Returned for Settlement and Closure of the Escrow.
I do not consent to the conditions of your contract.
(By: _____ agent UCC 3-403 (b)(1)
Dated: 11-3-2013



(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [ ] Adjustable Rate Rider
- [ ] Balloon Rider
- [ ] VA Rider
- [ ] Condominium Rider
- [X] Planned Unit Development Rider
- [ ] Biweekly Payment Rider
- [ ] Second Home Rider
- [ ] 1-4 Family Rider
- [ ] Other(s) [specify]

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

DOC #:524873    APPL #:7000153391    LOAN #:6920336540

-6A(VA) (0103)    Page 3 of 18    Form 3047 1/01

This Presentment is "Accepted for Value" front and back, And is Returned for Settlement and Closure of the Escrow. I do not consent to the conditions of your contract. By _____ agent UCC 3-403 (b)(1) Dated: 12-5-2003



Instr:200210910126545
Page: 4 OF 19

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the   County                          [Type of Recording Jurisdiction]
of Prince William                               [Name of Recording Jurisdiction]:

See Schedule "A" Attached

which currently has the address of
5981 Callie Furnace Court                                                            [Street]
Manassas                                    [City/County], Virginia  20112            [Zip Code]
("Property Address"):

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

   THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

   UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
   1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

DOC #:524874          APPL #:7000153391          Initials: AGC BSC    LOAN #:6920336548

-6A(VA) (0102)          Page 4 of 15          Form 3047  1/01

This Presentment is "Accepted for Value" front and back,
And is Returned for Settlement and Closure of the Escrow.
I do not consent to the conditions of your contract.
By: _____ agent UCC 3-403 (b)(I)
Dated: 4-3-2013

Dated: 12-2-2015

By: _____ agent UCC 3-403 (b)(1)
( I do not consent to these violations of your contract.

This Presentment is "Accepted for Value", front and back,
And is Returned for Settlement and Closure of the Escrow.

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such

Inst #: 200210010126648
Page: 6 OF 19

amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the

This Presentment is "Accepted for Value" front and back,
And is Returned for Settlement and Closure of the Escrow.
I do not consent to the conditions of your contract.
By: agent UCC 3-403 (b)(1)
Dated: 12-3-2013



payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in

DOC #:524077                    APPL #:7000153391                           LOAN #:6920036548

-6A(VA) (0102)                         Page 7 of 15                          Form 3047 1/01

This Presentment is "Accepted for Value" front and back, And is Returned for Settlement and Closure of the Escrow.
I do not consent to the conditions of your contract.
By: _____ agent UCC 3-403 (b)(1)
Dated: 12-3-2013



connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was

DOC  #:524878                    APPL #:7000153391              Initials: _____    LOAN #:6920336540

___-6A(VA) (0102)                                  Page 8 of 18                              Form 3047  7/01

This Presentment is "Accepted for Value" front and back,
And is Returned for Settlement and Closure of the Escrow.
I do not consent to the conditions of your contract.
By: _____ agent UCC 3-403 (b)(1)
Dated: 12-3-2013



Instr:20021001012054B
Page: 9 OF 19

required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

DOC #:524079          APPL #:7000153391                          LOAN #:6920336540
                                                      Initials: ____
-6A(VA) (0102)                     Page 9 of 15                   Form 3047 1/01

This Presentment is "Accepted for Value" front and back,
And is Returned for Settlement and Closure of the Escrow.
I do not consent to the conditions of your contract.
By: _____ agent UCC 3-403 (b)(1)
Dated: 12-3-2013

This Presentment is "Accepted for Value" front and back,
And is Returned for Settlement and Closure of the Escrow.
I do not consent to the publication of your contract.
By: [signature] agent UCC 3-403 (b)(1)
Dated: 12-5-202_

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

Dated: 11-5-2013
By: _____
agent UCC 3-403 (b)(1)
I do not consent to the conditions of your contract.
And is Returned for Settlement and Closure of the Escrow.
This Presentment is "Accepted for Value" front and back,

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this

DOC #:152499l          APPL #:703033333l          VMP®-6A(VA) (0310)          Page 11 of 15          Form 3047 1/01



Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

DOC  #:524882              APPL #:7000153391                        LOAN #:6920336540

-6A(VA) (0102)              Page 12 of 15              Initials: _____     Form 3047  1/01

This Presentment is "Accepted for Value" front and back,
And is Returned for Settlement and Closure of the Escrow.
I do not consent to the conditions of your contract.
By: _____ agent UCC 3-403 (b)(1)
Dated: 12-3-2013



Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

DOC  9:524883                APPL #:7000153391                LOAN #:6920336540
(UD)-6A(VA) (0102)                              Page 13 of 18                    Form 3047  1/01

This Presentment is "Accepted for Value" front and back,
And is Returned for Settlement and Closure of the Escrow.
I do not consent to the conditions of your contract.
By: _____ agent UCC 3-403 (b)(1)
Dated: 12-3-2013

# CERTIFICATION REGARDING CORRESPONDENT ACCOUNTS
# FOR FOREIGN BANKS

The information contained in this Certification is given pursuant to Sections 5318(j) and 5318(k) of Title 31 of the United States Code, as added by sections 313 and 319(b) of the USA PATRIOT Act of 2001 (Public Law 107-56).

The undersigned financial institution, *Branch Banking and Trust Company on behalf of its foreign branch*, ( the "**Foreign Bank**") hereby certifies as follows:

## A. Correspondent Accounts Covered by this Certification

This Certification applies to all correspondent accounts established for the Foreign Bank by Covered Financial Institutions.

## B. Physical Presence/Regulated Affiliate Status

The Foreign Bank maintains a physical presence in the Cayman Islands. This means that the Foreign Bank:

- Has a business address of, Branch Banking and Trust Company, c/o Intertrust Bank, 190 Elgin Avenue, Grand Cayman KY1-9005, Cayman Islands where it employs one or more individuals on a full-time basis and maintains operating records related to its banking activities.
- Is authorized to conduct banking activities in the country where its place of business is located.
- Is subject to inspection by the Cayman Islands Monetary Authority, the FDIC and the NC Commissioner of Banks that licensed the particular Foreign Bank to conduct banking activities.

## C. Indirect Use of Correspondent Accounts

No Correspondent Account maintained by a Covered Financial Institution may be used to indirectly provide banking services to certain foreign banks. Foreign Bank hereby certifies that it does not use any Correspondent Account with a Covered Financial Institution to indirectly provide banking services to any foreign bank that does not maintain a physical presence in any country and that is not a regulated affiliate.

## D. Ownership Information

The Foreign Bank is wholly owned by BB&T Corporation whose shares are publicly traded. Publicly traded means that the shares are traded on an exchange or an organized over-the-counter market that is regulated by a foreign securities authority as defined in section 3(a)(50) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(50)).

**E. Process Agent**

CT Corporation is a resident of the United States at the following street address: 225 Hillsborough Street, Raleigh, NC 27603, and is authorized to accept service of legal process on behalf of the Foreign Bank from the Secretary of the Treasury or the Attorney General of the United States pursuant to Section 5318(k) of title 31, United States Code.

**F. General**

The Foreign Bank hereby agrees to notify in writing each Covered Financial Institution at which it maintains any Correspondent Account of any change in facts or circumstances reported in this Certification. Notification shall be given within 30 calendar days of such change. The Foreign Bank will make such notification by publication on the BBandT.com website. Any Covered Financial Institution using this certification should check the BBT.com web site periodically to obtain updated certified information. Foreign Bank does not undertake to otherwise give notice to any Covered Financial Institution of any change in the Foreign Bank's certification.

The Foreign Bank understands that each Covered Financial Institution at which it maintains a Correspondent Account may provide a copy of this Certification to the Secretary of the Treasury and the Attorney General of the United States. The Foreign Bank further understands that the statements contained in this Certification may be transmitted to one or more departments or agencies of the United States of America for the purpose of fulfilling such departments' and agencies' governmental functions.

I, Ranea P. Sanders, certify that I have read and understand this Certification, that the statements made in this Certification are complete and correct, and that I am authorized to execute this Certification on behalf of the Foreign Bank.

Executed on this ___19th___ day of ___November___ 2013.

*Ranea P. Sanders*

Ranea P. Sanders, Senior Vice President
BSA/AML Group Operations Manager
Branch Banking and Trust Company

Received and reviewed by:
Name: _____
Title: _____
For: _____
    [*Name of Covered Financial Institution*]
Date: _____

MIN: 1002711-0000014787-4

Loan Number: W265949MA

# InterestOnly ADJUSTABLE RATE NOTE
### (Six-Month LIBOR Index (As Published in *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

JULY 15, 2005
[Date]

Holden
[City]

Massachusetts
[State]

50 LOVELL ROAD, HOLDEN , MASSACHUSETTS 01520
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**
   In return for a loan that I have received. I promise to pay U.S. $ 248,000.00    (this amount is called "Principal"), plus interest, to the order of Lender. Lender is HOMEBRIDGE MORTGAGE CORP, A NEW YORK CORPORATION
I will make all payments under this Note in the form of cash, check or money order.
   I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
   Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   6.200 %. The interest rate I will pay may change in accordance with Section 4 of this Note.
   The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**
   **(A) Time and Place of Payments**
   I will make a payment on the       1st       day of every month, beginning on SEPTEMBER 1, 2005    .
Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.
   I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on AUGUST 1, 2035       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
   I will make my monthly payments at 60 OAK DRIVE, SYOSSET, NEW YORK 11704

or at a different place if required by the Note Holder.
   **(B) Amount of My Initial Monthly Payments**
   My initial monthly payment will be in the amount of U.S. $1,281.33       before the First Principal and Interest Payment Due Date, thereafter it will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.
   **(C) Monthly Payment Changes**
   Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
   The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of AUGUST,   1  , 2008 , and the adjustable interest rate I will pay may change on that day every sixth month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

CONV
● UC-ARM InterestOnly Note
FE-4278 (0410)

Page 1 of 3

Initials: _____

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX AND 200/1000 percentage points ( 6.200 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125 %). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.200 % or less than 6.200 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 000/1000 percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 12.200 % or less than 6.200 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after AUGUST 1, 2008 .

