

THE OFFICIAL COURT

accepted and relied upon by anyone to whom it is presented until such PERSON, ENTITY, COURT *et cetera* either receives written notice of said revocation by me or a guardian or similar fiduciary of my estate or has actual knowledge.

B.   **Hold Harmless and Exempt**:   All actions of my agent shall bind me and my heirs, distributees, legal representatives, successors and assigns, and for the purpose of inducing anyone to act in accordance with the powers I have granted herein, I hereby represent, warrant and agree that if this Power of Attorney is terminated or amended for any reason, I and my heirs, distributees, legal representatives, successors and assigns will hold such party or parties harmless and exempt from any loss suffered or liability incurred by such party or parties while acting in accordance with this power prior to that party's receipt of *WRITTEN NOTICE* of such termination of said POWER OF ATTORNEY or *ACTUAL KNOWLEDGE* received or that REASONABLY should have been received or known.

D.  **GOVERNING LAW(S)**:

    a.   Foreigners/Non-Yamassee Guale/Non-Indigenous:

        i.   **Private Matters**: The Declaration on The Rights of Indigenous Peoples in conjunction with the Universal Declaration on Human Rights, International Human Rights law and Treaties govern the rights Indigenous peoples inalienably possess to practice their own customs, culture, and traditions. When dealing with private matters, first the Guale Yamassee Constitution, and next the laws of customs, customary international law and international law shall apply.

        ii.   **Public Matters**: When dealing with public matters, Treaties and the Guale Yamassee Constitution, and next the laws of customs, customary

9



THE OFFICIAL COURT

international law and international law shall apply.

b. **Yamassee Guale/Indigenous:**

i. **Private:** When dealing with issues between Yamassee Guale members, or other Indigenous Tribes, the Guale Yamassee Constitution is the governing supreme law.

ii. **Public:** When dealing with public matters Treaties amongst and between shall govern and next the laws of Yamassee Guale Constitution govern and of customs and international law shall be used in conjunction with the Guale Yamassee Constitution.

FURTHER, TO THE EXTENT NOT OTHERWISE EFFECTUALLY PROVIDED, MY ATTORNEY IN FACT AND ANY SUCCESSORS AS HEREIN NAMED, IDENTIFIED OR MENTIONED, THERETO SHALL HAVE THE POWER TO APPOINT A SUCCESSOR OR SUCCESSORS.

ALL SUCCESSORS SHALL BE OF INDIGENOUS HERITAGE AND OF COMPETENCY REGARDLESS OF APPEARING TO BE AT THE AGE OF COMPETENCE.

AS IN THE BEGINNING, SO SHALL IT BE IN THE END.

ANY AND ALL CHANGES, APPOINTMENTS, ASSIGNMENTS ET CETERA, MADE TO THIS SPECIAL POWER OF ATTORNEY, SHALL BE MADE IN WRITING AND NOTARIZED AND ATTACHED HERETO AND WITH THE APPROPRIATE SEALS OF THE GUALE YAMASSEE COUNSEL, OR GUALE YAMASSEE COURT.



THE OFFICIAL COURT

OTHERWISE, NO EVIDENCE OUTSIDE THE FOUR (4) CORNERS OF THIS SPECIAL POWER OF ATTORNEY SHALL SERVE TO AMEND, CONTRADICT, OR OVERRIDE THIS HEREIN POWER OF ATTORNEY AND NO ONE WITHOUT THE AUTHORITY, SPECIFICALLY IDENTIFIED HEREIN, MAY CHALLENGE THE VALIDITY OR THE APPLICABILITY OF THIS POWER OF ATTORNEY.

By my hand and divine autograph, I Vera L. Jo[_____], being of sound mind and full competence, have executed this special power of attorney ASSIGNING AGENT/REPRESENTATIVE AND ATTORNEY IN FACT, ™Rhashea Lynn Harmon-El©, Esq., CHIEF LEGAL COUNSEL OF THE GUALE YAMASSEE COURT, this 19 day of March month of 2019 year.

™:Vera-L.-Jones© (Principal)

I [Rhashea Lynn Harmon El] have executed this special power of attorney ACCEPTING THE ASSIGNMENT AS AGENT/REPRESENTATIVE AND ATTORNEY IN FACT this _____ day of _____ month of ____ year.

CHIEF LEGAL COUNSEL and appointed ATTORNEY IN FACT,
™Rhashea Lynn Harmon-El©, Esq.,
(Primary Attorney in Fact)

"All Rights Reserved"

11



THE OFFICIAL COURT

MUND BAREEFAN                                    )
GUALE YAMASSEE INDIGENOUS CLAN,                 )         ss

On this ___ day of __March__, in the year of Two Thousand and Nineteen (2019), before me, the undersigning Official Yamassee Officer, _Nawyn-Anna El_, appointed by the Grand Chief of the Royal House of Thunderbird, and hereby certify that personally appeared, _Vera El Jones_ and _Dhashon Lynne Huen Q_ whose names/appellations as executed and affixed herein this document, titled **SPECIALPOWER OF ATTORNEY**, and who is known to me or satisfactorily proved and acknowledged to be the Divine Living Being(s) whose name(s)/appellation(s) subscribed and affixed to the within instrument, without threat, duress, or coercion.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal on this ___ day of _Mard_ month, in the year 20___.

Autograph and Seal of Official Yamassee Officer:

_____
Autograph of Official Yamassee Officer

12

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

ORPHANS' COURT DIVISION

O. C. NO.*1493* AI of 20*15*

*CONTROL # 153673*

Estate of May McCloud,

an alleged incapacitated person

*FINAL* DECREE

AND NOW, this *8th* day of *FEBRUARY, 2015,* upon consideration of the petition and after hearing

held following due service of the Citation with Notice and a copy of the petition upon May

McCloud, this court finds by clear and convincing evidence that:

1. May McCloud is 81 years old and is a domiciliary of the City and County of

   Philadelphia.

2. May McCloud suffers from dementia which totally impairs her capacity to receiver

   and evaluate information effectively and to make and communicate decisions

   concerning management of her financial affairs or to meet essential requirements

   for her physical health and safety.

May Mccloud, An Alleged Inc Per

20150149301011

3. She requires assistance from others assistance from others for her daily activities.

Accordingly, it is thereby ORDERED and DECREED that May McCloud is adjudged a totally incapacitated person and that Vera Jones is appointed plenary guardian of the estate and person May McCloud, and incapacitated person.

The said guardian shall enter security, with corporate surety, in the amount of $ **WAIVED** In the event said incapacitated person has a safe deposit box, an Official Examiner of this court shall be in attendance when said safe deposit box is opened.  The Certificate of the Official Examiner of his examination of the assets in such safe deposit shall be submitted to the court, and, when approved by the hearing judge, shall be filed with the record in this case.  The amount and manner of compensation for these services of the Official Examiner shall be determined by the hearing judge.

The said guardian is directed to file an inventory within ninety (90) days of the date of the Decree in accordance with the provisions of 20 Pa.C.S.A. §5521 and §5142.

Furthermore, the said guardian shall file a Report at least once within the first twelve months of her appointment and at least annually thereafter in accordance with the provisions of 20 Pa.C.S.A. §5521(c)(1)(i) and (ii).

The said guardian is not permitted to expend the principal of the incapacitated person's estate without permission of the court in accordance with the provisions of 20 Pa.C.S.A. §5536.

Within sixty (60) days after the death of the incapacitated person or an adjudication of capacity, the guardian shall file a Final Report with the court pursuant to 20 Pa.C.S.A. §5521(c)(2).

The filing of exceptions or appeals from this Decree is governed by Phila. O.C. Rule 7.1A and Pa. O.C. Rule 7.1, as amended, and by Pa. R.A.P. 902 and 903.

May McCloud was/was not present at the hearing and was/was not represented by Counsel. Counsel for Petitioner shall cause to be read to May McCloud a copy of this Decree and the Statement of Rights, a copy of which is attached to this Decree as Exhibit "A", and file proof of such service with the Court within ten (10) days.

All evidence, pleadings, testimony, and documents concerning the present matter shall be deemed under SEAL and shall not be made available for dissemination or use except upon Decree of this Court.

MATTHEW D. CARRAFIELLO
ADMINISTRATIVE JUDGE                    A. J.

JULIE ROSE, ESQ



Indigenous Native American Association of Nations
Original Creek Yemassee Meethon, Seminole, Creek, Washtaw

**TRIBAL IDENTIFICATION CARD**

ID#: 4-278-13   EXP: 07/30/2023

MAY ETTA MCCLOUD
1361 S 46TH ST
PHILADELPHIA, PA 19143

BIRTHDATE       SEX    ISSUED
09/06/1934      F      07/30/2019
HEIGHT          EYES
5'1"            BROWN

Tribal Affiliation: MUND BA.REEF.AN



Indigenous Native American Association Of Nations Original Guale, Yamasee, Cherokee, Mechita, Creek, Seminole, Washitaw, Comanche, et al:

Treaty of Camp Holmes1835  Aug 24, 1835  I 7 Stat. 474 i Proclamation May19, 1836

RESTRICTIONS: NONE
ENDORSEMENTS: NONE
FOR VERIFICATION PLEASE CALL:- (215) 821-8227

**Indigenous Native American Association of Nations**

Original Grade Yamasee Merokan, Semitole, Creek, Washitaw

# TRIBAL IDENTIFICATION CARD

ID#: 4-278-42   EXP: 07/30/2023

**VERA L JONES**
1818 S ALDEN ST
PHILADELPHIA, PA 19143

| BIRTHDATE | SEX | ISSUED |
|-----------|-----|--------|
| 08/01/1958 | F | 07/30/2019 |
| HEIGHT | EYES | |
| 5'2" | BROWN | |

Tribal Affiliation: MUND BAREEFAN





# Mortgage Loan Fraud

PDF Download : mortgage_fraud112006.pdf (/sites/default/files/shared/mortgage_fraud112006.pdf)

An Industry Assessment based upon Suspicious Activity Report Analysis

November 2006

## Introduction

In recent years federal and state law enforcement and regulatory agencies have devoted considerable effort to the prevention, investigation and prosecution of mortgage loan fraud. The United States has experienced substantial growth in mortgage lending markets and of innovative loan products that have expanded consumer access to home finance. At the same time there has been a significant increase in filings of Suspicious Activity Reports (SARs) pertaining to suspected mortgage loan fraud.[1]

FinCEN's Office of Regulatory Analysis conducted this assessment to identify any trends or patterns that may be ascertained from an analysis of SARs regarding suspected mortgage loan fraud. Analysts searched the Bank Secrecy Act database for SARs [2] from depository institutions filed between April 1, 1996 and March 31, 2006 that contained "Mortgage Loan Fraud" as a characterization of suspicious activity. The search retrieved 82,851 reports, which were examined to discern the trends and patterns revealed in this assessment. A random sample of 1,054 narratives was reviewed for additional analysis. The parameters for the sample size were set to provide a 95 percent confidence level with a plus or minus three (+/-3) confidence interval. The analysis revealed - among other trends addressed in this report - a sharp increase in the number of SARs reporting mortgage loan fraud beginning in 2002. This trend is depicted in Figure 1 below.