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A prepayment of all the unpaid principal is known as a "Full prepayment." A prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

If I make a Partial Prepayment equal to one or more of my monthly payments, my due date may be advanced no more than one month. If I make any other Partial Prepayment, I must still make each later payment as it becomes due and in the same amount. I may make a Full or a Partial Prepayment at any time.

[X] If this box is checked, no prepayment penalty will be charged on this loan.
[ ] If this box is checked, I have selected a loan which has a prepayment penalty. The Prepayment Penalty Addendum attached hereto and made a part hereof defines the terms of the prepayment penalty. I understand that by agreeing to pay a prepayment penalty I acknowledge that my interest rate and/or fees are lower than they would be without a prepayment penalty.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 3.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) **Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8. **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9. **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10. **WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. **SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Witness To Both;

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
HAROLD L. HARRIS IV -Borrower

_____ (Seal)
SHAUNA HARRIS -Borrower

PAY TO THE ORDER OF
Countrywide Document Custody Services, A Division of Treasury Bank,

WITHOUT RECOURSE
HOMEBRIDGE MORTGAGE CORP.

BY _____ (Seal)
FRANK McBRIEN, TREASURER -Borrower

_____ (Seal)
-Borrower

PAY TO THE ORDER OF                    PAY TO THE ORDER OF

COUNTRYWIDE HOME LOANS INC.

WITHOUT RECOURSE                    WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC. (Sign Original Only)

COUNTRYWIDE DOCUMENT CUSTODY SERVICES,
A DIVISION OF TREASURY BANK, NA

BY _____          BY _____
LAURIE MEDER                        David A. Spector
VICE PRESIDENT        Page 3 of 3    Managing Director

CONV
● SC-ARM Interest Only Note
FE-4278 (0410)

 

HOMEBRIDGE MORTGAGE BANKERS

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when [ ] the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or [ ] the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| | | | |
|---|---|---|---|
| Mortgage Applied for: [ ] VA [ ] FHA [X] Conventional [ ] USDA/Rural Housing Service [ ] Other: | Agency Case Number | Lender Case Number W285949MA | |
| Amount $ 248000.00 | Interest Rate 6.200 % | No. of Months 360 | Amortization Type: [ ] Fixed Rate [ ] GPM [ ] Other (explain): [X] ARM (type): S36316-I 3/6 LIBOR ARM INTEREST ( |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| | |
|---|---|
| Subject Property Address (street, city, state & ZIP): 50 LOVELL RD, HOLDEN, WORCESTER MA 01520 | No. of Units: 1 |
| Legal Description of Subject Property (attach description if necessary): SECTION-BLOCK-LOT: | Year Built: 1948 |
| Purpose of Loan: [ ] Purchase [ ] Construction [ ] Other (explain): [X] Refinance [ ] Construction-Permanent | Property will be: [X] Primary Residence [ ] Secondary Residence [ ] Investment |

*Complete this line if construction or construction-permanent loan.*

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

*Complete this line if this is a refinance loan.*

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements [ ] made [ ] to be made |
|---|---|---|---|---|
| 2004 | $ 271000.00 | $ 269470.00 | 11 Cash-Out/Debt Conso | Cost: $ |

| | | |
|---|---|---|
| Title will be held in what Name(s): HAROLD HARRIS & SHAUNA HARRIS | Manner in which Title will be held: JOINTLY | Estate will be held in: [ ] Fee Simple [ ] Leasehold (show expiration date) |
| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) | | |

## III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Borrower's Name (include Jr. or Sr. if applicable): HAROLD HARRIS | Co-Borrower's Name (include Jr. or Sr. if applicable): SHAUNA HARRIS |
| Social Security Number: 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; Home Phone (incl. area code): 508-829-3499; DOB (MM/DD/YYYY): 02/06/1965; Yrs. School: | Social Security Number: 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; Home Phone (incl. area code): 508-829-3499; DOB (MM/DD/YYYY): 08/05/1975; Yrs. School: |
| [X] Married [ ] Unmarried (include single, divorced, widowed) [ ] Separated; Dependents (not listed by Co-Borrower) no. 0 ages | [X] Married [ ] Unmarried (include single, divorced, widowed) [ ] Separated; Dependents (not listed by Borrower) no. 0 ages |
| Present Address (street, city, state, ZIP) [ ] Own [X] Rent No. Yrs. 31: 50 LOVELL RD HOLDEN, MA 01520 | Present Address (street, city, state, ZIP) [X] Own [ ] Rent No. Yrs. 31: 50 LOVELL RD HOLDEN, MA 01520 |
| Mailing Address, if different from Present Address: 50 LOVELL RD Holden, MA 01520 | Mailing Address, if different from Present Address: 50 LOVELL RD Holden, MA 01520 |

*If residing at present address for less than two years, complete the following:*

| Borrower | Co-Borrower |
|---|---|
| Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs. | Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs. |

## IV. EMPLOYMENT INFORMATION

| Borrower | | Co-Borrower | |
|---|---|---|---|
| Name & Address of Employer [ ] Self Employed: JOS A. BANKS 500 HANOVER PIKE HOLDEN, MA 01520 | Yrs. on this job: 0Y5M; Yrs. employed in this line of work/profession: 5 | Name & Address of Employer [ ] Self Employed: BJ'S WHOLESALE 2088 Bay St TAUNTON, MA 02780 | Yrs. on this job: 2Y11M; Yrs. employed in this line of work/profession: 5 |
| Position/Title/Type of Business: STORE MANAGER | Business Phone (incl. area code): 508-651-1702 | Position/Title/Type of Business: PAYROLL ASSISTANT | Business Phone (incl. area code): 508-651-6905 |

*If employed in current position for less than two years or if currently employed in more than one position, complete the following:*

| Borrower | | Co-Borrower | |
|---|---|---|---|
| Name & Address of Employer [ ] Self Employed: TARGET STORES PAYROLL DEPT 330 TURNPIKE RD WESTBOROUGH, MA 01581 | Dates (from - to): 03/02-10/04; Monthly Income: $ | Name & Address of Employer [ ] Self Employed | Dates (from - to): -; Monthly Income: $ |
| Position/Title/Type of Business: MANAGER | Business Phone (incl. area code): 508-366-1426 | Position/Title/Type of Business | Business Phone (incl. area code) |
| Name & Address of Employer [ ] Self Employed | Dates (from - to): -; Monthly Income: $ | Name & Address of Employer [ ] Self Employed | Dates (from - to): -; Monthly Income: $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

## HOMEBRIDGE MORTGAGE BANKERS

### V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income * | $ 3750.00 | $ 2739.00 | $ 6489.00 | Rent | $ | |
| Overtime | | | | First Mortgage (P&I) | 1553.19 | 1281.33 |
| Bonuses | | | | Other Financing (P&I) | | 623.17 |
| Commissions | | | | Hazard Insurance | 56.42 | 56.42 |
| Dividends/Interest | | | | Real Estate Taxes | 213.68 | 222.82 |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other | | |
| Total | $ 3750.00 | $ 2739.00 | $ 6489.00 | Total | 1823.29 | 2183.74 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income   Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

### VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.    Completed ☐ Jointly ☑   Not Jointly ☐

| ASSETS | | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|---|
| Description | | | | | |
| Cash deposit toward purchase held by: | | $ | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
| | | | Name and address of Company | $ Payment/Months | $ |
| List checking and savings accounts below | | | WELLS FARGO | | |
| Name and address of Bank, S&L, or Credit Union | | | | 70.00 | 14941.00 |
| | | | | 213 | |
| | | | Acct. no.   6514759 | | |
| Acct. no. | | $ | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | CHASE | | |
| | | | | *259.00 | *6769.00 |
| | | | | 26 | |
| | | | Acct. no.   10228017691509 | | |
| Acct. no. | | $ | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | SOVEREIGN BK | | |
| | | | | 234.00 | 5921.00 |
| | | | | 25 | |
| | | | Acct. no.   3174037657620271 | | |
| Acct. no. | | $ | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | DMCCB | | |
| | | | | *73.00 | *2897.00 |
| | | | | 40 | |
| | | | Acct. no.   645860057609 | | |
| Acct. no. | | $ | Name and address of Company | $ Payment/Months | $ |
| Stocks & Bonds (Company name/number & description) | | $ | SALLIE MAE 3RD PTY LSC | | |
| | | | | 25.00 | 2625.00 |
| | | | | 105 | |
| | | | Acct. no.   10585692101F | | |
| | | | Name and address of Company | $ Payment/Months | $ |
| | | | SALLIE MAE 3RD PTY LSC | | |
| Life insurance net cash value | | $ | | 24.00 | 2520.00 |
| Face amount: $ | | | | 105 | |
| Subtotal Liquid Assets | | $ | Acct. no.   10585692102F | | |
| Real estate owned (enter market value from schedule of real estate owned) | | 311100.00 | Name and address of Company | $ Payment/Months | $ |
| | | | See Sch Of Liabilities | | |
| Vested interest in retirement fund | | $ | | 2613.19 | 294076.76 |
| Net worth of business(es) owned (attach financial statement) | | $ | Acct. no. | | |
| Automobiles owned (make and year) | | $ | Alimony/Child Support/Separate Maintenance Payments Owed to | $ | |
| Other Assets (itemize) | | $ | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | | Total Monthly Payments | $ 3298.19 | |
| Total Assets a. | $ | 311100.00 | Net Worth (a minus b) | $ -18648.76 | Total Liabilities b. | $ 329748.76 |