## Executive Summary

SARs pertaining to mortgage loan fraud increased by 1,411 percent between 1997 and 2005. This report filing trend continues apace in 2006, with 7,093 reports filed on suspected mortgage loan fraud during the first quarter, an increase of 35 percent over the SAR filings in the first quarter of 2005. One explanation for the increase in SARs reporting mortgage loan fraud is increased awareness of the potential for fraud in a dynamic real estate market. Many areas in the United States saw double-digit growth in real estate values during 2003 and 2004. At the same time, mortgage loan interest rates were at a historic low. Although growth in the housing industry appears to be slowing in the first quarter of 2006, opportunities for fraud are still present.

Reports of mortgage loan fraud rose significantly in 2003. The Federal Financial Institutions Examination Council reported an increase in the number of mortgage loans beginning in 2003: "The 2003 data include a total of 42 million reported loans and applications, which is an increase of about 33 percent from 2002, primarily due to a significant increase in refinancing activity (approximately 41 percent)." [3] SARs on mortgage loan fraud increased over 92 percent between 2003 and 2004. The increase in filings may be attributed to an increase in overall mortgage lending concurrent with the decline in interest rates in the 2002 – 2005 timeframe and a broader awareness of this fraudulent activity. Figure 1 depicts the filing trend between 1997 and 2005.

### MORTGAGE LOAN FRAUD REPORTING TREND



*Figure 1*

Mortgage loan fraud represents a growing percentage of total depository institution SARs. In 1997, reports of mortgage loan fraud comprised 2.12 percent of total depository institution SAR filings. In 2005, reports of mortgage loan fraud had increased to 4.94 percent of total depository institution filings. Figure 2 provides a comparison of the percentage of change in the number of total depository institution SAR filings to the change in the number of SARs reporting mortgage loan fraud.



*Figure 2*

Mortgage loan fraud can be divided into two broad categories: fraud for property and fraud for profit. Fraud for property generally involves material misrepresentation or omission of information with the intent to deceive or mislead a lender into extending credit that would likely not be offered if the true facts were known. The fraudulent activities observed in the SAR narratives describing fraud for property include: asset fraud; occupancy fraud; employment and income fraud; debt elimination fraud; identity theft; and straw buyers. 4Fraud for property is generally committed by home buyers attempting to purchase homes for their personal use. In contrast, the motivation behind fraud for profit is money. Fraud for profit is often committed with the complicity of industry insiders such as mortgage brokers, real estate agents, property appraisers, and settlement agents (attorneys and title examiners). Typical fraudulent activities associated with this category in the SAR filing sampling are: appraisal fraud; fraudulent flipping; 5 straw buyers; and identity theft.

Identity theft was frequently reported in conjunction with the commission of suspected mortgage loan fraud. Reports of identity theft increased nearly 102 percent between 2004 and 2005. The depository institution SAR form began collecting data on identity theft in July 2003. The SAR Activity Review – By the Numbers, Issue 6 (May 2006) reported that identity theft was observed in nearly two percent of the total depository institution SARs.

Identity theft was characterized as a suspicious activity on over two percent of the total mortgage loan fraud SAR reports. This is significant given the relatively brief amount of time specific data on identity theft has been collected in SARs.

## Overview

Real estate mortgage loan fraud poses a growing risk to financial institutions. The Federal Financial Institutions Examination Council reported: "Mortgage loan fraud is growing because it can be very lucrative and relatively easy to perpetrate, particularly in geographic areas experiencing rapid appreciation."6 Although the true level of mortgage loan fraud is unknown, the growing awareness of mortgage loan fraud is confirmed by the year to year increase in the number of SARs describing this activity. (See Figure 1, Mortgage Loan Reporting Trend.) Depository institutions filed 82,851 SARs describing suspected mortgage loan fraud between April 1, 1996 and March 31, 2006. This represents 3.57 percent of all depository institution SAR filings submitted during that time period.

Over the past 30 years (1975 – 2005), house prices at the national level have grown at about a six percent annual rate. 7 However, in the first quarter of 2005, the national average percentage increase was 12.5 percent. Many U.S. coastal states saw housing prices increase by as much as 20 percent or more during 2004. By contrast, growth rates in many states in the South and Midwest fell below the national average. 8 Interest rates for 30-year mortgages declined throughout the period from 1997 through 2004, with the exception of the first three quarters of 2000. 9 The number of residential loans increased steadily by 153 percent between 1997 and 2003, according to the Federal Financial Institutions Examination Council. 10 "Adjusted 2003 data show that low and moderate-income census tracts taken together experienced the largest increase, 16 percent, in home purchase lending. Such lending for middle and upper-income census tracts increased by 9 percent , respectively, from 2002 to 2003, according to the adjusted 2003 data." 11 The only year experiencing a decrease in the number of home loans was 2000, possibly due to concern over fluctuating interest rates during the first three quarters of 2000. The rapid growth in mortgage lending activity that resulted from the boom in the real estate industry could result in an increased risk in the mortgage loan industry.

## Vulnerabilities Identified in SAR Narratives
### _Automated loan processing_

The use of the Internet and related technology to receive and process loan applications is increasing. The growing faceless nature of these transactions increases the opportunities for fraud (especially identity fraud) and, coupled with "low-document" or "no-document" loans, creates a condition vulnerable to fraudulent activity.

Using the Internet or telephone to receive and process mortgage loans means that lenders may never meet borrowers, even during the loan closing process. In some cases, lenders forward the loan documents to borrowers by courier service and the documents are returned to lenders in the same manner.

Filers reported use of the telephone or Internet in origination of mortgage loans on 106 reports of mortgage loan fraud (less than one percent). Figure 3 depicts the reports of suspected fraudulent loans originated via telephone or Internet since 1998. (Note that the filings for 2006 occurred during the first three months.)

3/3/2019                                    Mortgage Loan Fraud | FinCEN.gov





*Sub-prime loans associated with*

*Figure 3*

## suspected fraud

Sub-prime lending involves higher-interest loans extended to consumers with impaired or non-existent credit histories stemming from modest incomes or excessive debts. The mortgage industry designed innovative loan packages to allow more low-to-moderate income borrowers to qualify for loans. Filers reported a pattern of the use of exaggerated or fabricated income information associated with sub-prime loans. Such activity may be part of added efforts by some lenders to qualify borrowers in the sub-prime market.

Loans specifically identified as sub-prime appeared in 68 (less than one percent) of the total reports of mortgage loan fraud. Figure 4 depicts the number of report narratives that describe sub-prime loans in SARs reporting suspected mortgage loan fraud.



*Mortgage broker originated loans*

*Figure 4*

The National Association of Mortgage Brokers reports that as many as two-thirds of mortgage loans are now originated by mortgage brokers. Currently there are no national standards for licensing and oversight of mortgage brokers. Some states license mortgage brokerage offices, but not individuals; 24 states have no specific educational or experience requirements for mortgage brokers; and only a few states require criminal background checks on mortgage brokers making it possible for unethical individuals to move from one mortgage brokerage firm to another.

Figure 5 depicts the number of sampled report narratives regarding mortgage broker-originated loans that involved suspected loan fraud. Note that the number of reports filed during the first quarter of 2006 equals the total number of reports filed in all of 2004.



*Figure 5*

Identity theft has been associated with both fraud for property and fraud for profit, and is recognized as one of the fastest growing crimes in the United States. Recent news reports of personal information theft from commercial data brokers, corporate databases, and credit report companies demonstrate the potential for large-scale identity theft. Identity theft was characterized as a suspicious activity on 1,761 (2.13%) of the reports of mortgage loan fraud filed from January 1, 2003 to March 31, 2006. Figure 6 shows the increasing incidence of identity theft in conjunction with mortgage loan fraud in the SARs reviewed for this study.



*Figure 6*

Retired persons were identified as subjects in 769 (1%) of the SARs reporting mortgage loan fraud filed between April 1, 1996 and March 31, 2006. Additionally, 25 filers suspected exploitation of older subjects in association with mortgage loan fraud. Low- or fixed-income retired persons are often targeted for fraudulent schemes. The growing number of retired and elderly citizens could provide a burgeoning target for mortgage loan fraud. Figure 7 displays the reporting trend for SARs involving this subject group.