HARRIS

 

## HOMEBRIDGE MORTGAGE BANKERS

### VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 50 LOVELL RD | SFR | $ 311100.00 | $ *277172.76 | $ | $ *2162.16 | $ 270.10 | $ |
| | | | | | | | |
| **Totals** | | $ 311100.00 | $ 277172.76 | $ | $ 2152.16 | $ 270.10 | $ |

**List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):**

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

| VII. DETAILS OF TRANSACTION | | VIII. DECLARATIONS | | | | |
|---|---|---|---|---|---|---|
| a. Purchase price | $ | If you answer "Yes" to any questions a through i, please use continuation sheet for explanation. | | Borrower | | Co-Borrower |
| | | | | Yes | No | Yes | No |
| b. Alterations, improvements, repairs | | a. Are there any outstanding judgments against you? | | ☐ | ☒ | ☐ | ☒ |
| c. Land (if acquired separately) | | b. Have you been declared bankrupt within the past 7 years? | | ☐ | ☒ | ☐ | ☒ |
| d. Refinance (incl. debts to be paid off) | 298045.76 | c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | ☐ | ☒ | ☐ | ☒ |
| e. Estimated prepaid items | 1159.15 | d. Are you a party to a lawsuit? | | ☐ | ☒ | ☐ | ☒ |
| f. Estimated closing costs | 6333.20 | e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such items as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | ☐ | ☒ | ☐ | ☒ |
| g. PMI, MIP, Funding Fee | | | | | | | |
| h. Discount (if Borrower will pay) 0.500 | 1240.00 | | | | | | |
| i. **Total costs (add items a through h)** | 306818.11 | f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | ☐ | ☒ | ☐ | ☒ |
| j. Subordinate financing | 62000.00 | g. Are you obligated to pay alimony, child support, or separate maintenance? | | ☐ | ☒ | ☐ | ☒ |
| k. Borrower's closing costs paid by Seller | | h. Is any part of the down payment borrowed? | | ☐ | ☒ | ☐ | ☒ |
| l. Other Credits (explain) | | i. Are you a co-maker or endorser on a note? | | ☐ | ☒ | ☐ | ☒ |
| | | j. Are you a U.S. citizen? | | ☒ | ☐ | ☒ | ☐ |
| | | k. Are you a permanent resident alien? | | ☐ | ☒ | ☐ | ☒ |
| | | l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | | ☒ | ☐ | ☐ | ☐ |
| m. Loan amount | 248000.00 | m. Have you had an ownership interest in a property in the last three years? | | ☒ | ☐ | ☒ | ☐ |
| (exclude PMI, MIP, Funding Fee financed) | | (1) What type of property did you own — principal residence (PR), second home (SH), or investment property (IP)? | | PR | | PR | |
| n. PMI, MIP, Funding Fee financed | | | | | | | |
| o. Loan amount (add m & n) | 248000.00 | (2) How did you hold title to the home — solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | SP | | SP | |
| p. Cash from / to Borrower (subtract j, k, l & o from i) | -3181.89 | | | | | | |

### IX. ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its successors or assigns may retain the original and/or electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X *Harold L. Harris* | 7/15/05 | *Shauna Harris* | 7/15/05 |

### X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information. | CO-BORROWER | ☐ I do not wish to furnish this information. |
|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino  ☒ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino  ☒ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native  ☐ Asian  ☐ Black or African American  ☐ Native Hawaiian or Other Pacific Islander  ☒ White | Race: | ☐ American Indian or Alaska Native  ☐ Asian  ☐ Black or African American  ☐ Native Hawaiian or Other Pacific Islander  ☒ White |
| Sex: | ☐ Female  ☒ Male | Sex: | ☒ Female  ☐ Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) | Name and Address of Interviewer's Employer |
|---|---|---|
| This application was taken by: | *Jason Ferrante* | HOMEBRIDGE MORTGAGE BANKERS |
| ☐ Face-to-face interview | Interviewer's Signature                Date | 60 OAK DRIVE |
| ☐ Mail | *(signature)*               7/15/05 | SYOSSET, NY 11791 |
| ☒ Telephone | Interviewer's Phone Number (incl. area code) | |
| ☐ Internet | (516) 998-4200 | |

Page 3 of 4

Printed by The Loan Handler from Ellie Mae, Inc. • www.elliemae.com

Fannie Mae Form 1003 01/04

 

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower HAROLD HARRIS | Agency Case Number |
|---|---|---|
| | Co-Borrower SHAUNA HARRIS | Lender Case Number W265949MA |

### LIABILITIES ADDENDUM

| Creditor's Name Address/City/State/Zipcode | Account Number | Payment | Months Left To Pay | Balance |
|---|---|---|---|---|
| CARECDT/GEMB | 6019180337287078 | *61.00 | 33 | *2040.00 |
| SM SERVICING | 529732676101F | 50.00 | 32 | 1600.00 |
| DELL FINANCIAL SVCS/CI | 7945012902658699 | *34.00 | 32 | *1102.00 |
| HSBC NV | 330008906356 | 47.00 | 20 | 942.00 |
| HSBC NV | 975001047342 | 21.00 | 35 | 730.00 |
| CBUSASEARS | 35940403 | 33.00 | 20 | 674.00 |
| HSBC NV | 010018026449 | 15.00 | 38 | 563.00 |
| TNB-TARGET | 928730117690 | 25.00 | 10 | 246.00 |
| LANE BRYANT | 163268937360972 | 10.00 | 17 | 171.00 |
| HFC - USA | 4200103921 | *141.00 | 57 | *8066.00 |
| FST PREMIER | 4610078705979144 | 24.00 | 32 | 770.00 |
| *R.E. Loan: ACCREDITED HOME LENDER | 406189437 | *1553.19 | 0 | *220083.87 |
| *R.E. Loan: MORTGAGE LENDERS NETWORK, U | 9000056457 | *599.00 | 0 | *57088.89 |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X _Harold H. Harris IV_ | 7/15/05 | _Shauna Harris_ | 7/15/05 |

Freddie Mac Form 65  1003.7/04  01/04         Page 4 of 4         Fannie Mae Form 1003  01/04

Printed by The Loan Handler from Ellie Mae, Inc. - www.elliemae.com

 

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower HAROLD HARRIS | Agency Case Number |
|---|---|---|
| | Co-Borrower SHAUNA HARRIS | Lender Case Number W265949MA |

### LIABILITIES ADDENDUM

| Creditor's Name Address/City/State/Zipcode | Account Number | Payment | Months Left To Pay | Balance |
|---|---|---|---|---|
| | | | | |
| TOTAL: | | 2613.19 | | 294076.76 |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

Borrower's Signature
X _Harold Y. Harris_ IV  7/15/05    Co-Borrower's Signature _Shauna Harris_ 7/15/05

 

# CONTINUATION SHEET/RESIDENTIAL LOAN APPLICATION

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>HAROLD L. HARRIS IV | Agency Case Number: |
|---|---|---|
| | Co-Borrower:<br>SHAUNA HARRIS | Lender Case Number:<br>W265949MA |

Under Massachusetts statute, Mass GEN L Ch 184, Section 17B you, the Borrower, are entitled to know the following:

1. The responsibility of the attorney for the Lender is to protect the interest of the Lender.

2. You, the Borrower, may at your own expense, engage an attorney of your own selection to represent your interests in this transaction.

The approximate expiration date of the Note is  AUGUST 1, 2035

The rate of interest charged is    6.200 %.

Please be aware that as of the expiration date of the Note, we, the Lender, may demand payment of said Note, may rewrite the Note by agreement at a greater or lesser rate of interest, or may, by agreement, allow payments to be made on said Note at the same, or a lesser or greater rate of interest.

| I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq. | | | |
|---|---|---|---|
| Borrower's Signature<br>x _Harold L. Harris IV_ | Date<br>7/15/05 | Co-Borrower's Signature<br>x _Shauna Harris_ | Date<br>7/15/05 |

10 3222734

Bk: 40344 Pg: 25

2006 00168787
Bk: 40344 Pg: 25   Doc: ABM
Page: 1 of 1  12/14/2006 02:41 PM

Doc ID# 000103222734MN35

## ASSIGNMENT OF MORTGAGE

Mortgage Electronic Registration Systems, Inc. acting solely as nominee for Homebridge Mortgage Corp

holder of a real estate mortgage

From: Harold L. Harris IV and Shauna Harris

To: Mortgage Electronic Registration Systems, Inc. acting solely as nominee for Homebridge Mortgage Corp

Dated:  July 15, 2005

Recorded with the Worcester County (Worcester District) Registry of Deeds in Book 36838 Page 275

property at:   50 Lovell Street, Holden, MA 01520

for value received and other good and valuable consideration paid assigns said mortgage and the note and claim secured thereby to:

Bank of New York as Trustee for the Certificateholders CWABS, Inc. Asset-Backed Certificates, Series 2005-AB4

whose address is 101 Barclay Street, New York, NY  10286

In witness whereof, the said Mortgage Electronic Registration Systems, Inc. acting solely as nominee for Homebridge Mortgage Corp, has caused its seal to be hereto affixed and these presents to be signed, acknowledged and delivered in its name and behalf by M. KELLY MICHIE, 1ST VICE PRESIDENT, its