Mortgage Loan Fraud Suspicious

*Figure 7*

## Activity Report Findings
### *Characterizations of Suspicious Activity*

Many reports included more than one characterization of suspicious activity in addition to "mortgage fraud." False statement was the most reported suspicious activity in conjunction with mortgage loan fraud. Identity theft represented the fastest growing secondary characterization reported, more than two percent in less than two years. Figure 8 reveals secondary characterizations of suspicious activities reported in conjunction with Mortgage Loan Fraud.

| CHARACTERIZATION OF SUSPICIOUS ACTIVITY | NUMBER OF SARs | % OF TOTAL SARs |
|---|---|---|
| P - MORTGAGE LOAN FRAUD | 82,851 | 100.00% |
| N - FALSE STATEMENT | 15,390 | 18.58% |
| S - OTHER | 3,149 | 3.80% |
| U - IDENTITY THEFT | 1,761 | 2.13% |
| O - MISUSE OF POSITION OR SELF DEALING | 1,219 | 1.47% |
| G - CONSUMER LOAN FRAUD | 699 | Less than 1% |
| E - COMMERCIAL LOAN FRAUD | 409 | Less than 1% |
| M - DEFALCATION/EMBEZZLEMENT | 373 | Less than 1% |
| C - CHECK FRAUD | 290 | Less than 1% |
| A - BSA/STRUCTURING/MONEY LAUNDERING | 256 | Less than 1% |
| J - COUNTERFEIT INSTRUMENT (OTHER) | 217 | Less than 1% |
| R - WIRE TRANSFER FRAUD | 169 | Less than 1% |
| H - COUNTERFEIT CHECK | 69 | Less than 1% |

3/3/2019                                                    Mortgage Loan Fraud | FinCEN.gov

| B - BRIBERY/GRATUITY | 68 | Less than 1% |
| D - CHECK KITING | 62 | Less than 1% |
| Q - MYSTERIOUS DISAPPEARANCE | 60 | Less than 1% |
| K - CREDIT CARD FRAUD | 57 | Less than 1% |
| F - COMPUTER INTRUSION | 33 | Less than 1% |
| L - DEBIT CARD FRAUD | 25 | Less than 1% |
| T - TERRORISM | 9 | Less than 1% |
| I - COUNTERFEIT CREDIT/DEBIT CARD | 5 | Less than 1% |

## *Primary Federal Regulators*

Figure 9 displays the primary federal regulators identified in the reports of mortgage loan fraud. National banks with offices located throughout the country made up the largest group of lenders reporting mortgage loan fraud. The Office of the Comptroller of the Currency (OCC) is the primary regulator for national banks. National banks filed nearly 41 percent of the total reports.



*Figure 9*

*Fraud Locations*

SARs contain data fields for subject addresses, the filer's main office address, and the branch address where the suspicious activity was discovered. In the SARs reviewed in this study, suspicious activity occurred in - or was otherwise associated with - all 50 states, the District of Columbia, Puerto Rico, Guam, and American Samoa.

The subject address provides the best source for identifying the geographic location of real estate involved in mortgage loan fraud because most residential mortgage loan applicants intend to reside on the property used to secure the loan. Figure 10 provides a comparison of the address states for the filer and branch offices, and reported subjects, as provided on depository institution SARs filed on mortgage loan fraud between April 1, 1996 and March 31, 2006.



During 2005, the top five reported subject address states were California, Florida, Illinois, Texas, and Georgia.

**Reported Suspicious Activities in Sampled Narratives**
*Loan Types*

In the sampled narratives, purchase of residential property was the most frequently reported loan purpose, followed by refinance, home equity, and second trust loans. New construction loans made up a relatively small percentage of the sampled narratives:

- Residential real estate purchase loans – 880 (83.65%);
- Residential refinance loans (76), home equity/lines of credit (28), FHA Title One loans (20), second Trust loans (4) – (12.17%); and
- New construction loans – 16 (1.52%).

*Material Misrepresentation/False Statements*

Material misrepresentation and false statements were reported on 692 (65.78%) of the sampled narratives. 12 Identity fraud was reported on 160 (23.12%) of the narratives and identity theft was reported on 27 (3.9%) of the narratives. 13 Mortgage brokers or correspondent lenders initiated the loans in 254 (36.71%) of these reports. Following are the types of loan falsifications reported in the sampled narratives.

- Altered bank statements;
- Altered or fraudulent earnings documentation such as W-2s and income tax returns;
- Fraudulent letters of credit;
- Fabricated letters of gift;
- Misrepresentation of employment;
- Altered credit scores;
- Invalid social security numbers;
- Silent second trust; 14
- Failure to fully disclose the borrower's debts or assets; or
- Mortgage brokers using the identities of prior customers to obtain loans for customers who were otherwise unable to qualify.

### *Misrepresentation of Loan Purpose*

Misrepresentation of loan purpose or misuse of loan proceeds was described in 129 (12.26%) of the sampled narratives. Mortgage brokers or correspondent lenders originated the loans described on 37 (28.68%) of the reports of misrepresentation or misuse of loan funds.

Misuse of FHA Title One loans was reported in 20 (15.5%) of these narratives. FHA Title One loans may be used to finance permanent home improvements that protect or improve the basic livability or utility of the property. The funds cannot be used for debt consolidation, cash-out, or any non-home related expenses, or for luxury items such as swimming pools or hot tubs.

The most commonly reported misrepresentation was occupancy fraud, which occurs when the borrower fails to occupy the property, although the loan application specified the property was the borrower's primary residence. Occupancy fraud was reported in 104 (80.62%) of these reports. Possible motivations for misrepresentation of the loan purpose are to purchase investment property with more favorable loan rates than would be available if a lender knew the property was intended for use other than as a primary residence, or to launder funds from illicit activity.

### *Appraisal Fraud and Property Flipping*

Appraisal fraud and fraudulent property flipping were described in 111 of the sampled reports (10.55%). Appraisal fraud is frequently associated with fraudulent property flipping. Filers indicated on 48 (42.34%) of these reports that they suspected the fraudulent activity was perpetrated with the collusion of mortgage brokers, appraisers, borrowers, and/or real estate agents/brokers.

Lenders rely on accurate appraisals to ensure that loans are fully secured. Appraisal fraud occurs when appraisers fail to accurately evaluate the property, or when the appraiser deliberately becomes party to a scheme to defraud the lender, the borrower, or both. The Appraisal Institute and the American Society of Appraisers testified that "… it is common for mortgage brokers, lenders, realty agents and others with a vested interest to seek out inflated appraisals to facilitate transactions because it pays them to do so." 15 Higher sales prices typically generate higher fees for brokers, lenders, real estate agents, and loan settlement offices, and higher earnings for real estate investors. Appraisal fraud has a snowball effect on inflating real estate values, with fraudulent values being entered into real estate multiple listing systems and then used by legitimate appraisers as comparable values for determining market values for neighborhood properties. Some commonly reported types of appraisal fraud found in the sampled narratives are:

- Appraisers failed to use comparable properties to establish property values;
- Appraisers failed to physically visit the property and based the appraisal solely on comparable properties, i.e., the actual condition of the property was not factored into the appraisal;
- Appraisers participated in a fraud scheme such as flipping; or
- A licensed appraiser's name and seal were used by unauthorized persons.

Fraudulent property flipping is purchasing property and artificially inflating its value. The fraud perpetrators frequently use identity theft, straw borrowers and industry insiders to effect property flipping schemes. Ultimately, the property is resold for 50 to 100 percent of its original cost. In the end, the loan amount exceeds the value of the property and the lender sustains a loss when the loan defaults. The following fraudulent activities were reported in the sampled narratives that described property flipping.

- Nearly 64 percent of sampled narratives described collusion by sellers, appraisers, and mortgage brokers in connection with property flipping.
- Nearly 14 percent of the sampled narratives described the use of straw buyers.

The number of sampled narratives that specified fraudulent property flipping activity remained steady over the past four years. A significant spike in reports describing appraisal fraud was seen in 2004, but there was a slight decrease in the trend in 2005. This does not necessarily indicate appraisal fraud and fraudulent property flipping are decreasing, especially since activities associated with flipping (straw buyers and false statements) are increasing. Figure 11 depicts the reporting trend for appraisal fraud and fraudulent property flipping as described in the sampled narratives.



*Figure 11*

Property flipping and appraisal fraud have received a lot of attention from the media, real estate professionals, and lawmakers. Some actions taken to combat fraudulent property flipping are:

- The Housing and Urban Development regulation "Prohibition of Property Flipping in HUD's Single Family Mortgage Insurance Programs; Final Rule" (codified in 24 C.F.R. part 203) makes certain frequently flipped properties ineligible for Federal Housing Administration mortgage insurance. The regulation, which became effective in June 2003, may have impeded some flipping schemes;
- Some home builders include clauses in their sales contracts that prohibit buyers from placing their houses back on the market for a period of time after closing – usually one year. 16 There is a question whether this type of contract clause is legally enforceable under applicable state law; and
- Some states have adopted new or enhanced appraisal standards and appraisal licensing requirements.

### *Straw buyers*

The use of straw buyers to obtain mortgage loans was specifically described in 27 (2.57%) of the sampled narratives. Mortgage brokers or correspondent lenders processed loans in 21 (77.78%) of these sampled narratives. Straw buyers are reported in the narratives of 2,566 SARs (3.1% of the total of 82,851) reports. Figure 12 displays the total number of mortgage loan fraud SARs that revealed the use of straw buyers.



*Figure 12*

Use of forged documents was reported on 20 (1.9%) of the sampled narratives, with correspondent lenders or mortgage brokers processing the loans described in five of those reports. The types of activity reported include the following:

- Borrowers forged co-owners' signatures to loan documents (most often one spouse forging the other spouse's signature without prior knowledge or permission);
- Loan closing services forged applicants' signatures on loan documents (possibly to expedite the loan process); or
- Builders forged borrowers' names on loan draw documents.

*Other Fraudulent Activity*

Other types of fraudulent activity reported in the sampled narratives included:

- Loan closing services failed to properly disburse loan proceeds or pay off underlying property liens, including prior mortgage trusts. Loan settlement offices were also reported for failure to pay insurance premiums from funds collected at settlement;
- Borrowers signed multiple mortgages on the same property from multiple lenders. The mortgage settlements were held within a short period of time to prevent the lenders from discovering the fraud;
- Loan closing services failed to record the mortgage in property land records;
- Prior lenders failed to release home equity loans in land record offices after receiving mortgage pay-off, causing the new lender's loans to have a subordinate position. Homeowners continued to use the prior lines of credit in addition to the new loan to obtain an extension of credit that exceeded the property value;
- Violations of the Mortgage Broker Practices Act by mortgage brokers who abused the terms of a power of attorney;
- Mortgage brokers or correspondent lenders failed to ensure all loan documentation was properly signed;
- Real Estate Settlement Procedures Act (RESPA) violations by lenders accepting kickbacks from mortgage brokers;
- Non-arm's-length sales occurred when parties to the real estate transaction failed to disclose relationships between the buyers and sellers. Knowledge of a non-arm's-length sale would alert lenders to scrutinize loan packages more carefully;
- Elder exploitation where older individuals were persuaded to sign loan documents without understanding borrower rights and responsibilities under applicable federal and state law;
- Unofficial loan assumption occurred when property ownership was transferred without the knowledge of lenders. This could indicate that a straw buyer was used to obtain the loan, with the property title being

transferred to the actual owner after the loan disbursement;
- Theft of debit card or convenience checks associated with home equity lines of credit;
- Fraudulent bankruptcy filings to stall or prevent foreclosure; and
- Suspected use of real estate purchases to launder criminal proceeds.