1ST VICE PRESIDENT, hereto duly authorized, effective the ___ day of ____, 2006

Mortgage Electronic Registration Systems, Inc. acting solely as nominee for Homebridge Mortgage Corp

By: _____
Its    M. KELLY MICHIE, 1ST VICE PRESIDENT

STATE OF   **TEXAS**

COUNTY   **COLLIN**

Then personally appeared the above named    M. KELLY MICHIE, 1ST VICE PRESIDENT   of Mortgage Electronic Registration Systems, Inc. acting solely as nominee for Homebridge Mortgage Corp, and acknowledged the foregoing instrument to be his free act and deed in such capacity and the free act and deed of Mortgage Electronic Registration Systems, Inc. acting solely as nominee for Homebridge Mortgage Corp, before me

_____
Notary Public
My commission expires: May 5, 2010

SANDRA L RIVERS
My Commission Expires
May 5, 2010

**ATTEST: WORC. Anthony J. Vigliotti, Register**

610  103222734  D8  001  001

*W 265949MA*

*Harris*

*CW SUB*

*103222734*

After Recording Return To:
HOMEBRIDGE MORTGAGE CORP
60 OAK DRIVE
SYOSSET, NEW YORK 11704
Loan Number: W265949MA

WORCESTER DISTRICT
REGISTRY OF DEEDS
RECEIVED & RECORDED
INST# __0011663 7__
BK 36834 PG 275
TIME 10.23 AM
DATE 7.20.05
ANTHONY J. VIGLIOTTI, REGISTER

TIME STAMP

――――――――― [Space Above This Line For Recording D―

# MORTGAGE

MIN: 1002711-0000014787-4

610   103222734   D2   001   001

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "Security Instrument" means this document, which is dated JULY 15, 2005 , together with all Riders to this document.
(B)  "Borrower" is HAROLD L. HARRIS IV AND SHAUNA HARRIS

Borrower is the mortgagor under this Security Instrument.
(C)  "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D)  "Lender" is HOMEBRIDGE MORTGAGE CORP

Lender is a                                                                                          organized
and existing under the laws of NEW YORK
Lender's address is 60 OAK DRIVE, SYOSSET, NEW YORK 11704

(E)  "Note" means the promissory note signed by Borrower and dated JULY 15, 2005
The Note states that Borrower owes Lender TWO HUNDRED FORTY-EIGHT THOUSAND AND 00/100                                    Dollars (U.S. $ 248,000.00          ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than AUGUST 1, 2035
(F)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

Borrower Initials: *HLHIV SH*

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS  *DocMagic eForms* 800-849-1362
Form 3022 01/01                                    Page 1 of 13                                    www.docmagic.com

MA3022.mzm 1.tem

**(H)** "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | Exhibit "A" |

**(I)** "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** "Escrow Items" means those items that are described in Section 3.

**(M)** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

COUNTY of WORCESTER
[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

Borrower Initials: _____

Ms3022 mzm 2.tem

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".

which currently has the address of   50  LOVELL  ROAD

[Street]

HOLDEN                          , Massachusetts      01520        ("Property Address"):
[City]                                                [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim

Borrower Initials: _____  _____  _____  _____  _____

which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.**  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Borrower and Lender can agree

Borrower Initials:  HLH WSH

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS  *DocMagic eForms* 800-849-1362
Form 3022 01/01                                        Page 4 of 13                                      www.docmagic.com

Ms3022.mzm 4.tem

in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens.  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any

Borrower Initials: HLHIV SH

Ms3022.mzm 5 tem

form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Borrower Initials: HLHIV

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS   *DocMagic eForms* 800-649-1362
Form 3022 01/01                        Page 6 of 13                        *www.docmagic.com*

Ma3022 mzm 6 tzm

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying

Borrower Initials: _HLH IV_ _____ _____ _____ _____ _____

the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or

Borrower Initials:  HLH IV

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS   DocMagic ⑩Rms 800-849-1362
Form 3022 01/01                                        Page 8 of 13                                        www.docmagic.com

Ms3022.mzm 8.tem

rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law. ·

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.

Borrower Initials: _HLAIV_  _____  _____  _____  _____  _____  _____

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS   *DocMagic* *eFarms* 800-649-1362
Form 3022 01/01                                   Page 9 of 13                                      www.docmagic.com

Ma3022.mzm.9.tcn

If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter

Borrower Initials: HLHV ____ ____ ____ ____ ____

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS *DocMagic eForms* 800-649-1362
Form 3022 01/01                                       Page 10 of 13                                    www.docmagic.com

Ma3022.mzm 10 tem

the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be

Borrower Initials: HLHW ᓚᘏᗢ

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS  DocMagic *eForms* 800-649-1362
Form 3022 01/01                                    Page 11 of 13                                    www.docmagic.com

Ms3022.mzm.11.tem

entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
HAROLD L. HARRIS IV            -Borrower

_____ (Seal)
SHAUNA HARRIS                  -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

Witness:                       Witness:

_____      _____

Commonwealth of Massachusetts

County of  WORCESTER

On this   15th day of   July, 2005            , before me, the undersigned notary public,
personally appeared  HAROLD L. HARRIS IV, SHAUNA HARRIS

proved to me through satisfactory evidence of identification, which were   *M A D L*                    ,

to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (he) (she)
signed it voluntarily for its stated purpose.

☐ (as partner for
  a corporation)                                                                                      ,

☐ (as                                              for
                                                                          , a corporation)

☐ (as attorney in fact for
  the principal)                                                                                    ,

☐ (as                                              for
                                                                          , (a) (the)
                                              )

JOHN W. KYGER
Notary Public
Commonwealth of Massachusetts
My Commission Expires Jul 12, 2007

Notary Public

Notary Public (Printed Name)

(Seal)                        My commission expires: _____

*HLHIV*
*SH*

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS  *DocMagic eForms*  800-649-1362
Form 3022 01/01                        Page 13 of 13                            · www.docmagic.com

Ms3022.mzm.13.tem

Exhibit A

Property Address: 50 Lovell Road, Holden, Massachusetts 01520

The land with the buildings and improvements thereon on the southeasterly side of Lovell Road, Holden, Worcester County, Massachusetts, at a corner of the land now or formerly of Raddin and at the westerly corner of the premises;

Thence N. 33 degrees E. by Lovell Road seventy-three (73) feet to the land formerly of Fowler;

Thence S. 48 degrees by said Fowler land eighty-five (85) feet, more or less, to land formerly of Davis;

Thence S. 33 1/4 degrees W. by said Davis land seventy-three (73) feet to said Raddin land;

Thence N. 48 degrees W. by said Raddin land eighty-five (85) feet, more or less, to the place of beginning.

Excepted from the above premises is the portion thereof consisting of approximately four hundred forty-eight and five tenths (448.5) square feet conveyed by B.B. Wilbur to Herbert V. Lindsay Jr. and June M. Lindsay by a deed dated April 15, 1974, and recorded with the Worcester District Registry of Deeds in Book 5539, Page 187 (See Plan Book 399, Plan 108).

Being the same premises conveyed to the herein named mortgagor (s) by deed recorded with Worcester South Registry of Deeds in Book 34211, Page 294.

After Recording Return To: HOMEBRIDGE MORTGAGE CORP
60 OAK DRIVE
SYOSSET, NEW YORK 11704
Loan Number: W265949MA
MIN: 1002711-0000014787-4

Prepared By:

——————————————— [Space Above This Line For Recording Data] ———————————————

DOC ID #:

## InterestOnly ADJUSTABLE RATE RIDER

### (Six-Month LIBOR Index (As Published in The Wall Street Journal) - Rate Caps)

THIS InterestOnly ADJUSTABLE RATE RIDER is made this 15th day of JULY 2005 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to HOMEBRIDGE MORTGAGE CORP, A NEW YORK CORPORATION (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

50 LOVELL ROAD, HOLDEN , MASSACHUSETTS 01520
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

CONV
• BC-ARM Rider
FE-4279 (0410)                       Page 1 of 4

Initials

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of   6.200  %. The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay will change on the        1st          day of AUGUST, 2008  , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX AND 200/1000          percentage points (  6.200 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

CONV
● BC-ARM Rider
FE-4279 (0410)                         Page 2 of 4                         Initials:

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.200 % or less than 6.200 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 000/1000 percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 12.200 % or less than 6.200 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after AUGUST, 2008 .