**Emerging Mortgage Fraud Schemes**

*Asset Rental Fraud*

Nine (less than one percent) of the sampled SAR narratives reported asset rental fraud. Mortgage brokers or correspondent lenders processed the loans in six of those reports. This is a fraudulent scheme designed to exaggerate or inflate the stated value of a borrower's assets. Filers reported that funds were temporarily deposited into the loan applicant's bank account for the time required to qualify for a loan. The funds came from friends or family, or even from mortgage brokers attempting to qualify an ineligible borrower. The temporary funds were withdrawn from the bank account after the loans were approved.

One elaborate asset rental fraud scheme reported in a news article involved deposits of funds into bank accounts established in a prospective borrower's name, with the deposited funds being temporarily "rented" for a fee. The customary fee charged for this "service" was reportedly approximately five percent of the deposited funds. The service also may include verification of employment and income in any amount for an additional fee of one percent of the claimed annual income.17

*Debt Elimination Fraud*

Debt elimination schemes were reported in ten (less than one percent) of the sampled narratives. Filers described borrowers attempting to pay off their mortgages with non-negotiable checks, or fake instruments such as bills of exchange or subrogation and security bonds. Filers described specious arguments in which the borrowers claimed the mortgage was invalid and the debt never existed. 18 The arguments relied on an unreasonable interpretation of Section 1-207 of the Uniform Commercial Code that has never been affirmed or supported by any court or governmental authority.

Other types of debt elimination schemes reported in the SARs were attempts to fraudulently release mortgage liens from municipal land records. Once the land title appeared clear of all mortgage debt, the homeowner could theoretically obtain another mortgage loan based on what appeared to be a clear title. The threat this fraud scheme presents is that a subsequent lender could believe it had a first priority lien on property when in reality there could be little or no equity to secure the loan.

Reports of debt elimination schemes were described in 430 SARs (less than one percent of the SARs reporting mortgage loan fraud) filed between April 1, 1996 and March 31, 2006. Figure 13 depicts the filing trend for debt elimination fraud through March 31, 2006.



Conclusion

*Figure 13*

The study of the depository institution SARs describing mortgage loan fraud confirms reports of fraud associated with mortgage loans continues to grow – although it is unclear if this is primarily due to an increase in the number of fraudulent loans or an increase in awareness of this suspected fraudulent activity. It is apparent from the number of pending fraud cases reported by the Federal Bureau of Investigation (721 in 2005, up from 534 in 2004) that the awareness of mortgage loan fraud is increasing. 19 See Figure 2 for a comparison of the percentage of growth in total depository institution SARs filings to the growth in reports of mortgage loan fraud.

High home prices coupled with rising mortgage rates result in a reduction in housing affordability. In response to this trend, the housing industry is expecting a slow down in mortgage loan originations, a decrease in housing sales, and a slowing in housing price gains. The slow down in the growth of housing prices could result in the housing industry becoming less attractive to investors, which in turn could result in a reduction in the reports of fraud for profit. The current housing trend could also lead to an increase in fraud for housing as the increased costs of housing decreases the number of persons who qualify for mortgage loans. The current trend of rising interest rates and slowing housing equity growth could result in an increase in debt elimination fraud schemes, especially for homeowners with adjustable rate mortgages and interest only loans.

1 The information contained in this report is the complete mortgage loan fraud study findings as promised in The SAR Activity Review Trends, Tips & Issues, Highlighted Trend: Mortgage Loan Fraud, Issue 10, May 2006. See https://www.fincen.gov/sarreviewissue10.pdf, page 13-16.

2 See Form FR 2230 (Board of Governors of the Federal Reserve System); Form 6710/06 (Federal Deposit Insurance Corporation): Form 8010-9,8010-1 (Office of the Comptroller of the Currency); Form 1601 (Office of Thrift Supervision); Form 2362 (National Credit Union Administration; Form TD F 90-22.47 (U.S. Department of the Treasury).

3 Federal Financial Institutions Examination Council, Press Release, July 26, 2004, http://www.ffiec.gov/hmcrpr/hm072604.htm. Accessed October 3, 2005.

4 A straw buyer is someone who purchases property for another person in order to conceal the identity of the true purchaser.

5 Property flipping generally involves the buying and selling of the same property within a short period of time with the intention of making a quick profit.

6 Federal Financial Institutions Examination Council, The Detection, Investigation, and Deterrence of Mortgage Loan Fraud Involving Third Parties: A White Paper, Produced by the October 27 – November 7, 2003 FFIEC Fraud Investigations Symposium, Issued February 2005. http://www.ffiec.gov. Accessed August 30, 2005.

7 Mortgage Bankers Association, Housing and Mortgage Market: An Analysis, September 6, 2005. http://www.mortgagebankers.org/files/News/InternalResource/29899_HousingandMortgageMarkets-AnAnalysis.pdf. Accessed October 11, 2005.

8 Ibid.

9 Federal Reserve Internet site, http://www.federalreserve.gov/releases/h15/data/wf/cm.txt. Accessed October 3, 2005.

10 Federal Financial Institutions Examination Council, Press Release July 26, 2004. http://www.ffiec.gov/hmcrpr/hm072604.htm. Accessed October 3, 2005.

11 Ibid.

12 Material misrepresentation relating to straw buyers, appraisal fraud, or property flipping are addressed in subsequent paragraphs.

13 For the purpose of this report, identity fraud is differentiated from identity theft. Identity fraud as used here refers to the loan applicant's use of a non-existent social security number or a number taken from the social security death index, along with the use of the borrower's true personal identifiers (name, date of birth, address). The loan applicant intends to use the Social Security number to qualify for a loan, either because the borrower does not have a number or because the borrower's credit rating associated with their true number is inadequate for approval. Identity theft, on the other hand, is an attempt to obtain credit in another person's name.

14 A silent second trust occurs when the seller takes back a second trust from the buyer in lieu of a cash down payment. The lender is not aware of the second trust.

15 Testimony presented on behalf of the Appraisal Institute, the American Society of Appraisers, and the American Society of Farm Managers and Rural Appraisers before the House Committee on Financial Services Subcommittee on Housing and Community Opportunity and the Subcommittee on Financial Institutions and Consumer Credit on Legislative Solutions to Abusive Mortgage Lending Practices, May 24, 2005.

16 REAL ESTATE JOURNAL.COM, The Wall Street Journal – Guide to Property, October 3, 2005. http://www.realestatejournal.com/buysell/tactics/20050927-sichelman.html, accessed October 5, 2005.

17 Kenneth Harney, "Now You Can Rent Assets To Qualify For A Loan," The Baltimore Sun, August 28, 2005.

18 Borrowers who presented these specious arguments are believed to belong to groups that believe U.S. laws and regulations, along with banking regulations, do not apply to them. A typical debt elimination fraud scheme involved the presentation of numerous documents containing frivolous arguments that the subject mortgage was invalid. The arguments presented in the documents avowed that funds were never loaned, despite the fact that the borrower received the proceeds. Successful culmination of this scheme would result in the filing of a fraudulent mortgage discharge.

19 Federal Bureau of Investigation, Press Release, "Mortgage Fraud operation "Quick Flip"", December 14, 2005. Http://www.fbi.gov/pressrel/pressrel05/quickflip121405.htm. Accessed May 16, 2006.



**Home (/)**

**Resources (/resources)**

**Contact (/contact)**

**About (/what-we-do)**

**Careers (/cutting-edge-opportunities)**

**Newsroom (/news-room)**

**Site Map (/sitemap)**

**Contract Opportunities (/contract-opportunities)**

USA.gov (https://www.USA.gov) | Regulations.gov (https://www.Regulations.gov) | Treasury.gov (https://www.treasury.gov) | IRS.gov (https://www.IRS.gov) | Freedom of Information Act (FOIA) (/freedom-information-act-foia-and-guide-accessing-fincen-information) | NO FEAR Act (https://www.treasury.gov/No-Fear-Act/Pages/default.aspx) | Accessibility (/accessibility) | EEO & Diversity Policy (/equal-employment-opportunity-and-diversity-policy) | Privacy Policy (/privacy-security)



**The New York Times** |

**BUSINESS DAY**

# Flawed Paperwork Aggravates a Foreclosure Crisis

By GRETCHEN MORGENSON   OCT. 3, 2010

As some of the nation's largest lenders have conceded that their foreclosure procedures might have been improperly handled, lawsuits have revealed myriad missteps in crucial documents.

The flawed practices that GMAC Mortgage, JPMorgan Chase and Bank of America have recently begun investigating are so prevalent, lawyers and legal experts say, that additional lenders and loan servicers are likely to halt foreclosure proceedings and may have to reconsider past evictions.

Problems emerging in courts across the nation are varied but all involve documents that must be submitted before foreclosures can proceed legally. Homeowners, lawyers and analysts have been citing such problems for the last few years, but it appears to have reached such intensity recently that banks are beginning to re-examine whether all of the foreclosure papers were prepared properly.

In some cases, documents have been signed by employees who say they have not verified crucial information like amounts owed by borrowers. Other problems involve questionable legal notarization of documents, in which, for example, the notarizations predate the actual preparation of documents — suggesting that signatures were never actually reviewed by a notary.

1
ARTICLE
REMAINING

Enjoy a 4-week free trial to The Times.