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within

CONV
● BC-ARM Rider
FE-4279 (0410)                          Page 3 of 4                    Initials: _HLH_ IV

which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

_____ (Seal)
HAROLD L HARRIS IV                        - Borrower

_____ (Seal)
SHAUNA HARRIS                             - Borrower

_____ (Seal)
                                          - Borrower

_____ (Seal)
                                          - Borrower

CONV
• BC-ARM Rider
FE-4279 (0410)                 Page 4 of 4



MIN: 1000533253823576
V1 MERS MIN # 5031826576

# NOTE

| | | |
|---|---|---|
| APRIL 14, 2011 | Philadelphia, | PENNSYLVANIA |
| [Date] | [City] | [State] |

1361 N 66TH ST, PHILADELPHIA, PA 19143-3321
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.    $70,000.00    (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is    FLAGSTAR BANK, FSB, A FEDERALLY CHARTERED
SAVINGS BANK.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who
is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a
yearly rate of    5.250%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section
6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the    1ST    day of each month beginning on    JUNE 1, 2011.
I will make these payments every month until I have paid all of the principal and interest and any other charges described
below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be
applied to interest before Principal. If, on    MAY 1, 2041,    I still owe amounts under this Note, I will
pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
1151 COMMERCE DR
TROY, MI 48083-2639

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S.    $386.56.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known
as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate
a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will
use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply
my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to
reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in
the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest
or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any
such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any

*Initials:* _____

MULTISTATE FIXED RATE NOTE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200 1/01
© 1999-2007 Online Documents, Inc.    Page 1 of 3    F3200NT (CD)    04-13-2011 16:00

5031826576

ORIGINAL NOTE-1

V1 VBCD LOAN # 503182676

sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of        15       calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be       5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which

Initials: _____

503182676

ORIGINAL NOTE-1

VA USED LOAN # 503182676

Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

*May E. McCloud*

MAY E. MCCLOUD

PAY TO THE ORDER OF
WITHOUT RECOURSE
FLAGSTAR BANK, FSB

BY: *Melinda McNeal*
MELINDA McNEAL
VICE PRESIDENT

[Sign Original Only]

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
© 1999-2007 Online Documents, Inc.                Page 3  of  3           F3200NOT  0701
                                                                          06-13-2011 16:00

503182676

ORIGINAL NOTE-1

V1 WCED LOAN # 5031826716
MIN: 100252535307537605

# NOTE

| APRIL 16, 2011 | Philadelphia, | PENNSYLVANIA |
|---|---|---|
| [Date] | [City] | [State] |

1361 S 46TH ST, PHILADELPHIA, PA 19143-3527
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $70,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is STARFIRE BANK, FSB, A FEDERALLY CHARTERED SAVINGS BANK.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.250%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my payment on the 1st day of each month beginning on JUNE 1, 2011. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MAY 1, 2041, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 3121 CORPORATE DR
TROY, MI 48083-3639

or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments
My monthly payment will be in the amount of U.S. $386.54.

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any

Initials:

5031826716
ORIGINAL NOTE-1

06-13-2011 16:05

V1 VSCD LOAN # 503182676

sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of            15           calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which

Initials: _____

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200 1/01
© 1999-2007 Online Documents, Inc.                    Page 2  of 3                              FR200NOT  0701
                                                                                                04-13-2011  16:00

503182676

ORIGINAL NOTE-1

V1 VSCD LOAN # 503182676

Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

*May E. McClough* (1)

MAY E. MCCLOUD

PAY TO THE ORDER OF
WITHOUT RECOURSE
FLAGSTAR BANK, FSB

BY: *Melinda McNeal*

MELINDA McNEAL
VICE PRESIDENT

[Sign Original Only]

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
© 1999-2007 Online Documents, Inc.                Page 3  of 3                F3200NOT  0701
                                                                              04-13-2011 14:00

503182676

ORIGINAL NOTE-1

After Recording Return To:
FLAGSTAR BANK
5151 CORPORATE DRIVE
TROY, MI 48098
FINAL DOCUMENTS, MAIL STOP W-531-1

APN #: 272169800
APN #:

———————————— [Space Above This Line For Recording Data] ————————————

V1 WBCD LOAN # 503162676

# MORTGAGE

MIN: 100052550318267605

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  APRIL 14, 2011,
together with all Riders to this document.

(B) "Borrower" is  May E. McCloud  and  Vera L. Jones.

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has a mailing address of P.O. Box 2026, Flint, MI 48501-2026, and a street address of 1901 E. Voorhees Street, Suite C, Danville, IL 61834. The MERS telephone number is (888) 679-MERS.

(D) "Lender" is  FLAGSTAR BANK, FSB.

Initials:

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
OnLine Documents, Inc.                         Page 1 of 13                         PAEDEED    PAEDEDL 1011
                                                                                   04-13-2011 14:00

Lender is a **FEDERALLY CHARTERED SAVINGS BANK**                    V1 WBCD LOAN # 503182676
laws of **UNITED STATES OF AMERICA.**                              organized and existing under the
**5151 CORPORATE DR, TROY, MI  48098-2639.**                       Lender's address is

(E) "Note" means the promissory note signed by Borrower and dated **APRIL 14, 2011.**
The Note states that Borrower owes Lender ∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗**SEVENTY THOUSAND AND NO/100**
∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗**Dollars (U.S.    $70,000.00    )**
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt
in full not later than **MAY 1, 2041.**
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider            ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider  ☐ Other(s) [specify]
☐ 1-4 Family Rider           ☐ Biweekly Payment Rider
☐ V.A. Rider

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments
and other charges that are imposed on Borrower or the Property by a condominium association,
homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to
debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated
teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds
paid by any third party (other than insurance proceeds paid under the coverages described in Section
5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part
of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as
to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default
on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under
the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As
used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed
in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related
mortgage loan" under RESPA.
(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether
or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

                                                                        Initials: _____

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page  2  of 13                         PAEDEDL 1011
                                                                         04-13-2011 14:00

V1 WBCD LOAN # 503162676

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the   COUNTY
[Type of Recording Jurisdiction] of  PHILADELPHIA                            [Name of Recording Jurisdiction]:
SEE TITLE
APN #: 272165600

which currently has the address of 1361 S 46TH ST, PHILADELPHIA,

[Street] [City]

Pennsylvania     19143-3927     ("Property Address"):
            [Zip Code]
    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Initials:
PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page  3  of 13                         PAEDEDL  1011
                                                                                04-13-2011 14:00

V1 WBCD LOAN # 503102676

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time

Initials: _____

V1 NBCD LOAN # 503182676

by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification

Initials: _____

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01

Online Documents, Inc.                    Page   5   of 13

PAEDEDL 1011
04-13-2011 14:00

V1 WBCD LOAN # 503182676

services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Initials: 

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page 6 of 13                   PAEDEDL 1011
04-13-2011 14:00

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at

Initials: [signature]

V1 WBCD LOAN # 503182676

a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured

Initials: _____

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page  8  of 13                         PAED3GL  1011
                                                                                 04-13-2011 14:00

V1 WBCD LOAN # 503182676

by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend,

Initials: _____

V1 WBCD LOAN # 503182676

modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited

Initials:

PENNSYLVANIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page · 10 of 13                    PAEDEDL  1011
                                                                            04-13-2011 14:00

to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of

Initials: [signature]

V1 WBCD LOAN # 503182676

acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.

23. Release. Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any

Initials:

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page   12 of 13                    PAEDEDL  1011
04-13-2011 14:00

V1 WBCD LOAN # 503182676

present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

25. Reinstatement Period. Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

26. Purchase Money Mortgage. If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

27. Interest Rate After Judgment. Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____
Veda L. Jones

_____(Seal)
MAY E. MCCLOUD

Commonwealth of PENNSYLVANIA
County of PHILADELPHIA

On this, the 14 day of April 2011 before me, _____, the undersigned officer, personally appeared May E. McCloud,

known to me (or satisfactorily proven) to be the person whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes therein contained.
In witness whereof I hereunto set my hand and official seal.

My commission expires: 1/20/14

_____
Yelena Public
Title of Officer

NOTARIAL SEAL
YELENA SNIGUR
Notary Public
LOWER MORELAND TWP, MONTGOMERY COUNTY
My Commission Expires Jan 20, 2014

Certificate of Residence
I, The Subscriber
do hereby certify that the correct address of the within-named Mortgagee is 8151 CORPORATE DR, TROY, MI 48098-2639 .

Witness my hand this 14 day of April 2011

_____
Agent of Mortgagee

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page 13 of 13                    PAEDEDL 1011
                                                                          04-13-2011 14:00

# Allodial Quit Claim Deed

**PREPARED BY AND RETURN TO:**
RLH MA'AT LAW AND THE RIGHTS
OF INDIGENOUS PEOPLE
C/O AGENT/ATTORNEY ™RHASHEA LYNN HARMON©
THE PHILADELPHIA BUILDING
1315 WALNUT STREET, SUITE 320
PHILADELPHIA, PENNSYLVANIA 19107
267.312.7322

**This Indenture** made the 13ᵗʰ day of July in the year of The Most High **Two Thousand And Sixteen (2016),**

-Between-

**Vera L Jones (Daughter) -and- May E. McCloud (Mother)**

(**Hereinafter**, called ("**Grantors**")), of the original in Fee,

-And-

**The Be Kind & Unified Indigenous Private Foreign Tribal Family Trust** ("**Family Trust**"),

(**Hereinafter**, called "**Grantee(s)**")", of the other part, in Fee on behalf of allative Trustees.

**Witnesseth**, that the said **Grantors**, for and in consideration of the sum of ONE SILVER DOLLAR COIN ( United States FIAT Value $25.00), lawful money and legal tender of the United States of America (USA), unto them well and truly paid by the said **Grantees/Trustees** in good faith, at and before the sealing and delivery of these presents, the receipt whereof it is hereby acknowledged, Grantor, hath or have remised, released and quit- claimed;

**And**

**By**, these presents, **Grantors**, doth or do remise, release, and forever quit-claim, unto the **Grantee(s)/Trustee(s)**, his heirs/assigns/agents/beneficiaries, all the rights, titles, interests, property, claims, and demands whatsoever, both in law, domestically and internationally, and in equity, in or to the lands or premises released, or intended so to be, so that neither the **Grantor or Grantor(s)**, nor his or their personal representatives, nor his or their heirs, nor his or their assigns (including agents/beneficiaries), nor his or their third party capacitors, shall

# Allodial Quit Claim Deed

at any time thereafter, have, claim, challenge, or demand the said lands and premises and buildings or any part thereof, in any manner whatever; and

**Hereby, Grantor(s),** grant, conveys, bargains, sells, aliens, enfeoffs, releases and quit-claims **Allodial Quit Claim Deed Rights,** and **Confirm** unto the said Grantees, their heirs, and Assigns; and

**Allative,** rights, titles, interests, claims, in the below described real property known in the United States as *real estate*; and

**All That Certain,** lot or piece of ground with the messuage or tenement thereon erected; and

**Situated,** on the Northern easterly side of 46th Street at the distance of 478 feet, 4 inches Southeastward from the Southeast side of **Woodland Avenue in the Twenty Seventh (27th) Ward of the City of Philadelphia]** *de facto;* and

**Containing,** in front or in breadth on the said 46th Street, 14 feet, four (4) inches and extending of that width in length or depth Northeastward 80 feet to a certain alley three (3) feet wide.