START YOUR FREE
TRIAL

Subscriber login

Other problems occurred when notarizations took place so far from where the documents were signed that it was highly unlikely that the notaries witnessed the signings, as the law requires.

On still other important documents, a single official's name is signed in such radically different ways that some appear to be forgeries. Additional problems have emerged when multiple banks have all argued that they have the right to foreclose on the same property, a result of a murky trail of documentation and ownership.

There is no doubt that the enormous increase in foreclosures in recent years has strained the resources of lenders and their legal representatives, creating challenges that any institution might find overwhelming. According to the Mortgage Bankers Association, the percentage of loans that were delinquent by 90 days or more stood at 9.5 percent in the first quarter of 2010, up from 4 percent in the same period of 2008.

But analysts say that the wave of defaults still does not excuse lenders' failures to meet their legal obligations before trying to remove defaulting borrowers from their homes.

"It reflects the hubris that as long as the money was going through the pipeline, these companies didn't really have to make sure the documents were in order," said Kathleen C. Engel, dean for intellectual life at Suffolk University Law School and an expert in mortgage law. "Suddenly they have a lot at stake, and playing fast and loose is going to be more costly than it was in the past."

Attorneys general in at least six states, including Massachusetts, Iowa, Florida and Illinois, are investigating improper foreclosure practices. Last week, Jennifer Brunner, the secretary of state of Ohio, referred examples of what her office considers possible notary abuse by Chase Home Mortgage to federal prosecutors for investigation.

The implications are not yet clear for borrowers who have been evicted from their homes as a result of improper filings. But legal experts say that courts may

1
ARTICLE
REMAINING

Enjoy a 4-week free trial to The Times.

START YOUR FREE
TRIAL

Subscriber login

Judges may dismiss the foreclosures altogether, barring lenders from refiling and awarding the home to the borrower. That would create a loss for the lender or investor holding the note underlying the property. Almost certainly, lawyers say, lawsuits on behalf of borrowers will multiply.

In Florida, problems with foreclosure cases are especially acute. A recent sample of foreclosure cases in the 12th Judicial Circuit of Florida showed that 20 percent of those set for summary judgment involved deficient documents, according to chief judge Lee E. Haworth.

"We have sent repeated notices to law firms saying, 'You are not following the rules, and if you don't clean up your act, we are going to impose sanctions on you,' " Mr. Haworth said in an interview. "They say, 'We'll fix it, we'll fix it, we'll fix it.' But they don't."

As a result, Mr. Haworth said, on Sept. 17, Harry Rapkin, a judge overseeing foreclosures in the district, dismissed 61 foreclosure cases. The plaintiffs can refile but they need to pay new filing fees, Mr. Haworth said.

The byzantine mortgage securitization process that helped inflate the housing bubble allowed home loans to change hands so many times before they were eventually pooled and sold to investors that it is now extremely difficult to track exactly which lenders have claims to a home.

Many lenders or loan servicers that begin the foreclosure process after a borrower defaults do not produce documentation proving that they have the legal right to foreclosure, known as standing.

As a substitute, the banks usually present affidavits attesting to ownership of the note signed by an employee of a legal services firm acting as an agent for the lender or loan servicer. Such affidavits allow foreclosures to proceed, but because they are often dubiously prepared, many questions have arisen about their validity.

Although lawyers for troubled borrowers have contended for years that banks

1

ARTICLE
REMAINING

Enjoy a 4-week free trial to The Times.

START YOUR FREE

TRIAL

Subscriber login

in 23 states because of problems with its legal practices. The move by GMAC followed testimony by an employee who signed affidavits for the lender; he said that he executed 400 of them each day without reading them or verifying that the information in them was correct.

JPMorgan Chase and Bank of America followed with similar announcements.

But these three large lenders are not the only companies employing people who have failed to verify crucial aspects of a foreclosure case, court documents show.

Last May, Herman John Kennerty, a loan administration manager in the default document group of Wells Fargo Mortgage, testified to lawyers representing a troubled borrower that he typically signed 50 to 150 foreclosure documents a day. In that case, in King County Superior Court in Seattle, he also stated that he did not independently verify the information to which he was attesting.

A spokesman for Wells Fargo said the bank was confident in its foreclosure policies and practices; he also noted that the judge overseeing the case involving Mr. Kennerty had ruled in favor of the bank.

In other cases, judges are finding that banks' claims of standing in a foreclosure case can conflict with other evidence.

Last Thursday, Paul F. Isaacs, a judge in Bourbon County Circuit Court in Kentucky, reversed a ruling he had made in August giving Bank of New York Mellon the right to foreclose on a couple's home. According to court filings, Mr. Isaacs had relied on the bank's documentation that it said showed it held the note underlying the property in a trust. But after the borrowers supplied evidence indicating that the note may in fact reside in a different trust, the judge reversed himself. The court will revisit the matter soon.

Bank of New York said it was reviewing the ruling and could not comment.

Another problematic case involves a foreclosure action taken by Deutsche Bank

1
ARTICLE
REMAINING

Enjoy a 4-week free trial to The Times.

START YOUR FREE
TRIAL

Subscriber login

But according to court filings made by David B. Shaev, a lawyer at Shaev & Fleischman who represents the borrower, the assignment to Deutsche Bank is riddled with problems. First, the company that Deutsche said had assigned it the mortgage, the Sand Canyon Corporation, no longer had any rights to the underlying property when the transfer was supposed to have occurred.

Additional questions have arisen over the signature verifying an assignment of the mortgage. Court documents show that Tywanna Thomas, assistant vice president of American Home Mortgage Servicing, assigned the mortgage from Sand Canyon to Deutsche Bank in October 2009. On assignments of mortgages in other cases, Ms. Thomas's signatures differ so wildly that it appears that three people signed the documents using Ms. Thomas's name.

Given the differences in the signatures, Mr. Shaev filed court papers last July contending that the assignment is a sham, "prepared to create an appearance of a creditor as a real party in interest/standing, when in fact it is likely that the chain of title required in these matters was not performed, lost or both."

Mr. Shaev also asked the judge overseeing the case, Shelley C. Chapman, to order Ms. Thomas to appear to answer questions the lawyer has raised.

John Gallagher, a spokesman for Deutsche Bank, which is trustee for the securitization that holds the note in this case, said companies servicing mortgage loans engaged the law firms that oversee foreclosure proceedings. "Loan servicers are obligated to adhere to all legal requirements," he said, "and Deutsche Bank, as trustee, has consistently informed servicers that they are required to execute these actions in a proper and timely manner."

Reached by phone on Saturday, Ms. Thomas declined to comment.

The United States Trustee, a unit of the Justice Department, is also weighing in on dubious court documents filed by lenders. Last January, it supported a request by Silvia Nuer, a borrower in foreclosure in the Bronx, for sanctions against JPMorgan Chase

**1**
ARTICLE
REMAINING

Enjoy a 4-week free trial to The Times.

START YOUR FREE
TRIAL

Subscriber login

In testimony, a lawyer for Chase conceded that a law firm that had previously represented the bank, the Steven J. Baum firm of Buffalo, had filed inaccurate documents as it sought to take over the property from Ms. Nuer.

The Chase lawyer told a judge last January that his predecessors had combed through the chain of title on the property and could not find a proper assignment. The firm found "something didn't happen that needed to be fixed," he explained, and then, according to court documents, it prepared inaccurate documents to fill in the gaps.

The Baum firm did not return calls to comment.

A lawyer for the United States Trustee said that the Nuer case "does not represent an isolated example of misconduct by Chase in the Southern District of New York."

Chase declined to comment.

"The servicers have it in their control to get the right documents and do this properly, but it is so much cheaper to run it through a foreclosure mill," said Linda M. Tirelli, a lawyer in White Plains who represents Ms. Nuer in the case against Chase. "This is not about getting a free house for my client. It's about a level playing field. If I submitted false documents like this to the court, I'd have my license handed to me."

A version of this article appears in print on October 4, 2010, on Page A1 of the New York edition with the headline: Banks' Flawed Paperwork Throws Some Foreclosures Into Chaos.

---

© 2019 The New York Times Company

**1**
ARTICLE
REMAINING

Enjoy a 4-week free trial to The Times.

START YOUR FREE
TRIAL

Subscriber login

1/3/2019    USDOJ: US Attorney's Office - Southern District of New York



THE UNITED STATES ATTORNEY'S OFFICE

SOUTHERN DISTRICT *of* NEW YORK



SEARCH THE ARCHIVE

[SEARCH]

Home » News



**Current Site**

Department of Justice

L— U.S. Attorneys

L— Southern District of New York



**Archives**

Department of Justice

L— U.S. Attorneys

L— Southern District of New York

## MANHATTAN U.S. ATTORNEY SUES FLAGSTAR BANK FOR FRAUDULENT MORTGAGE LENDING PRACTICES AND SETTLES FOR $132.8 MILLION AND OTHER CONCESSIONS

**FOR IMMEDIATE RELEASE**                                    Friday February 24, 2012

*Bank Admits and Accepts Responsibility for Submitting False Certifications to HUD and Also Agrees to Reform Practices*

Preet Bharara, the United States Attorney for the Southern District of New York, Helen Kanovsky, General Counsel of the U.S. Department of Housing and Urban Development ("HUD"), and David A. Montoya, the Inspector General of HUD, announced today that the United States has filed, and simultaneously settled, a civil fraud lawsuit against FLAGSTAR BANK, F.S.B. ("FLAGSTAR"), one of the nation's largest savings banks and originators of mortgage loans, for improperly approving residential home mortgage loans for government insurance.  In the settlement, FLAGSTAR admitted, acknowledged, and accepted responsibility for submitting false certifications to HUD.  The false certifications induced the Federal Housing Administration ("FHA") to accept loans for government insurance that were not eligible and that resulted in losses to HUD when the loans defaulted.  FLAGSTAR agreed to pay $132.8 million to the United States in damages and penalties under the False Claims Act and to reform its business practices.  The settlement was approved today by United States District Judge Katherine B. Forrest.