**Being Known As:**

> 1361 S. 46th Street
>
> TAX ID#: 27-2-1658-00

**Being,** the same premises title which, **John A. Morris,** Executor by Deed dated December 1, 1982 and recorded December 9, 1982 in **[Philadelphia County]** *de facto,* in Deed Book EFP 615 page 436 granted and conveyed unto **Leon A. Womach** and **Jessie Womach,** his wife in fee,

> **And**

**Being,** the same premises title which, **Leon A. Womach** and **Jessie Womach,** Executors by Fee Simple Deed dated March 18, 1996 and RECORDED June 28, 1996 in **[Philadelphia County]** *de facto,* granted and conveyed unto **May E. McCloud** and **Vera L. Jones** in Allodial Fee Simple as **Joint Tenants With The Right Of Survivorship** in Deed Book Number and/or Instrument Number: JTD 27 Page 480.

**This,** herein **Allodial Quit Claim Deed** is a conveyance from Mother and Daughter as Joint Tenants with the Right of Survivorship, to **The Be Kind & Unified Indigenous Foreign Tribal Family Trust** in **Allodial Fee Simple.**

# Allodial Quit Claim Deed

**Together,** with all and singular buildings, improvements, ways, streets, alleys, passages, waters, water courses, rights, liberties, privileges, hereditaments and appurtenances, whatsoever thereupon belonging or in any wise appertaining, including but not limited to any and all reversions and remainders, rents, issues and profits thereof and all the estate, right, title, interest, property, claim and demand whatsoever of the said **Grantor(s)**, in law, equity, or otherwise, howsoever, of, in and to the same and every part thereof.

**To Have And To Hold,** the said lot or piece of ground, real property, estate above described along with the buildings and improvements thereon erected, hereditaments thereunto belonging or in anywise appertaining, and all the estate, premises hereby granted or mentioned and intended so to be, with all appurtenances, unto the said **Grantee(s)/Trustee(s)**, and the survivor of them, and their heirs, and their assigns, in perpetuity, of such survivors to and for the only proper use and behoof of the said Grantees/Trustess, and their survivors.

**And,** the **Grantors** for themselves, their heirs and their assigns, their Heirs, their Executors, and their Administrators,

**Do,** hereby, these **Presents Convey, Sell, Grant** all rights, titles, interests liens, equity, and claim whatsoever for the first party, either in law or equity, to **Grantees/Trustees**, their **Assigns,** their **Heirs,** their **Executors,** and their **Administrators,** et cetera to their benefit and behoof.

In Support of the above said Witnesses are the following:

**Witness 1:** _Khathia Lynn Jackson El, Esq_

**Witness 2:** _____

**In Witness Whereof,** the said parties of the first part of these presents have hereunto set their hands and seals:

_Vera May McCloud 07/13/2016_     _D. Lynn Jackson El Trustee 07.18.2016_
Grantor's Signature (Legal Guardian)        Grantee's Signature

_Vera L. Jones May McCloud_     _D. Lynn - El_
Vera L. Jones and May McCloud Grantor(s)     Grantee's (Trustee's) Name

_1361 S. 46th STREET_     _1315 Walnut Street, Suite 320_
Grantor's Address, Residence     Grantee's Address

# Allodial Quit Claim Deed

*Phila, PA. 19143*
_____
**City, State & Zip**

*Philadelphia, PA   19107*
_____
**City, State, & Zip**

**State Of: Pennsylvania  )**

**County Of Philadelphia  )**

*On this 25th day of November in the year of Two Thousand and Eighteen (2018), before me, the undersigned Notary Public Officer, Jamila Bellamy, hereby certify that personally appeared, Vera L. Jones / Guy Midland L. Bran Robinson / Neal Jones whose names are signed to the foregoing instrument, titled ALLODIAL QUIT CLAIM DEED, and who is Known to me (or satisfactorily proven) and acknowledged to be the person(s) whose name(s) subscribed to the within instrument and acknowledged that they executed the same, voluntarily on the day the same bears dated.*

**In Witness Whereof,** *I have hereunto set my hand and official seal on this* 25th *day of* November *month in the year of* 2018 *.*

-and-

**Signature of Notary Officer:**

*Jamila Bellamy*
_____

**My Commission Expires:** 3/3/21

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
JAMILA BELLAMY, Notary Public
City of Philadelphia, Phila. County
My Commission Expires March 3, 2021

|  | BOOK NO. | PAGE NO. |
|---|---|---|

| DATE RECORDED | |
|---|---|
| CITY TAX PAID | |

# PHILADELPHIA REAL ESTATE TRANSFER TAX CERTIFICATION

Complete each section and file in duplicate with Recorder of Deeds when (1) the full consideration/value is/is not set forth in the deed, (2) when the deed is with consideration, or by gift, or (3) a tax exemption is claimed. If more space is needed, attach additional sheet(s).

## A. CORRESPONDENT — All inquiries may be directed to the following person:

| NAME | TELEPHONE NUMBER: | |
|---|---|---|
| Rhashea Lynn Harmon El, Esquire | AREA CODE 267, | 312-7322 |

| STREET ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 1315 Walnut Street, Suite 320 | Philadelphia | PA | 19107 |

## B. TRANSFER DATA

DATE OF ACCEPTANCE OF DOCUMENT:

| GRANTOR(S)/LESSOR(S) | GRANTEE(S)/LESSEE(S) |
|---|---|
| Vera L. Jones and May E. McCloud | *The Be Kind & Unified Families Trust* |

| STREET ADDRESS | STREET ADDRESS |
|---|---|
| 1361 S. 46th Street | 1361 S. 46th Street |

| CITY | STATE | ZIP CODE | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| Philadelphia | PA | 19143 | Philadelphia | PA | 19143 |

## C. PROPERTY LOCATION

| STREET ADDRESS | CITY, TOWNSHIP, BOROUGH |
|---|---|
| 1361 S. 46th Street | Philadelphia |

| COUNTY | SCHOOL DISTRICT | TAX PARCEL NUMBER |
|---|---|---|
| Philadelphia | Philadelphia | 27-2-1658-00 |

## D. VALUATION DATA

| 1. ACTUAL CASH CONSIDERATION | 2. OTHER CONSIDERATION | 3. TOTAL CONSIDERATION |
|---|---|---|
| 25,000 | + | = |

| 4. COUNTY ASSESSED VALUE | 5. COMMON LEVEL RATIO FACTOR | 6. FAIR MARKET VALUE |
|---|---|---|
| $78,500.00 | x 1.01 | = 79,285 |

## E. EXEMPTION DATA

| 1A. PERCENTAGE OF EXEMPTION | 1B. PERCENTAGE OF INTEREST CONVEYED |
|---|---|
| | |

**2. Check Appropriate Box Below for Exemption Claimed**

☐ Will or intestate succession _____ 
    *(NAME OF DECEDENT)*                     *(ESTATE FILE NUMBER)*

☐ Transfer to Industrial Development Agency.

☐ Transfer to agent or straw party. (Attach copy of agency/straw party agreement).

☐ Transfer between principal and agent. (Attach copy of agency/straw trust agreement). Tax paid prior deed $_____

☐ Transfers to the Commonwealth, the United States, and Instrumentalities by gift, dedication, condemnation or in lieu of condemnation. (Attach copy of resolution).

☐ Transfer from mortgagor to a holder of a mortgage in default. Mortgage Book Number_____, Page Number_____ Mortgagee (grantor) sold property to Mortgagor (grantee) (Attach copy of prior deed).

☐ Corrective deed (Attach copy of the prior deed).

☒ Other (Please explain exemption claimed, if other than listed above.)
    Transfer from Mother and Daughter to *The Be Kind & Unified Family Trust Charitable*

*Under penalties of law or ordinance, I declare that I have examined this Statement, including accompanying information, and to the best of my knowledge and belief, it is true, correct and complete.*

| SIGNATURE OF CORRESPONDENT OR RESPONSIBLE PARTY | DATE |
|---|---|
| *Rhashea Lynn Harmon El* | 9-24-2019 |

82-127 (Rev. 6/93)                     (SEE REVERSE)

# INSTRUCTIONS FOR COMPLETING PHILADELPHIA REAL ESTATE TRANSFER TAX CERTIFICATION

**Section A**   **Correspondent:** Enter the name, address and telephone number of party completing this form.

**Section B**   **Transfer Data:** Enter the date on which the deed or other document was accepted by the Party(ies). Enter the name and address of the Grantor(s)/Lessor(s) and Grantee(s)/Lessee(s). You must list all names. Attach additional sheet(s) with full name and address of parties involved, if necessary.

**Section C**   **Property Location:** This section deals with the property being transferred; complete fully. Include the tax parcel number where applicable and the county where the Statement is being filed.