Manhattan U.S. Attorney Preet Bharara stated:   "The lawsuit filed today is another stark example of how certain lenders put profit ahead of responsibility by recklessly churning out mortgage loans without regard to the risk that those loans would default or the significant consequences for the individual homeowners who would inevitably default on their loans, the housing market, and in the aggregate, our nation's economy.  With today's settlement FLAGSTAR has accepted responsibility for its conduct, and committed to reform its business practices to ensure compliance with HUD requirements.  Participation in this federally subsidized program is a privilege, not a right, and the cases this office has filed against banks that abuse this privilege should underscore our commitment to holding them to account."

HUD General Counsel Helen Kanovsky stated: "It is absolutely fundamental that lending institutions that earn the authority to directly endorse FHA-insured mortgages apply our standards.  Lenders that play fast and loose with FHA requirements, placing families at unnecessary risk, do so at their own peril."

HUD Inspector General David A. Montoya stated: "Today's settlement is the latest example of our continued work of holding FHA Direct Endorsement Lenders accountable for adhering to strict underwriting standards.  I laud the cooperation between my office and the Departments of Housing and Urban Development and Justice to bring this matter to closure.  This success could not have happened without the untold energy and effort of my audit, investigative and legal staff, and their foundational role in enabling today's settlement."

The following allegations are based on the Complaint filed today in Manhattan federal court:

FLAGSTAR has been a participant in the Direct Endorsement Lender program ("DEL program"), a federal program administered by the FHA, since 1988.  The DEL program authorizes private-sector mortgage lenders ("Direct Endorsement Lenders") to approve mortgage loans for insurance by the FHA.  If a Direct Endorsement Lender approves a

mortgage loan for FHA insurance and the loan later defaults, the holder of the loan may submit an insurance claim to HUD for the costs associated with the defaulted loan that HUD must then pay. Under the DEL program, neither the FHA nor HUD reviews a loan before it is endorsed for FHA insurance. Consequently, it is crucial that Direct Endorsement Lenders follow the DEL program rules in determining which loans to approve for FHA insurance. One such rule requires that Direct Endorsement Lenders employ experienced underwriters who have demonstrated knowledge and skill in mortgage evaluation and the principles of mortgage underwriting ("DE underwriters") to conduct due diligence on loans before they are endorsed for FHA insurance.

From January 1, 2002 to the present (the "Covered Period"), FLAGSTAR routinely delegated key underwriting functions to staff employees who were not DE underwriters. Notwithstanding the fact that these "underwriting assistants" lacked the qualifications necessary to be DE underwriters, they were frequently assigned by FLAGSTAR to review conditions that had been placed on FHA loans and to make the final decision on whether the requisite conditions for FHA insurance had been met. Even though FLAGSTAR permitted these key underwriting responsibilities and decisions to be delegated to underwriting assistants, FLAGSTAR's DE underwriters falsely certified to HUD, for each loan they manually underwrote and endorsed for government insurance, that the DE underwriters had themselves reviewed all of the loan documents and had exercised due diligence in underwriting the loans.

The Complaint also alleges that FLAGSTAR's DE underwriters repeatedly endorsed loans for FHA insurance that did not comply with HUD's underwriting requirements and thus were not eligible for government insurance. FLAGSTAR's DE underwriters nevertheless falsely certified to HUD, for each loan they endorsed for FHA insurance, that it was eligible for such insurance.

FLAGSTAR also set daily quotas for its DE underwriters and underwriting assistants, specifying the number of loans and conditions that they had to process per day, and paid these employees substantial incentive awards for exceeding their daily quotas. For example, in 2008, 10 FLAGSTAR DE underwriters earned at least $30,000 in incentive awards, with the top earner receiving $82,180.33 in extra compensation. The default rates on the loans that these 10 DE underwriters manually underwrote and approved for FHA insurance in 2008 were higher than the average default rate for all of the manually-underwritten loans that Flagstar approved for FHA insurance that year.

As part of the settlement, FLAGSTAR has admitted, acknowledged, and accepted responsibility for the following conduct:

- Notwithstanding loan-level certifications to the contrary, a Flagstar DE underwriter did not, in every instance, 'personally review' 'all associated documents' for the loans that Flagstar manually underwrote and endorsed for FHA insurance during the Covered Period.

- In a number of instances, underwriting assistants were the only ones to review documents associated with material conditions on the loans that Flagstar manually underwrote and approved for FHA insurance during the Covered Period.

- In a number of instances, underwriting assistants cleared material conditions — without DE underwriter supervision — relating to the borrower's income, assets and credit.

- In a number of instances, notwithstanding loan-level certifications to the contrary, loans that Flagstar underwrote and approved for FHA insurance during the Covered Period, and for which HUD has paid insurance claims, did not comply with certain underwriting requirements contained in HUD's handbooks and Mortgagee Letters and were therefore ineligible for mortgage insurance under the DEL program.

- Flagstar made false certifications on loans that induced the FHA to accept for Government insurance loans that were ineligible and that the FHA otherwise would not have insured, and that resulted in losses to HUD when the loans defaulted.

Under the settlement, FLAGSTAR has agreed to pay $15 million within 30 days after approval of the settlement by the Court, and to make additional payments totaling an additional $117.8 million as soon as FLAGSTAR meets certain financial benchmarks. The settlement payments represent the maximum that FLAGSTAR can pay, consistent with its banking regulatory requirements and other requirements, including capital requirements imposed by the Office of the Comptroller of the Currency and the obligation of its parent holding company to satisfy its obligations in connection with the Troubled Asset Relief Program.

FLAGSTAR has also agreed to comply with all relevant HUD/FHA rules applicable to Direct Endorsement Lenders.  FLAGSTAR has further agreed that, in addition to complying with all relevant HUD/FHA rules applicable to Direct Endorsement Lenders, FLAGSTAR's continued participation in the DEL program is conditioned on: (1) FLAGSTAR's completion of a one-year period during which FLAGSTAR's compliance with all HUD/FHA rules applicable to Direct Endorsement Lenders shall be monitored by a third party at FLAGSTAR's own expense (under certain conditions, this monitoring period may be extended by HUD for an additional two years); (2) FLAGSTAR's implementation of a training program for all employees involved in the origination and underwriting of FHA loans regarding all relevant HUD/FHA rules applicable to Direct Endorsement Lenders; and (3) FLAGSTAR's certification to HUD that the individuals in senior leadership positions who previously had primary responsibility for, respectively, overseeing and initiating and overseeing FLAGSTAR's manual underwriting process are no longer employed by FLAGSTAR.

The case is being handled by the Office's Civil Frauds Unit.  Mr. Bharara established the Civil Frauds Unit in March 2010 to bring renewed focus and additional resources to combating financial fraud, including mortgage fraud.

The Complaint filed today against FLAGSTAR represents the fourth civil fraud lawsuit brought by this Office in the last nine months alleging reckless or fraudulent lending practices by residential mortgage lenders.  On May 3, 2011, the Government sued DEUTSCHE BANK and its subsidiary, MORTGAGEIT, INC., in connection with $386 million of FHA insurance claims paid by HUD for defaulted mortgage loans.  On November 1, 2011, the Government sued ALLIED HOME MORTGAGE CORPORATION and its CEO in connection with $834 million of FHA insurance claims paid by HUD.  On February 15, 2012, the Government sued and settled with CITIMORTGAGE, INC. ("CITIMORTGAGE"), a subsidiary of CITIBANK, N.A., for engaging in over six years of misconduct in connection with CITIMORTGAGE's participation in the DEL program.  In the settlement, CITIMORTGAGE admitted and accepted responsibility for failing to comply with certain DEL program requirements, and agreed to pay $158.3 million in damages.  The Office's Civil Frauds Unit is handling all four cases as part of its continuing investigation of reckless mortgage lending practices.

The Civil Frauds Unit works in coordination with President Barack Obama's Financial Fraud Enforcement Task Force, on which Mr. Bharara serves as a Co-Chair of the Securities and Commodities Fraud Working Group.  President Obama established the interagency Financial Fraud Enforcement Task Force to wage an aggressive, coordinated, and proactive effort to investigate and prosecute financial crimes.  The task force includes representatives from a broad range of federal agencies, regulatory authorities, inspectors general, and state and local law enforcement who, working together, bring to bear a powerful array of criminal and civil enforcement resources.  The task force is working to improve efforts across the federal executive branch, and with state and local partners, to investigate and prosecute significant financial crimes, ensure just and effective punishment for those who perpetrate financial crimes, combat discrimination in the lending and financial markets, and recover proceeds for victims of financial crimes.

Mr. Bharara thanked HUD and HUD-OIG for their extraordinary assistance in this case.  He also expressed his appreciation for the support of the Commercial Litigation Branch of the U.S. Department of Justice's Civil Division in Washington, D.C.

Assistant U.S. Attorney Christopher B. Harwood is in charge of the case.

12-061

Return to Top

USAO ARCHIVE
HOME

JUSTICE.GOV/USAO

Accessibility        Justice.gov
FOIA                 USA.gov
Privacy Policy
Legal Policies &
Disclaimers





 **REUTERS**

Brexit      Imprisoned In Myanmar      Sectors Up Close      Breakingviews      Investing      Future of Mone'

**BONDS NEWS**

FEBRUARY 5, 2013 / 7:25 PM / 6 YEARS AGO

# UPDATE 3-NY judge finds Flagstar liable for $90 mln in mortgage case



* U.S. judge orders Flagstar to pay Assured Guaranty $90.1 million

* Lawsuit focused on quality of loans in mortgage-backed securities

* Assured had sought $116 million

* Flagstar says will appeal the ruling

By Nate Raymond

NEW YORK, Feb 5 (Reuters) - Flagstar Bancorp Inc was ordered on Tuesday to pay $90.1 million to bond insurer Assured Guaranty Ltd in a contract dispute over loans underlying $900 million in mortgage-backed securities.

U.S. District Judge Jed Rakoff in Manhattan ruled that Flagstar had materially breached contracts specifying the quality and characteristics of loans to be packaged into the securities.

The closely watched lawsuit has been seen as a test of the ability of bond insurers to hold banks accountable for losses incurred insuring securities at the heart of the financial crisis.

SPONSORED

A number of other suits have been filed against banks by Assured and fellow insurers, but have yet to reach trial.