**Section D**   **Valuation Data:** Complete for all transactions.
1.  **Actual Cash Consideration** - Enter that amount.
2.  **Other Consideration** - Enter the total amount of non-cash consideration such as property and securities. Include mortgages and liens existing before the transfer and not removed thereby, and the agreed consideration for the construction of improvements.
3.  **Total Consideration** - Indicate on line 3 the total of lines 1 and 2. This will be the total consideration for the purchase of the property.
4.  **:County Assessed Value** - Enter the actual assessed value of the property as per records of the county assessment office.
5.  **Common Level Ration Factor** - Enter the county common level ratio factor applicable for the county in which the property is located. An explanation of this factor is provided below.
6.  **Fair Market Value** - Multiply the county assessed value (4) and the county common level ratio factor (5) and enter the result in block 6.

**Section E**   **Exemption Data:** Complete only for transactions where an exemption is claimed.
1a.  **Percentage of Exemption** - Enter the percentage of the total consideration claimed as exempt.
1b.  **Percentage of Interest Conveyed** - Enter percentage of interest conveyed.
2.  **Check Appropriate Box for Exemption Claimed** - Boxes are provided for the most often used Pennsylvania realty exemptions. Each is explained in order of appearance on the Realty Transfer Statement of Value form.

**"Will or Intestate Succession"** - A transfer by Will for no or nominal consideration, or under the intestate succession laws is exempt from tax. Provide the name of the decedent and estate file number in the space provided.

**"Transfer To or From Agent or Straw Party"** - A transfer to or from an agent is exempt from tax if a transfer to or from the agent's principal by the third party would be exempt from tax. Attach a copy of the agency/straw party agreement and a statement explaining the exemption claimed.

**"Transfer Between Principal and Agent"** - A transfer between an agent or principal for no or nominal consideration is exempt. Attach a copy of the agency/straw trust agreement. Enter the tax paid on the prior deed in the space provided.

**"Transfer to the Commonwealth, the United States and Instrumentalities by Gift, Dedication, Condemnation or In lieu of Condemnation." - (Attach a copy of resolution)**

**"Transfer from Mortgagor to Holder of a Mortgage in Default"** - A transfer from a mortgagor to a holder of a mortgage in default, whether pursuant to a foreclosure or in lieu, thereof, is exempt. Provide the mortgage book number and page number where mortgage is recorded, and property was transferred directly from the Mortgage to the Mortgagor.

**"Corrective Deed"** - A deed for no or nominal consideration which corrects a deed that was previously recorded but does not extend or limit the title or interest under the prior deed is exempt from tax. (Attach copy of the prior deed).

**"OTHER" (PLEASE EXPLAIN EXEMPTION CLAIMED IF OTHER THAN THOSE LISTED ABOVE.)**
-When claiming an exemption other than those listed, you must specify which exemption is claimed. When possible, provide the applicable statutory citation. Attach additional pages, if necessary.

## COMMON LEVEL RATIO FACTOR
This is a property valuation factor provided by the Department of Revenue by which the county assessed value is multiplied to determine the taxable value of real estate for all non-arm's length transactions, leases and acquired companies. The factor is base on the common level ratio established by the State Tax Equalization Board. The common level ration is a ratio of assessed values to current fair market values as reflected by actual sales of real estate in each county. A statewide list of the factors is available at the Recorder of Deeds' office in each county.

**THIS STATEMENT MUST BE SIGNED BY A REASONABLE PERSON CONNECTED WITH THE TRANSACTION.**

82-127 (Reverse) (Rev. 6/93)





THE OFFICIAL COURT

Mund Barcelan Clan - Guale/Yamassee-Indigenous Native American Association of Nations:

Original Guale, Yamassee, Mechica, Cherokee, Seminole, Creek, Washita

### Special Power Of Attorney
### Of Mund Barcelan Clan, Guale Manassee:
### Bera-F. Jones:

### March 13, 2018

## "NOTICE"

THE PURPOSE OF THIS POWER OF ATTORNEY IS TO CONVEY AUTHORITY TO THE INDIVIDUAL YOU DESIGNATE (YOUR "AGENT"/REPRESENTATIVE) SPECIFIC POWERS TO HANDLE ANY SUITS IN LAW OR OTHER CAPACITIES THAT ARE BROUGHT AGAINST YOU, CONCERNING YOUR BEING, AND ANY REAL, AND/OR PERSONAL, PROPERTY, WHICH ALSO INCLUDES THE FULL POWERS TO NEGOTIATE AND ANSWER IN YOUR STEAD WITHOUT ADVANCE NOTICE TO YOU OR APPROVAL BY YOU.

THIS SPECIAL POWER OF ATTORNEY IMPOSES A DUTY ON YOUR AGENT OR REPRESENTATIVE TO EXERCISE THE SPECIFIED GRANTED POWERS, AND WHEN THE POWERS VESTED ARE EXERCISED, YOUR AGENT/REPRESENTATIVE SHALL USE DUE CARE TO ACT FOR AND IN YOUR BENEFIT, AND IN ACCORDANCE WITH THE POWERS VESTED WITHIN THIS POWER OF ATTORNEY AS LONG AS THOSE POWERS DO NOT CONFLICT WITH OR VIOLATE THE MUND BAREEFAN CONSTITUTION.

YOUR AGENT /REPRESENTATIVE HAS THE AUTHORITY TO EXERCISE THE POWERS GIVEN HERE AND COMPLIANT WITH THE GUALE YAMASSEE CONSTITUTION THROUGHOUT THE DURATION OF THE SPECIAL CIRCUMSTANCE WHICH GAVE RISE TO THE CREATION OF THIS SPECIAL POWER OF ATTORNEY.

ONCE YOU HAVE DECIDED TO REVOKE THIS SPECIAL POWER OF ATTORNEY, AND CAN TEND TO YOR OWN AFFAIRS SURROUNDING THE SPECIAL CIRCUMSTANCES WHICH PROMPTED THE NEED FOR THE CREATION OF THIS SPECIAL POWER OF ATTORNEY, THE POWERS HEREIN VESTED SHALL IMMEDIATELY CEASE TO OPERATE BY OPERATION OF LAW, UNLESS YOU EXPRESSLY INDICATE OTHERWISE WITHIN THEREIN.



THE OFFICIAL COURT.

**FURTHER,** BE IT UNDERSTOOD THAT, AS A YAMASSEE GUALE TRIBAL MEMBER THAT THE DOCTRINE OF "REFLECTIVE HUMANISM", APPLIES IN ALL SITUATIONS, IN THIS SPECIAL POWER OF ATTORNEY.

**FURTHER,** AS WITH ALLATIVE POWERS OF ATTORNEY CONVEYING AUTHORITY TO ANOTHER, THE GUALE YAMASSEE COURT MAY REVOKE THE POWERS OF YOUR AGENT/REPRESENTATIVE. IF THE COURT **DETERMINES** THAT, YOUR AGENT IS ACTING IN VIOLATION OR IN CONTRAVENTION OF THE DUTIES BESTOWED AND ENTRUSTED. SPECIFICALLY RELATING TO NOT ACTING IN YOUR BEST INTEREST AND/OR IS CARELESSLY AND/OR RECKLESSLY ACTING AGAINST THE DUTIES SPECIFICALLY MENTIONED WITHIN THIS SPECIAL POWER OF ATTORNEY OR THAT VIOLATE FIDUCIARY AND LEGAL DUTIES AS PER THE RELATIONSHIP ESTABLISHED BY THIS SPECIAL POWER OF ATTORNEY OR REQUIRED BY THE GUALE YAMASSEE CONSTITUTION CONCERNING INDIGENOUS AGENTS/REPRESENTATIVES AS WELL AS VIOLATIONS OF THE DOCTRINE OF "REFLECTIVE HUMANISM".

**FURTHER,** THE POWERS AND DUTIES OF AN INDIGENOUS AGENT/REPRESENTATIVE UNDER A POWER OF ATTORNEY ARE EXPLAINED MORE FULLY AS SET FORTH THROUGH THE RELATIONSHIP OF CUSTOMARY INTERNATIONAL LAW GOVERNING UNIVERSAL AGENT/FIDUCIARY DUTIES AND THE GUALE YAMASSEE CONSTITUTION WHICH IS THE PRIMARY SOURCE AND SUPREME LAW OVER ALL OTHERS CONCERNING THE AFFAIRS OF GUALE YAMASSEE TRIBAL MEMBERS.

IF THERE IS ANYTHING ABOUT THIS SPECIAL POWER OF ATTORNEY THAT YOU DO NOT UNDERSTAND, YOU SHOULD SEEK COUNCIL FROM THE YAMASSEE CHIEF OR CHIEF LEGAL COUNCIL TO EXPLAIN IT TO YOU.

I, Vera [signature] HAVE READ OR HAD EXPLAINED TO ME THIS NOTICE AND UNDERSTAND CLIENT'S AND PURPOSE.

AUTOGRAPH OF:
Vera-Li: Jones:
(PRINCIPAL)

DATE: 3/14/19

2



THE OFFICIAL COURT

𝕾𝖕𝖊𝖈𝖎𝖆𝖑 𝖕𝖔𝖜𝖊𝖗 𝕺𝖋 𝕬𝖙𝖙𝖔𝖗𝖓𝖊𝖞 𝖆𝖓𝖉 𝕬𝖚𝖙𝖍𝖔𝖗𝖎𝖟𝖆𝖙𝖎𝖔𝖓 𝖔𝖋 𝕬𝖘𝖘𝖎𝖌𝖓𝖒𝖊𝖓𝖙 𝕺𝖋
Vera L Jones ____, on 19 𝖉𝖆𝖞 𝖔𝖋 March 𝖒𝖔𝖓𝖙𝖍, in 2019         𝖞𝖊𝖆𝖗
𝖔𝖋 𝖙𝖍𝖊 𝕰𝖑𝖔𝖍𝖎𝖞𝖒.