"This ruling is a significant milestone in forcing the banks to honor the contractual commitments they made and have long sought to avoid," Jacob Buchdahl, a lawyer for Assured at Susman Godfrey, said in a statement.

The ruling followed a bench trial last year. Assured had at the close of trial sought $116 million.

In a statement late on Tuesday, Flagstar Bancorp said it "strongly disagrees with the court's ruling and intends to vigorously contest the outcome on appeal."

The lawsuit, filed in April 2011, accused Troy, Michigan-based Flagstar of misrepresenting the quality and traits of loans packaged into two mortgage securitizations issued in 2005 and 2006, valued at more than $900 million.

Assured had guaranteed the Flagstar securities. When the housing meltdown hit, it was forced to pay millions in claims.

Rakoff said the loans in the securitizations "pervasively breached Flagstar's contractual representations and warranties."



SPONSORED BY WEWORK

## Space that empowers

An office is more than just four walls. It's a space to do your best work and inspire your team

Learn more ›

The decision was another reminder of the continued litigation fallout from the subprime meltdown of 2007 and the financial crisis that followed.

The ruling came a day after the U.S. Department of Justice launched a civil fraud lawsuit against credit ratings agency Standard & Poor's, a unit of The McGraw-Hill Companies Inc , over its mortgage bond ratings.

The Flagstar case mirrors other lawsuits by insurers such as MBIA Inc and Ambac Financial Group Inc. Defendants have included JPMorgan Chase & Co, Credit Suisse Group AG and Bank of America Corp's Countrywide Financial unit.

Assured's lawsuit against Flagstar was the first by the insurers to reach trial. Assured CEO Dominic Frederico, whose company is pursuing other lawsuits, in a statement said the ruling "sets a strong precedent in support of the rights of Assured Guaranty in these cases."

Flagstar, which had net income of $223.7 million for 2012, said Jan. 23 that it had reserved $82.7 million for pending and threatened litigation, including Assured's lawsuit.

The litigation reserves also cover another bondholder lawsuit launched earlier this month by MBIA, which sued after paying out $165 million on claims related to two mortgage-backed transactions it insured.

Flagstar had separately agreed in February 2012 to pay $132.8 million to settle claims by the U.S. Department of Justice that it improperly approved mortgages for government insurance.

The Assured case amounted to what Rakoff called a "war of experts." Expert witnesses for Assured used a statistical sample of 800 of the 15,000 loans at issue. Of the 800, 606 were defective, an expert for Assured testified.



Flagstar challenged the experts' methodologies and the insurer's ability to prove liability on a sample. But Rakoff said sampling was a "widely accepted method of proof" and largely accepted the experts' testimony.

The case is Assured Guaranty Municipal Corp v Flagstar Bank, FSB in U.S. District Court, Southern District of New York, 11-2375.



**MEMBERS** of "The Families of Phila." have cause to celebrate. A federal judge has ordered our local courts to answer charges levied against it by Phila. homeowners charging the city's mortgage-foreclosure practices have illegally forced hundreds out of their homes. TFOP members with similar cases, L-R: Johnny Young, Jameel El, Adisa Folami El, Crystal Stephen, Sheila Lloyd and Danyiell Wright. Photo by Wendell Douglas

### BY JOE SHAHEELI

The 1st Judicial Dist., long criticized for the way it handles civil forfeiture proceedings, finally has to answer charges filed by the Institute for Justice on behalf of four Philadelphia residents.

Federal Judge Eduardo C. Robreno has the 1st Dist.'s motion to dismiss the class action challenging its administration of civil forfeiture proceedings, filed in August 2014 by the Washington-based Institute for Justice on behalf of four Philadelphians.

Waving a flag of joy and relief are a host of homeowners in this city who, eight years ago, banded together under the umbrella of The Families of Philadelphia. Uniting them was a common bond. Each was losing a home or property through what they felt, and later discovered, were illegal practices, many of which were ignored by the judges of this city who routinely handled flawed requests to approve forfeitures.

Each had a sad tale to tell. No matter to whom they were referred for relief and support, no matter the evidence they accumulated that they had complied with requests from mortgagors, and entered into and honored new financial arrangements, their property was on a fast track to forfeiture.

Darpana Sheth, IJ's senior and lead attorney on the case, said, "This decision makes clear in no uncertain terms that Philadelphia's state court administrators must now defend their inadequate procedures that have systematically trampled on the rights of our clients and the rights of thousands of other property owners."

Judge Robreno squarely rejected the 1st Judicial Dist.'s argument that IJ's lawsuit should be dismissed because the district had recently changed some of its procedures. Judge Robreno ruled, "This is not like a new case, finding IJ's complaint sufficiently alleged both "that the pre-October 2015 civil forfeiture procedures were unconstitutional" and "that the changes to the procedures have not fixed those deficiencies."

Judge Robreno further rejected the 1st Judicial Dist.'s arguments that its procedures are constitutionally adequate, holding once more that "Plaintiffs have the better of [the] argument."

The IJ claims, "The 1st Judicial Dist. and Philadelphia police and prosecutors have long failed to provide property owners with a prompt opportunity to get their property back. Meanwhile, individual property owners have been forced to attend as many as 10 or more proceedings, with many losing their property for missing a single one. And for almost a decade, the 1st Judicial Dist. let the city's prosecutors run a forfeiture 'courtroom,' the infamous Courtroom 478, with no judge or jury."

"Philadelphia tried to seize my home even though I did not do anything wrong, but the court system in Philadelphia did not give me a chance even to see a judge," said Christos Sourovelis, the lead plaintiff in the case. "I am very happy the case will go on, because it means the court administrators are going to have to be accountable for the nightmare they put my family and others through."

"Civil forfeiture laws are draconian and outrageous in many places in the country, but Philadelphia is in a league of its own in how it treats property owners," explained Milad Emam, attorney at the IJ. "Philadelphia has seized over $64 million from its residents in an 11-year forfeiture machine that must be dismantled."

*The Philadelphia Public Record* for the past two years has periodically reported on problems suffered by the members of The Families of Philadelphia, detailing what they cited as illegal procedures leading to their homes being placed on sheriff sales.

Crystal Stephens, 56, has been one of the victims. For the past 27 years, she has lived in her Northern Liberties home which she owns. She found herself battling her mortgage company, which had refused to lower her rates when they had taken a big dip nationally.

She was among several who testified before City Council at a hearing chaired by Councilman Curtis Jones, Jr. as to her arduous and costly efforts to save her home. Today, her case sits in the State's Superior Court.

Despite this, her property is being processed for Sheriff Sales this May 2.

Sheriff Jewell Williams, who has seen cases such as hers sent to him to be auctioned, says he and his staff have offered as much assistance as they were able, pointing her and others to where help might be available. But, bound by state law, his office has to process those properties for sale, unless stopped by agreement or court order.

Johnny Young, who is a spokesman for the group, has long cited the federal laws which were being given short shrift by the Philadelphia courts. He said The Families of Philadelphia collectively has put over eight years of research into cases involving its members. He believes he will provide the Institute with more proof of misconduct and deceptive legal practices by some law firms which have stolen property from Philadelphia homeowners.

"Soon," he adds, "but unfortunately not in time to save the homes of many Philadelphians, the Feds will demand and make sure remedial changes are put in place, ending the travesties being inflicted on the poor victims caught in this web spun by the courts and some law firms.

## Continued Success

**Paul Randall**
**202-689-0526**
**Judahgarments@gmail.com**
ForeclosureSurvivalToday.com



**BUSINESS**

# Jury awards $5.4 million to couple after finding fraud in foreclosure case

Jury awards couple $5.4 million in foreclosure case against Wells Fargo and its mortgage servicer

**L.M. Sixel**

Dec. 9, 2015  ⋮  Updated: Dec. 10, 2015 11:37 a.m.



**David Wolf and his wife, Mary Ellen Wolf, stand on the porch of their West University home, which is at the center of a foreclosure dispute. ( James Nielsen / Houston Chronicle )**

Photo: James Nielsen, Staff

David and Mary Ellen Wolf were several payments behind on their home mortgage and knew that foreclosure loomed.

They were puzzled, though, when a foreclosure notice came early in 2011 from Wells Fargo because they hadn't done business with that bank.

They asked their West University neighbor, lawyer W. Craft Hughes, for help. After poring over mortgage records, Hughes came to the conclusion that neither Wells Fargo nor its mortgage servicer, Carrington Mortgage Services, had legal claim to the note on the house or the right to foreclose.

**Unlimited Digital Access as little as $0.99**

Read more articles like this by subscribing to the Houston Chronicle

SUBSCRIBE

A state district court jury in Harris County agreed last month and awarded the Wolfs $5.4 million after a four-day trial.

"It's very unusual," said Linda E. Fisher, professor of law at Seton Hall Law School who has testified before Congress on the effect of mortgage fraud on consumers. "Cases like this don't usually get in front of a jury."

The situation has its roots in practices that evolved in the years leading to the Great Recession that began in 2007. Wall Street investment houses were eager to generate mortgage-securitized trusts - financial instruments created by bundling thousands of mortgages and selling shares to investors who expected to profit from the combined monthly mortgage payments.

That's how the Wolfs' loan, which they originally got through the First Community Credit Union in late 2000, eventually became part of the Wells Fargo and Carrington portfolio.

## *Robo-signings*

To deal with the paperwork involved with securitized trusts, many banks set up a process that came to be called robo-signing - high-volume approval of mortgage transfer documents by employees who didn't review details and missed troubled mortgages. Homeowners have had

Case 3:21-cv-00006-MHL   Document 3-7   Filed 01/06/21   Page 51 of 58 PageID# 448

little success in court with arguments that robo-signing made loans unenforceable through foreclosure.

But the Wolfs took a different route.

## Texas law

Hughes argued that when Wells Fargo retroactively attached the Wolfs' mortgage to a securitized trust that was closed and sold to investors three years earlier, the bank violated a Texas law that prohibits fraudulent real estate filings. The jury agreed, although State District Judge Mike Engelhart hasn't formally entered the verdict, and the bank and mortgage company haven't said whether they'll appeal.