**ASSIGNMENT:**

I, Vera L. Jones       do hereby appoint and assign CHIEF LEGAL

COUNSEL OF GUALE YAMASSEE COURT, Shasheen Lynn Hammond as my true and

lawful Attorney- in-Fact (**"ATTORNEY-IN-FACT"** or "MY ATTORNEY") and as my

agent (**"AGENT"/ "REPRESENTATIVE**) with full power of substitution, proxy, for me

and in name and stead, to transact all my business concerning any suits concerning Foreign

Court matters brought against me and any individuals for whom I am the Legal Guardian,

and to manage and/or to appoint and assign another Guale-Yamassee Tribal Member

or Tribal Counsel to manage all my legal affairs as completely as I might do if personally

present or personally dealing with the matter.

FURTHER, these appointment and assignments include and are not limited to remaining

in full effect through exercising the authorized powers set-forth herein below in the event that

I become incapacitated, disabled, or mentally impaired.

FURTHER, If CHIEF LEGAL COUNSEL Shasheen Lynn Hammond (PRIMARY

AGENT/REPRESENTATIVE) OF RLH MA'AT LAW & THE RIGHTS OF INDIGENOUS

PEOPLES TRUST, BRICK & MORTAR, 1315 WALNUT STREET, SUITE 320,

PHILADELPHIA HOMERULE CHARTER, PENNSYLVANIA COMMONWEALTH, [19107]

*DE FACTO* and P.O. BOX 7446, PHILADELPHIA, PENNSYLVANIA 19101, becomes

3



THE OFFICIAL COURT

incapacitated or can no longer serve as my agent/Representative, another GUALE YAMASSEE MEMBER WHO IS COMPETETENT IN THE GUALE YAMASSEE CONSTITUTION AND LAWS AND LAWS OF NATIONS, INTERNATIONALLY AND CUSTOMARILY shall serve.

FURTHER, I, _____ hereby revoke any and all prior General and/or Special Powers of Attorney(s) that I have heretofore knowingly or unknowingly given to any foreign person(s) or individual(s), including entities prior to this herein said **SPECIAL POWER OF ATTORNEY.**

FURTHER, this SPECIAL POWER OF ATTORNEY may be voluntarily revoked only by me at any time by my written revocation entered and filed of public record, in the jurisdiction in which I have been hailed to as a "Respondent" or "Defendant" in accordance and in operation with all rights provided through the DECLARATION ON THE RIGHTS OF INDIGENOUS PEOPLES, which is operable and enforceable through the GUALE YAMASSEE CONSTITUTION. Therefore, any publication, not merely within the counties or municipalities, e.g. the deed of records of PHILADELPHIA HOME RULE CHARTER, CITY OF PHILADELPHIA, PENNSYLVANIA COMMONWEALTH, HOME RULE CHARTER shall be sufficient, provided said publication is affixed with my validly executed autograph and SEAL explicitly indicating revocation along with notarized and delivered to my CHIEF LEGAL COUNSEL and appointed ATTORNEY IN FACT, ™Rhashea Lynn Harmon-El©, Esq.

**SPECIAL POWER OF ATTORNEY**: This power of attorney shall continue in force and may be accepted and relied upon by anyone to whom it is presented despite my

4



THE OFFICIAL COURT

purported revocation of it or my death, UNTIL the actual WRITTEN NOTICE of such revocation is received by such person(s) or contacted by and informed by my CHIEF LEGAL COUNSEL and appointed ATTORNEY, ™Rhashea Lynn Harmon-El©, Esq.

FURTHER, this power of attorney shall become immediately effective upon the execution of my autograph and SEAL. All acts done by my AGENT/REPRESENATIVE and CHIEF LEGAL COUNSEL and appointed ATTORNEY, ™Rhashea Lynn Harmon-El©, Esq., pursuant to this special power during any period of this suit in law, shall have the same effect to my benefit and bind me and my successors in interest as if I were the individual directly addressed. Included in these powers, and not limited by same are the powers as are customary within the GUALE YAMASSEE CLAN and outlined in the GUALE YAMASSEE CONSTITUTION and Yamassee Codes as follows:

(1) "To serve as my power of attorney or representative in Yamassee or foreign suits or any formal, including business and governmental affairs"

(2) "To create a trust for my benefit."

(3) "To make discuss any amendments to an existing trust for my benefit with the Trustee."

(4) "To disclaim any interest in property."

(5) "To renounce fiduciary positions."

(6) "To negotiate and make or receive payments"

(7) "To answer questions in my stead."

(8) "To engage in real property transactions (Trade and Commerce)."

(9) "To engage in tangible personal property transactions (Trade and Commerce)."

(10) "To engage in stock, bond and other securities transactions."

5



THE OFFICIAL COURT

(11) "To engage in commodity and option transactions."

(12) "To engage in banking and financial transactions."

(13) "To enter safe deposit boxes."

(14) "To engage/inquire in insurance transactions."

(15) "To engage/inquire in retirement plan transactions."

(16) "To engage/inquire in Loan transactions."

(17) "To handle interests in estates and trusts."

(18) "To pursue public and private claims and litigation."

(19) "To receive government (Tribal or Foreign) benefits."

(20) "To pursue any and all finance/economic matters."

A.    **FIDUCIARY RELATIONSHIP:**  An agent or representative acting under a power of attorney has a fiduciary relationship with the principal. In the absence of a specific provision to the contrary in the power of attorney, the fiduciary relationship includes the duty to:

(1) Exercise the powers for the benefit of the principal.

(2) Keep separate the assets of the principal from those of an agent.

(3) Exercise reasonable caution and prudence.

(4) Keep a full and accurate record of all transactions, receipts and disbursements on behalf of the principal.

B.    **ADDITIONAL POWERS:** In addition to but not by way of limitation, I also include other powers as follows:

(1) **Contracts:**   To enter into, perform, modify, extend, cancel, compromise, enforce, negotiate or otherwise act with respect to any contract of any sort whatsoever. Contracts includes the law suits of any kind which require an agreement

6



THE OFFICIAL COURT

or waiver of jurisdiction or authority to sue or defend any forced suits and forced claims of jurisdiction over my being, my property (real and personal), my estate, my trusts *et cetera*.

(2) **Mail**:  To receive all mail addressed to me from the United States Postal Service and any private carrier and to forward my mail to any address my CHIEF COUNSEL and appointed ATTORNEY, ™Rhashea Lynn Harmon-El©, Esq., may designate.

(3) **Employ Professionals**:  To employ lawyers, investment counsel, accountants, physicians, other professionals and other persons or entities to render services for or to me and to treat, engage, or finance for such services. My only requirement is that those individuals employed as professionals be Indigenous and that they adhere to and honor the Guale Yamassee Constitution.

(4) **Appointment as Guardian**.  In the event a guardian of my Estate is ever appointed by Yamassee Court, I nominate my Attorney-in-fact as guardian of my estate and in the event my **ATTORNEY IN FACT OR AGENT** becomes incapacitated or is no longer living then as mentioned above I assign/appoint someone who possesses the legal competence, knowledge and expertise as Guale Yamassee Legal Chief Counsel in the primary AGENT'S/REPRESENTATIVE'S stead and revocation.

Thereafter, Guale Yamassee Court has the authority to appoint someone in accordance with the Constitution of Guale Yamassee Clan. This clause has no effect upon the wishes and statements regarding the assigned executor of my estate upon my death. My Trustee in law and in Fact, is the executrix of my estate as per the bylaws of the Clan Trust. This herein "**Guardianship Clause**" is solely applicable wherein I have

7

8

THE OFFICIAL COURT



become incapacitated, suffered from loss of sound mind, become mentally impaired or mentally disabled during my life and such Guardianship is necessary, reasonable and appropriate for the benefit of my care during my life. Should I regain full capacity and full competence, then by operation of Divine law this Guardianship Clause will of course return to its hibernated passive state and all matters herein addressed shall resume as specified herein. for Prince

C.     **GENERAL GRANT OF POWERS:** IN ADDITION TO THE POWERS AND DISCRETION HEREIN, SPECIFICALLY GIVEN AND CONFERRED UPON MY ATTORNEY-IN-FACT and AGENT/REPRESENTATIVE, AND NOTWITHSTANDING ANY USAGE OR CUSTOMS DECLARATIONS OR LAWS, AS PROVIDED IN THE DECLARATION ON THE RIGHTS OF INDIGENOUS PEOPLES, TO THE CONTRARY, MY ATTORNEY-IN-FACT, CHIEF LEGALL COUNSEL AND APPOINTED ATTORNEY, ™Rhashea Lynn Harmon-El©, Esq., (PRIMARY AGENT-REPRESENTATIVE), SHALL HAVE THE FULL POWER, RIGHT AND AUTHORITY, TO DO, PERFORM AND TO CAUSE TO BE DONE AND PERFORMED ALL SUCH TRANSACTIONS, ACTS, DEEDS AND MATTERS IN CONNECTION WITH ANY SUIT BY FOREIGN COURTS, MY PROPERTY AND ESTATE AS MY ATTORNEY-IN-FACT AND AT MY ATTORNEY IN FACT'S SOLE DISCRETION, WHICH SHALL BE DEEMED REASONABLE, NECESSARY, DESIRABLE AND PROPER, AS FULLY, EFFECTUALLY AND ABSOLUTE AS IF MY ATTORNEY-IN-FACT WERE THE ABSOLUTE OWNER AND POSSESSOR AND TITLE IN FEE AS PRINCIPAL THEREOF.

A.     **Reliance on Powers Granted:** This powers authorized and granted herein, may be