The Wolfs discussed the jury's decision recently under the portico of the residence at the center of the case, a 1950s ranch-style house on Buffalo Speedway.

It's on the market for $850,000, and neither the couple nor their lawyer knows who legally owns it.

"That's a big question mark," said Hughes. The jury found that neither Wells Fargo nor Carrington owns the mortgage note. But the jury also determined the Wolfs owe $655,000 on the note they signed in 2006.

Wells Fargo and Carrington declined to comment on the case.

During the trial, Wells Fargo argued the timing of its filings did not make them invalid. Ownership of a deed is created when the promissory note is transferred to a trustee, not when change of ownership is recorded at the county clerk's office, Wells Fargo's lawyers argued in court filings.

The Carrington Trust was created in 2006. Wells Fargo didn't file the Wolfs' transfer documents until 2009.

## Legal standing?

Wells Fargo also argued the Wolfs do not have legal standing to contest whether their note and deed of trust were handled correctly under the trusts' pooling and servicing agreements. The mortgage industry has used that argument successfully in foreclosure cases across the country.

A party alleging bank fraud must prove that someone suffered a loss, said David Kwok, assistant professor at the University of Houston Law Center. But homeowners are typically in the background and aren't involved in buying or selling mortgages, transferring documents into trust agreements or creating mortgage-backed securities. The banks, brokers and transfer agents that do that work are the ones who can claim damages.

## Bank criticized

But, he added, the Wolfs' case is intriguing because of the way the homeowners used the Texas statute.

The Office of Inspector General for the U.S. Department of Housing and Urban Development criticized Wells Fargo in 2012 for failing to establish effective controls over its foreclosure process. The agency's report studied the nation's five largest Federal Housing Administration mortgage servicers.

The inspector general found that Wells Fargo employees routinely certified they had personal knowledge of the content of documents yet didn't have the underlying records or verify their accuracy. Some signed as many as 600 documents each day - the practice that came to be called robo-signing.

## 'Behind the scenes'

"The law allows the banks to do whatever the hell they want behind the scenes," said Hughes. "And when homeowners sue, the courts say that the homeowners don't even have standing to object to the foreclosures if they're bought by mortgage-backed security trusts."

But this time, the Wolfs could stop the foreclosure - and potentially receive millions of dollars in damages if the jury verdict stands - because of the Texas law that prevents fraudulent filing of documents involving real estate.

Dana Karni, a consumer rights lawyer in Houston, said that lenders, as well as companies that buy debt at a discount. then try to collect it, may view occasional legal judgments as a business expense unless juries award millions of dollars or more.

## 'An M or a B'

"When a bank gets hit in the gut, the only way they really feel it is when they're paying out damages that start with an M or a B," Karni said.

Hughes filed the Wolf case as a class action on behalf of about 4,000 Texans, but it was dismissed on a procedural issue over the timing of some claims. He is hoping to resurrect the class claim on behalf of Texans he says have faced similar foreclosures.

The Wolfs bought their home in the heart of West University in 2000 for $283,150. Six years later, they refinanced their mortgage for $400,000.

David Wolf was chief technology officer for a construction company in 2009 when he got word, along with hundreds of other employees, that funding was drying up and he no longer had a job. By 2010, the Wolfs were only making partial payments and by the end of that year, they had stopped paying entirely because he hadn't found a new job.

A representative from Carrington told them that with the job loss and mounting bills, they would be good candidates for a federal program to help struggling homeowners. Shortly after they submitted the affidavits and other documents. However, they were served with the foreclosure notice. By that time their $400,000 loan had increased to $500,000.

The Wolfs tried to sell their house for $590,000 and received a couple of offers, but the sales didn't close. They also wrote a letter to Wells Fargo in 2012 offering to pay their $2,500 monthly mortgage into an escrow account until the property's ownership is settled. The Wolfs said they never got a reply to the offer.

©2019 Hearst

# Miami NewTimes



Taber Andrew Bain / Flickr

# Miami Judge Threatens Major Mortgage Company Lawyers With Criminal Charges for Hiding Documents

**JERRY IANNELLI** | DECEMBER 14, 2017 | 11:23AM

*Update 12/14: Miami-Dade County Judge Beatrice Butchko moved forward today with criminal contempt-of-court charges against Ditech's lawyers. The attorneys say they plan to file an appeal.*

Ditech, one of America's largest home-loan companies, achieved fame in the 1990s with TV commercials that showed its competitors complaining they had "lost another loan to Ditech." The company largely vanished during the 2008 housing crisis but has since rebounded and
remains
one of the largest mortgage-service firms in America. It brings in revenue in excess of $1 billion per year and handles thousands of home-foreclosure cases annually.

But in Miami, circuit court Judge Pedro Echarte Jr. has accused lawyers
for
the giant firm of hiding key documents — it's even possible those attorneys could face criminal charges after a hearing today. The documents in question suggest the company's lawyers might have lied about whether the company ensures payment balance data is accurate and its customers are getting foreclosed upon fairly.

Poor and/or negligent record-keeping was a major contributor to the 2008 housing crash. Four major banks, including JPMorgan Chase, reached an eye-popping $25 billion settlement with the U.S. Department of Justice in 2012 after the banks were found to be willfully "
robo
-signing" thousands of foreclosure documents every day without bothering to check them.

In a hearing at the Miami-Dade County Courthouse today, lawyers for Ditech will have to explain why they should not be held in contempt of court. A potential nonjury trial date has been set for February 1, 2018.

"The Defendants are hereby noted that this is now a criminal matter," Echarte warned Ditech's lawyers Yacenda Hudson and Amina McNeil in an order filed just before Thanksgiving. Echarte also accused one of Ditech's witnesses of giving false testimony during foreclosure proceedings in order to cover up the company's allegedly inadequate loan processes.

Neither the lawyers in question nor Ditech responded to *New Times*' multiple requests for comment sent earlier this month. The lawyers have since hired defense attorneys and filed multiple motions in attempts to kill the measure.

In court documents, Ditech attorneys argued that its lawyers acted ethically and that its representatives "should not have to defend themselves in criminal proceedings for actions taken while properly representing their clients." Ditech's lawyers claim the facts laid out in the judge's order "do not show (or even suggest)" anyone broke the law.

But Bruce Jacobs, a local foreclosure lawyer, AM radio host, and former Miami-Dade County prosecutor representing homeowners who were foreclosed upon, characterizes Ditech's actions in this case as an "attack on the integrity" of the court system.

"As a former prosecutor, I strongly believe banks should be presenting truthful evidence and should be punished if they were caught doing something no other party would be allowed to get away with, especially because they are banks," Jacobs tells *New Times*.

Ditech's largest competitor, Ocwen, has been the subject of multiple lawsuits from state governments and the federal Consumer Finance Protection Bureau (the government body set up to protect homeowners after the 2008 housing crisis) over mishandling this very same process, known as "loan boarding."

If companies mishandle their loan-boarding processes, there are real impacts for regular people: A mortgage servicer might buy policies from a different company and never know whether that company kept accurate records. The new company might then foreclose on a home without properly informing the homeowners or might try to repossess a home that's fully paid up.

The documents Ditech allegedly hid — employee training manuals — raise questions about the accuracy of the company's record-keeping processes nationwide.

The trouble in Miami began in September 2015, when Ditech tried to foreclose on a home at 11260 SW 157th Ct. in the Hammocks area of West Kendall. Ditech alleged the family that bought the home owed $287,675 on its mortgage. Ditech, under its former name (Green Tree), had bought the mortgage in question from another company.

In court, Jacobs asked Ditech how it knew the old company's records were accurate. Ditech representatives responded that the company uses an industry-standard "red flag" checking process, which prevents loans from being "boarded" into Ditech's systems if the old company's records are incorrect or incomplete. Ditech also said this process was laid out in its training manuals.

In court filings, Jacobs wrote that Ditech's statements piqued his interest: Ditech's process sounded nearly identical to that of the company's biggest competitor, Ocwen. (In fact, another Miami-Dade judge, Beatrice Butchko, called Ocwen's loan-boarding process a "legal fiction.") So Jacobs asked Ditech to produce evidence that its manuals require employees to check records of new mortgages.

But when Jacobs tried to obtain a copy of the training manuals, Ditech's lawyers refused to hand them over. The company suddenly claimed the documents were confidential and filed a flurry of legal motions in an attempt to prevent the training manuals from being disclosed to the court. Judge Echarte, frustrated, told Ditech that if it could not find a time to agree to a deposition with Jacobs, he would force both parties to meet at midnight on a weekend. Echarte jokingly assumed this threat would force the two parties to find a way to compromise and sort out their differences.

Instead, according to court documents, Ditech's lawyers walked into a deposition at midnight Sunday, July 23, and in "violation of the Court's order, they refused to produce any training manuals or other documents requested" by the court. On November 16, Echarte again demanded Ditech turn over the manuals or face a second wave of possible contempt charges. At 11:59 a.m. that day, one minute before their time was set to expire, Ditech's attorneys finally submitted the materials.

It turns out the manuals mention no accuracy-checking process. Echarte claims the company willfully lied in court to protect itself.

"Plaintiff, Ditech Financial... appears to have willfully violated this Court's order to produce training manuals," Echarte wrote in a judicial order issued just before Thanksgiving. "The training manual produced on November 16, 2017, now appears to show that Ditech's standard business practice does not verify prior servicer's records for accuracy before boarding loans. The training manual produced appears to show that Ditech's witness, Christopher Ogden, gave false testimony in an effort to introduce the prior servicer's records into evidence under false pretenses."

Echarte, an experienced judge, was incensed. In his November 20 order, he told Ditech's lawyers to get their own lawyers.

"If any Defendant is found in Contempt of Court

,

because it is indirect criminal contempt, that Defendant may be facing jail, adjudication, probation, and/or other sanctions," Echarte wrote. "If any lawyer is found in contempt, the matter will be referred to the Florida Bar."

RELATED TOPICS:     NEWS          REAL ESTATE

Use of this website constitutes acceptance of our terms of use, our cookies policy, and our privacy policy

©2019 Miami New Times, LLC. All rights reserved.