expectation, due to the nature of past dealings and developing a livelihood from stealing people's property, that Respondent **will** fail "to meet with Plaintiffs or an authorized consumer credit counseling agency or [will] den[y] assistance by the Pennsylvania Housing Finance Agency". Again, Respondent(s) reserves ALL RIGHTS and WAIVES NONE at no time EVER in this matter and continues to assert in TRUTH that Plaintiffs lack standing as well as any valid and lawful claim(s) against Respondent(s) because a valid mortgage contract does not exist in law, in fact or in truth and **Plaintiff's Complaint fails** for this very reason. But for the existence of such a **valid Agreement**, Respondent(s) is not **lawfully** required by **any law** to meet with person(s) (alive or dead), merely because Plaintiff dictates Respondent comply, when Respondent(s) has not contracted, owes no legal duty or legal obligation or moral or ethical responsibility. *To the extent this pleading is factual and truthful, strict proof is demanded. Respondents Reserve All Rights and Waive None.*

**WHEREFORE,** Respondents having ANSWERED Plaintiff's assertions, Respondent NOW COMES and RAISES AFFIRMATIVE DEFENSES AND NEW MATTER in the nature of DEMURRERS or other appropriate RESPONSES to Plaintiffs Fraudulent and unlawful Foreclosure suit.

## NEW MATTER & DEMURRER

9. Plaintiff(s) lack standing to assert a valid claim against Respondent(s). There is no valid lawful contract and therefore no relationship that exists between Plaintiffs and Respondent(s).

    a. Plaintiffs never presented owner's in fee with an opportunity to enter into a valid mortgage agreement; Owners in Fee never presented Plaintiffs with an offer to enter into a valid mortgage agreement.

    b. Respondent never entered into a mutually agreed upon contractual relationship with Plaintiffs to borrow funds of any kind and in return for such funds to then repay a specific amount. There was no bargain for exchange/consideration.

    c. At no time did Respondent ever execute any documents knowingly, willingly or intentionally so as to create any duty or obligation upon Respondent to Plaintiff.

10. Plaintiff(s) fail to state a cause of action for which relief can be granted.

11. Plaintiff(s) failed to join all *necessary* parties.

12. Plaintiff(s) failed to attach all *written contracts,* which they assert the basis of the claim rest upon, and for which the Pa.R.C.P unequivocally require that such attachments "*shall*" be included, despite Plaintiff's false assertions of material fact(s) that "there is no such requirement".

13. Plaintiff(s) failed to produce evidence of **valid consideration** for the alleged mortgage agreement they claim the herein action is based. Sham consideration is no consideration.

14. Plaintiff(s) have failed to produce factual evidence that supports their false assertions that Respondents in Fee knowingly, intentionally and willingly executed the alleged mortgage contracts asserted. On numerous occasions, Respondent(s) requested copies of:

   a. Documents evidencing the loan transaction;
   b. A copy of the cancelled check and/or the wire transfer;
   c. A valid mortgage agreement with the signature of both owner in fees;
   d. A valid mortgage note with the signature of both owner in fees;
   e. Any documents other than documents that could be falsely contrived to advance a Scam and Fraud.

At all times, Plaintiffs have failed to produce said:

   a) Valid executed agreements;
   b) Valid documents supporting the transaction/transfer of funds; and
   c) Valid allonge.

Failure to ignore Respondents' request and failure to produce the requested documents is a direct violation of RESPA. This is Fact and this is Law.

15. Respondent(s) aver that the mortgage contract is invalid and void *ab initio* for lack of a valid signature by Respondent and therefore is a violation of common law contract law and statutory contract law as well as a violation of the Statute of Frauds, which requires for contracts concerning real property to be in writing and executed by the parties to be charged at the time of the agreement.

16. As per educated deducements of the attached documents enclosed with Plaintiffs' filed Complaint, several alleged foreclosure assistant agencies were contacted:

a. On February 22, 2018, NACA was contacted: Respondent informed them of the situation and the false signature and was advised to merely file a loan modification or file for Chapter 7 or Chapter 13 bankruptcy and that Respondent(s) just have to pay. The specific assistance was "make two payments then figure out what you want to do with your home; "most people just move out".

b. On February 22, 2018 HUD was contacted and Respondent was provided with a number to call. Respondent contacted the Dickenson House and scheduled an appointment. Respondent has been working with the Dickenson House. On Monday April 10, 2018 Respondent had an appointment and learned that her case worker was no longer employed with the Agency. In fact, everyone with whom Respondent had dealt had been replaced.

c. On April 5, 2018, Respondent followed up with Legal Aide as per advisement by the case worker at Dickenson House. At the appointment, Respondent was informed Legal Aide could not assist her and that cases of her nature were not the type of cased they addressed. Respondent was provided with information regarding recent filings and orders from the docket and informed that a Response was due April 11, 2018. Additionally, Respondent was asked "why don't you just hire a lawyer" to which Respondent replied: "I cannot afford one; that is why I am here".

Respondent avers that the attached documents with lists of alleged agencies to assist are merely Racket agencies and providing such documents is a mere unlawful formality scam to entrap and cause undue stress and emotional distress under the already traumatic circumstances, which is intentionally and deliberately directly being caused by Plaintiff and Plaintiff's lawyers. Such injurious and nefarious tactics are a violation of a duty of good faith and fair dealing, whether a valid contract exists or not. Further, Respondent(s) contends that such actions committed against both she and her mother :May-E. McCloud: are nefariously intentional and that due to their indigenous status they are the targets of the housing Fraud prevalently occurring in the City of Philadelphia and displacing thousands of indigenous people, just as the Homestead Acts and other united states policies and laws have in the past.

17. Respondents have been unlawfully discriminately targeted in a city that is determined to push out the indigenous population. Respondents raised several issues in Preliminary Objections that were constantly viewed by Plaintiff as being attempts to waste the courts time and cause unnecessary delay. On numerous occasions in this herein matter, Respondents have faced discrimination in filing their documents, denied access to electronically file documents and then seek nondiscriminatory relief concerning these matters. The series of factual truthful acts committed by Plaintiffs, Plaintiff's lawyer(s) and the judicial system gives factual baseful grounds for unclean hands and violations of a duty that is owed by all court officers, clerks and lawyers to the public regardless of race, status and nationality. Discriminately targeting and creating through acts, directly or indirectly, constituting threat, duress and coercion that may dissuade one (Respondent(s)) from pursuing a lawful right is a direct violation of the United States Constitution, Pennsylvania Constitution and the United Nations Rights of Indigenous Peoples and American Declaration of the Rights of Indigenous Peoples, which have been adopted by the United Nations Treaty on Human Rights, which the United States is a signatory. When the clerks office denied all documents attempted to be filed on line, access to the courts were denied. When Plaintiff dissembled about serving Respondents and then made reference to documents not attached as exhibits, further acts of intentional dissembling and misrepresentations were committed; when Respondent(s) request for documents evidencing a valid contract and payment of consideration for an alleged mortgage contract Respondent did not execute are denied yet clearly required by the Court's rules, Fraud and illegality is not only being committed but is ongoing and continuing until remedy is received. Plaintiffs continued avoidance to provide requested documents to support Plaintiffs position and allegations and claims against Respondent remain.

18. Respondent(s) further asserts that Plaintiff's contention and assertion of continued payment owed without Plaintiff in good faith producing required documents not only required for a well pled complaint, but also evidencing a valid and lawful contract, is Fraud and Misrepresentation, and illegality that is continuing and ongoing. and does not in law provide lawful grounds for Plaintiff to file a foreclosure action. Therefore, Plaintiffs' suit is not only Frivolous but also an intentional wrongful use of civil proceedings.

19. Respondent(s) further asserts, that in the event Plaintiff's Complaint is not dismissed, Plaintiff is not the genuine party of interest in the matter and therefore barred from making

any claims against Respondents or the Foreign Trust that holds the real property in trust as an asset.

20. Respondent(s) further assert the defense of "unclean hands".

21. Respondent(s) reserves all rights and waives none regardless of any decisions that have made and regardless of any objections that have been overruled. All objections herein in this Answer, New Matter and Counterclaim and raised in any previously responded documents are preserved. Additionally, Respondent reserves the right to raise any additional defenses including affirmative defenses as discovery progresses. Again, Respondent(s) as a non-willing or voluntary or intentional signatory to the alleged mortgage contract asserted and presented by Plaintiffs reserves ALL RIGHTS.

22. Respondent, further demands that in the event this matter moves forward, that the matter receives a trial by jury.

23. Respondent(s), NOW having raised NEW MATTER and DEMURRER respectfully demand:

    1. Plaintiff's Complaint be DISMISSED with Prejudice; and

    2. Respondents be compensated compensatorily and punitively to the fullest extent of the law.

## COUNTER-CLAIM

## <u>UNJUST ENRICHMENT</u>

1. Respondent(s) <u>never</u> entered into a valid mortgage contract with Plaintiffs. Plaintiffs have provided and admit evidence of payments made by Respondent :May-E. McCloud: who has chronic progressive Dementia.

2. Plaintiff received payment in return for not providing a loan to Respondent under fraudulently contrived mortgage agreement documents. Therefore, Plaintiffs are thieves and pirates hiding behind a shielded corporation.

3. When Respondent(s) :Vera-L. Jones: became the legal guardian of :May E. McCloud: an inventory of the Estate was conducted and the fraudulent mortgage agreement was discovered.

4. Respondent(s) contacted Plaintiffs, whose contact and good faith inquiry and request for more information was ignored.

5. Respondent(s) ceased automatic withdrawal payments. Shortly thereafter, Plaintiffs assigned the mortgage to Matrix Financial Services Corporation.

6. Respondent(s) aver that Plaintiff's and/or FlagStar were unjustly enriched at Respondent(s) expense because a valid mortgage contract did not/does not exist and never existed.

7. Respondent(s) contend that all times Plaintiffs were fully aware of the mental state of :May-E. McCloud: and fully aware that :Vera-L. Jones: had not in fact or truth executed any mortgage contract documents.

## <u>LACK OF CONSIDERATION</u>

8. Plaintiff failed to provide Respondent on numerous occasions with evidence of the valid mortgage contract and transaction or transfer of any funds to Respondent :May-E. McCloud:

9. Respondent, :Vera-L. Jones: at all times was unaware that a mortgage existed on premises 1361 S. 46th Street until she became the legal guardian of the Estate and was required to perform an inventory of the Estate to be filed in Orphans' Court.

10. Respondent, :May-E. McCloud: suffers from chronic progressive Dementia and suffered from Dementia at the alleged time Plaintiffs assert a mortgage was entered by Respondent(s).

11. Plaintiff has not provided any evidence that consideration (the alleged loan) was ever provided to effectuate the final element of a valid and bilateral mortgage contract.

## FRAUD

12. Plaintiffs presented Respondent(s) with a mortgage contract with a forged or copied and pasted signature on the document.

13. Plaintiffs presented Respondent with a copy of the note that lacked Respondent, :Vera -L. Jones: signature, with Plaintiff reasoning and stating to the housing counselor "the note does not require her signature because she was not the one making the payments".

14. The note and mortgage lawfully must remain together. The note follows the mortgage agreement and under contract law all agreements that are to be charged against the party must be executed by the party.

15. Plaintiffs refused to provide Respondent with an original copy of the mortgage contract.

16. Plaintiffs refused to provide Respondent with a copy of cancelled check, wire transfer of funds or any documents evidencing the validity of an existing valid mortgage contract.

17. Respondent on numerous occasions, in writing and over the phone informed Plaintiffs that she had never executed any mortgage agreements with Plaintiffs.

18. Plaintiff dismissed Respondents request and continued to pursue and move forward, in bad faith, to foreclose on the property without providing evidence of the existence of a valid mortgage contract.

19. Plaintiff intentionally ignored a material fact and instead of addressing the issue that documents could have been forged and falsified, Plaintiffs chose to intentionally ignore the probative information as if their sole intention was to foreclose and dispossess Respondents of their Family Tribal Estate, whether a valid mortgage existed or not.

20. Respondent upon learning of the truth of the fraudulent mortgage on her property blocked access to the automatically withdrawn payments.

21. At no time were Plaintiffs concerned about whether the mortgage was fraudulent; Plaintiffs solely were concerned about receiving payment and who paid and under whatever circumstance was not their concern.

22. Plaintiffs did not address or respond to Respondents inquiries until payments ceased.

23. Respondents have suffered injury of being defamed, denied access to defend the foreclosure lawsuit and dismissed as it they do not matter by Plaintiff's lawyer contending that their concerns are frivolous and attempts used to delay the foreclosure process.

24. Plaintiffs actions exhibit a clear pattern of violations and detest for those who attempt to challenge an otherwise obvious and yet comfortable lifestyle Plaintiffs have managed to achieve through committing such unlawful acts.

## VIOLATION OF FAIR DEBT COLLECTION ACT

25. Plaintiffs violated various provisions of the FDCPA by using unfair and unconscionable means to collect the debt they would not provide evidentiary documents to substantiate their claim.

26. Plaintiff contacted Respondent :May-E. McCloud: at all times of the day and evening. The contacts continued incessantly, even after they were contacted and informed by correspondence and phone not once, but three (3x's) that their acts were in violation. Plaintiff's ignored all notices and continued calling Respondent :May-E. McCloud: threatening to foreclose on the home even though it had/has no right to possession of the property. The phone calls caused Respondent :May-E. McCloud, a chronic dementia patient to become visibly upset and emotionally distressed and confusion.

**WHEREFORE**, Respondent DEMANDS compensation in actual damages, including for mental anguish; statutory damages and any other compensation the Court deems reasonable and fair.

## VIOLATION OF RESPA

27. Plaintiffs have consistently refused to provide Respondent with documents and information requested in their alleged foreclosure action.

28. Plaintiffs have charged late fees for timely payments that were automatically deducted from Respondents' account, although they were not entitled to payment.

29. Plaintiffs have ignored and refused to cease its harassing collection efforts and foreclosure proceedings after receiving numerous consumer reporting warnings and complaints due to late phone calls and harassing personal visits to 1361 S. 46th Street.

30. Plaintiffs have provided information to consumer reporting agencies regarding overdue payments allegedly owed by Respondent(s), which remains a genuine issue of material fact.

**WHEREFORE**, Respondent(s) request that this Court DISMISS Plaintiffs' Complaint and provide equitable, just and compensatory relief to Respondent(s) as Truth and Justice so require.

Honorably Submitted,

'All Rights Reserved'

Date of Execution: 04.11.2018

By:

*Autograph of Trustee for the Be Kind and Unified Indigenous Foreign Private Family Trust On behalf of ©May E. McCloud™ and © Vera L. Jones™ and the Authorized Living woman and Representative :Vera-Lynn: Jones: -Al-ways in Propria Persona, Sui-Juris-*

By:

*Autograph of: Vera L. Jones: The Authorized Representative, Foreign Indigenous Beneficiary and Living Woman as Created by the Creator -All Rights Reserved-*

## VERIFICATION

By my autographed hand enseated, I _____, verify that the factual statements herein are true, correct and made with honor and free of any misleading information, lies, deceit or untruths according to my knowledge, information and comprehension. Respondent-beneficiary _Vera Jones_ and Trustee _____ of the **Be Kind and Unified Indigenous Foreign/Private Family Trust, verify that in accordance with the laws of the Creator, Jus Cogens (International Law), and Customary Laws,** that the statements presented herein are made with the utmost knowledge and intent to represent **TRUTH** and that it is comprehended that having intentionally being made of the corrupt mind with the intent to commit nefarious, deceitful and perjuries and that such actions cause an understanding of the established 18 Pa. C.S. §4904 relating to unsworn falsifications, that have customarily been codified as per Jus Cogens.

Honorably Submitted,

All Rights Reserved

Date of Execution: 04.11.2018

_Autograph of Trustee for the_
_Be Kind and Unified Indigenous_
_Foreign Private Family Trust_
_On behalf of ©May E. McCloud™_
_and © Vera L. Jones™ and_
_the Authorized Living woman and_
_Representative :Vera-Lynn: Jones:_
_Al-ways--in--Propria Persona, Sui_
_Juris_

_Autograph: of : Vera-L. Jones:,_
_Propria Persona, Sui Juris_
_The Authorized Representative,_
_Foreign Indigenous Beneficiary and_
_Living Woman as Created by the_
_Creator_
_-All Rights Reserved-_

## CERTIFICATE OF SERVICE

By my autograph and seal, and in conformance with the Uniform Postal Act and laws governed by the Uniform Postal Union, I _____, have certified that I have caused a true and correct copy of the RESPONSE/ANSWER, NEW MATTER AND COUNTER-CLAIM in Support thereof to be filed on _____ and mailed by the U.S. Postal Service (USPS) First Class Mail on: _____ to the following persons (entity) or living men or women:

**MICHAEL A. PELLIGRINO, ESQUIRE**
**DBA ATTORNEY FOR PLAINTIFF**
**PHELAN HALLINAN LLC**
**1617 JOHN F. KENNEDY BLVD**
**SUITE 1400, ONE PENN CENTER PLAZA**
**PHILADELPHIA, PENNSYLVANIA 19103**

Date of Execution: _____ By _____
                                          Autograph of living man or woman.



P.O. Box 4503
Iowa City, Iowa 52244

March 9, 2017

Harold Harris
50 Lovell Rd
Holden, MA  01520

Subject: Your submission, number 170216-001427

Dear Harold Harris:

We received your submission and will review it as soon as possible to determine if it involves a Federal consumer financial law within our authority.

Depending on what we find, we will either:

- Send your complaint to the company for a response; or
- Send your complaint to the appropriate regulator or help you get in touch with your state and local consumer protection office if your complaint is not within our authority; or
- Let you know if we need more information to continue our work.

While we can't give legal advice or represent individuals in legal matters, if you want more help you can contact a private attorney or your local legal aid office for free or low-cost legal resources at www.lsc.gov.

You can register to track the status of your submission at:
https://help.consumerfinance.gov/app/account/complaints/list.

New CFPB mortgage rules protect borrowers and make it easier for them to get the help they need. Submitting a complaint won't automatically stop or delay foreclosure, but if you're behind on your mortgage, or having a hard time making payments, call us at (855) 411-CFPB (2372). We can help you find a housing counselor in your area who can develop a plan of action for your situation and help you work with your mortgage company. Foreclosure prevention help is free and special assistance may be available to military members or veterans. You can find more information on mortgages at:
http://www.consumerfinance.gov/mortgage/

Thank you,

Consumer Financial Protection Bureau
consumerfinance.gov
(855) 411-CFPB (2372)



P.O. Box 4503
Iowa City, Iowa 52244

March 9, 2017

Harold Harris
50 Lovell Rd
Holden, MA  01520

Subject: Your submission, number 170215-000267

Dear Harold Harris:

We've sent your complaint to the company for a response.

We will let you know when the company responds. The response should include the steps they took, or will take, in response to your complaint.

You should receive a status update within the next 15 days.

You can track the status of your complaint at: help.consumerfinance.gov/app/account/complaints/list.

New CFPB mortgage rules protect borrowers and make it easier for them to get the help they need. Submitting a complaint won't automatically stop or delay foreclosure, but if you're behind on your mortgage, or having a hard time making payments, call us at (855) 411-CFPB (2372). We can help you find a housing counselor in your area who can develop a plan of action for your situation and help you work with your mortgage company. Foreclosure prevention help is free and special assistance may be available to military members or veterans. You can find more information on mortgages at: http://www.consumerfinance.gov/mortgage/

Thank you,

Consumer Financial Protection Bureau
consumerfinance.gov
(855) 411-CFPB (2372)

| | |
|---|---|
| MATRIX FINANCIAL SERVICES . | IN THE COURT OF COMMON PLEAS OF |
| CORPORATION, | · PHILADELPHIA COUNTY, |
| Plaintiff, | · PENNSYLVANIA |
| vs. | · CIVIL TRIAL DIVISION |
| MAY-E. MCCLOUD AND VERA-L.. JONES. | MAY TERM, 2017 |
| Respondents. | · No. 03419 |

## RESPONDENTS' RESPONSE TO REQUESTS TO PRODUCE DOCUMENTS

1.  All documents referred to or relied upon in the Answer.

    **Response:**

    In responding to any Answers to Interrogatories Respondents' relied upon documents produced by Plaintiffs Flagstar and Matrix Financial that were filed with the Foreclosure Complaint as well as Complaint to Quiet Title. Documents relied upon that were not produced by Plaintiff are attached.

    All Rights Reserved.

2.  All documents referred to or relied upon in your answers to the accompanying

    Interrogatories Directed to Defendants May-E. McCloud and Vera-L. Jones.

    **Response:**

    In responding to any Answers to Interrogatories respondents relied upon documents produced by Plaintiffs Flagstar and Matrix Financial that were filed with the Foreclosure Complaint as well as filed in the new action to Quiet Title. At this time Respondents do not possess additional independent documents that they know of.

#3715044 v. 1

All Rights Reserved.

3.    All documents relating to the Loan, the Note, or the Mortgage.

**Response:**

In responding to any Answers to Interrogatories respondents relied upon documents produced by Plaintiffs Flagstar and Matrix Financial that were filed with the Complaint as well as filed in the new action to Quiet Title.

All Rights Reserved.

4.    All documents relating to any liens against the Property.

**Response:**

At this time, Respondents are without knowledge or information regarding any such documents pertaining to any liens.

All Rights Reserved.

5.    All documents relating to any judgments against you.

**Response:**
Respondents are without knowledge or information regarding any judgments against them.

All Rights Reserved.

6.    All Communications and Documents Relating To mortgage payments forbearance

payments, trial payments, trial plan payments, trial modification payments, and/or

modification payments made by you from execution of the Loan Documents to

the present, including without limitation, cancelled checks (front and back), bank

statements, and wire confirmations.

**Response:**
Respondent does not possess any such information or documents. Respondent
Jones has NEVER made any such payments and has never entered into a
contractual arrangement or agreement with Flagstar Bank or any of its affiliates or
Matrix Financial Corporation.

**All Rights Reserved.**

7.    All documents relating to the amount due on the Loan.

**Response:**

Documents in Respondents' possession concerning any amounts due on the alleged
loan were forwarded and conveyed by Plaintiff Matrix Financial Corporation and
Flagstar Bank as attachments to the Foreclosure Complaint. Respondent Jones
never possessed any independent documents of her own. However, upon request
for documents evidencing a Mortgage with Respondent Jones' signature through
the assistance of the Attorney General's Office and the Department of Banking and
Securities, Plaintiffs produced by way of correspondence dated February 27, 2017
to the Office of the Pennsylvania Attorney General Bureau of Consumer Protection
the alleged payment history of Respondent McCloud.

Therefore, Plaintiffs are already in possession of the documents which they are
requesting. Respondents are unaware of any independent documents relating to the
amount due on the Loan.

**All Rights Reserved.**

# 3715044 v. 1

8.   All documents relating to receipt of the Act 6 of 1974 notice and to the

     receipt of the Act 91 of 1983 notice.

     **Response.** In responding to any Answers to Interrogatories respondents relied upon
     documents produced by Plaintiffs Flagstar and Matrix Financial Corporation that
     were filed with the Complaint as well as filed in the new action to Quiet Title. The
     Act 6 Act of 1974 and the Act 91 of 1983 were included with the Foreclosure
     Complaint packet that was filed with the court. Plaintiffs are already in possession
     of these requested documents.

     All Rights Reserved.

9.   All documents constituting or relating to any communication between

     you and Matrix Financial Corporation or any of its employees, agents, or

     representatives.

     **Response:** To comply with this request we would first need to know who Matrix
     Financial is and who their employees, agents, and/or representatives are. At this time,
     we only possess knowledge regarding Matrix Financial Corporation as Plaintiff in
     this lawsuit that they have filed against Respondents. Beyond that information, we
     have had no other communications with them.

     All Rights Reserved.

10.  All documents provided to, received from, or prepared by any person you expect to

     call as an expert witness at the trial in this lawsuit.

     **Response:** Unknown and unavailable at this time.

     All Rights Reserved.

11.  If your response to any of the accompanying Request for

     Interrogatories Directed to Defendants May- E, McCloud and Vera-

L. Jones is anything other than an unqualified admission, all documents supporting, refuting or otherwise relating to the denials or qualified admissions.

**Response:**

This request is confusing. All denials were specifically explained. If there were any documents relied upon in support of the DENIALS, the documents at the time of the response that were relied upon were documents produced by Plaintiff in both their Foreclosure complaint as well as their Complaint to Quiet Title.

For example. Plaintiffs produced a Note, that was unsigned and unexecuted by Respondent Jones; Plaintiffs produced an intentionally forged Mortgage document that not only had a hand drawn line with Respondent Jones' name written under the line, but also had someone attempt to copy Respondent Jones' signature.

Additionally, the Mortgage document possessed infinitesimal initials that were also forged in an attempt to factually represent Respondent Jones' acknowledgement of the document.

Further, Plaintiff then produced two (2) different copies of the Mortgage. The copy of the Mortgage produced to the Attorney General's Office in 2017 lacked Respondent Jones' name as included and witnessed to have "personally appeared" before the Notary. However, on December 10, 2018 upon filing the Complaint to Quiet Title with the first Judicial Courts, Court of Common Pleas of Philadelphia County, a substantially different copy of the Mortgage which now, miraculously included Respondent Jones' written name as May E. McCloud + Vera L Jones having "personally appeared" before the Notary, was now included and filed as well as verified.

The handwriting of "Vera L Jones" written name is substantially different from the handwritten name of "May E McCloud". Not to mention since the beginning of this matter, Respondent has

vehemently denied having EVER executed any mortgage documents for the subject property of this matter.

Therefore, Respondent relies upon allative documents per se presented by Plaintiffs as her supporting EVIDENCE that Flagstar Bank and/or Matrix Financial Corporation intentionally filed a document containing forged signatures in an intentional act to commit Fraud.

Otherwise, Respondent remains without knowledge, information or belief as to what exactly this question is requesting.

All Rights Reserved.

12.   All documents supporting, refuting, or otherwise relating to your

contention that Matrix lacks standing to assert a valid claim against Respondent(s),

alleged in Paragraph 9 of the New Matter & Demurrer.

**Response:**
The response in connection to this question is based upon Respondents personal lack of knowledge or information regarding any personal or business relationship connection through contracting or otherwise. Additionally, the response further relies upon the alleged documents Plaintiff provided in their Complaint asserting claim against Respondents. None of the document produced by Plaintiff include Plaintiff's signature as well as Respondents. At no time during communications with reaching out to figure out who Flagstar was did Respondent ever come in contact with or was Respondent informed that Matrix Financial Corporation was also asserting a claim or right to the alleged Mortgage Document presented with Respondent McCloud's signature.

   All Rights Reserved.

13.   All documents supporting refuting or otherwise relating to your contention that Matrix fails to state a cause of action as alleged in Paragraph 10 of the New Matter and Demurrer.

**Response:**

Respondent reinforces that this is the point. There are no documents possession either respondents' signature that connects and presents a contractual duty upon Respondents to Matrix Financial. If Matrix Financial can not provide evidentiary documentation that they possess standing from an injury or harm committed by Respondent who owed them a duty, then they will have established standing. At this time Respondent lacks any documents evidences any such relationship establishing a duty upon Respondent that would entitle Matrix Financial to possess standing in this matter it has filed against Respondents.

**All Rights Reserved.**

14.   All documents supporting, refuting, or otherwise relating to your contention that Matrix failed to join all necessary parties as alleged in Paragraph 11 of the New Matter and Demurrer.

**Response:**
Plaintiffs have filed a claim against Respondents without providing evidentiary proof that they have the correct Respondents and now expect for Respondents to assist them in carrying out what they competently should have acquired prior to filing suit. The documents that provide the evidence are any and all documents that have been filed with the courts that have either been accepted or denied, including Respondents Preliminary Objections filed in response to Plaintiff's Complaint. In the Preliminary Objections, which it is clear that Plaintiff had received and read and responded, Respondents informed Plaintiff that Respondents are no longer the owners of the property 1361 S. 46th Street and have not been since 2016. Respondents provided Plaintiffs with the name of the Private Trust which holds the property in trust. Therefore, Plaintiffs already possess this information.

**All Rights Reserved.**

15.   All documents supporting, refuting, or otherwise relating to your contention that Matrix failed to attach all written contracts, as alleged in Paragraph 12 of the New Matter and Demurrer.

**Response:**

# 3715044 v. 1

This request speaks for itself. When Matrix Financial Corporation filed the foreclosure Complaint, there were **no**:

a) Agreements attached;
b) Notes attached;
c) Allonges attached;
d) Evidence of Consideration; or
e) Loan Applications attached.

At this juncture, Respondents have received numerous copies of the alleged Mortgage (albeit with differences and substantial differences), Unexecuted Notes, Unexecuted Loan Applications.

However, Plaintiffs have continued to withhold evidence of consideration and allonges.

All Rights Reserved.

16.    All documents supporting, refuting, or otherwise relating to your contention that Matrix failed to produce evidence of valid consideration for the alleged mortgage agreement as alleged in Paragraph 13 of the New Matter and Demurrer.

**Response**: Respondent continues to remain without evidence requested personally and through the Pennsylvania Attorney General's office concerning evidence of valid consideration. Specifically, the documents requested, were and remain unproduced:

a) Copy of check evidencing loan proceeds;
b) Wire Transfer evidencing transfer and receipt of alleged loaned funds;
c) Bank Statements evidencing transaction of transfer of loaned funds;
d) IRS documents evidencing reports of filed interests payments earned from loan; and/or
e) Bank Documents evidencing book keeping or other business documents evidencing loan transaction of funds prepared in the ordinary course of business. *Et cetera*.

8

Plaintiffs' request for Respondent to produce "all documents…" is confusing here, when Plaintiff is aware that they have never produced said requested documents, but now attempt to shift the burden of proof on Respondent to explain why such contention has been asserted.

Here, the fact that Plaintiffs never produced the requested documents is *per se* evidence that Plaintiff, Matrix Financial Corporation, failed to produce evidence of valid consideration for the alleged mortgage agreement.

All Rights Reserved.

17.   All documents supporting, refuting, or otherwise relating to your

Contention that Matrix "failed to produce factual evidence that supports their false

assertions that Respondents in Fee knowingly, intentionally and willingly executed

the alleged mortgage," as alleged in Paragraph 14 of the New Matter and Demurrer.

**Response:**

The documents produced by Matrix Financial Corporation per se reveal that someone either at Flagstar or at Matrix Financial Corporation added Respondent Jones' initials to the Mortgage Document and/or also falsified her signature either by physically committing forgery of her signature. At first glance to the untrained and unknown eye, the signature appears to represent Respondent Jones' however, to those who are familiar with her handwriting including Respondent Jones, the signature lacks the personality and artistic flow that Respondent Jones' signature always contains.

Additionally, the initials are clearly not the handwriting of Respondent Jones, as Respondent Jones never would have affixed her initials in such an infinitesimal and unidentifiable manner.

All Rights Reserved.

18.   All documents supporting, refuting or otherwise relating to your contention that the mortgage contract is invalid and void ab initio for lack of a valid signature, as alleged in Paragraph 15 of the New Matter and Demurrer.

**Response:**

Again, the documents Plaintiff(s) produced are per se evidence that the mortgage contract is invalid.

a)  The Note is unsigned by Respondent Jones.
b)  Plaintiffs produced two (2) substantially different copies of the Mortgage, which they possessed and without Respondent having any access.
c)  The produced Loan Application lacks Respondent Jones' signature, handwriting, and even initials.
d)  Respondent Jones' name on the Mortgage was not executed by Respondent.
e)  Respondent **never** received any documents, bills, copies of agreements, updated mortgage assignments or servicing *et cetera* from Flagstar or Matrix Financial containing her name prior to becoming the legal guardian in 2016.

Plaintiffs again request evidence from Respondents which solely they possess and are in total control to alter, manipulate and create post 2011.

Further, they are aware of the laws that they must follow in accordance with Federal and State practice to prevent predatory lending and unconscionable acts. Plaintiffs are aware and in possess of these documents.

Further, any and all procedural manuals regarding the loan application and approval process of Flagstar Bank and any assignments *et cetera* remain in possession of Plaintiffs. It is not Respondent who contains the documentary evidence Plaintiffs request, but Plaintiffs themselves.

All Rights Reserved.

a 3715044 v. 1

19.     All documents supporting, refuting, or otherwise relation to your contentions of

violation of the duty of good faith and fair dealing, as alleged in Paragraph 16 of

the New Matter and Demurrer.

**Response:**  Under 24 CFR 203.604 "The mortgagee must have a face-to-face
interview with the mortgagor, or make reasonable effort to arrange such a meeting
before three (3) full monthly installments due on the mortgage are unpaid.
Additionally, "a lender, in order to offer a borrower a face-to-face meeting must,
at a minimum, do the following:

>    (a) Send a letter offering such a meeting; and
>    (b) Go to the door of the borrower's home for the purpose of offering a
>         face-to-face meeting." *See 24 CFR 203.604(d).*

Here, Respondents again, never received any such phone calls regarding such. In
fact, the only phone calls Respondents incessantly received, were phone calls to
collect the alleged mortgage payments, that were made at all times of the day and
night. (*See attached correspondences).*

Further, Plaintiffs knowing that they have forged the documents continue to assert
that they have a claim and that they continue to incur damages from the non-
payment of a fraudulent mortgage. This contention is substantially evidenced by
the two (2) Complaints Plaintiffs have filed and verified in this matter. Therefore,
again, the documents requested here by Plaintiff are already in Plaintiffs'
possession.
**All Rights Reserved.**

11

20.   All documents supporting, refuting or otherwise relating to your contentions of

unclean hands, as alleged in Paragraph 17 of the New Matter and Demurrer.

**Response:**

Again, the documents presented by Matrix Financial are fraudulent document
containing forged signatures, initials, and names that were not originally apart of
the documents. The documents presented by Matrix Financial are per se evidence
that Matrix Financial has engaged in dealings of this matter with unclean hands.
The documents Plaintiff requests are already in the possession of Plaintiff.

All Rights Reserved.

21.   All documents supporting. Refuting, or otherwise relating to your

Contention of fraud and misrepresentation, as alleged in Paragraph 18 of the New

Matter and Demurrer.

**Response:**
Again, the documents presented by Plaintiff are per se fraudulent documents. The
signatures and initials of Respondent Jones were not obtained from Respondent
Jones. Additionally, the two (2) substantially different copies of the Mortgage where
one contained the Notary attesting that both "May E. McCloud + Vera L Jones"
appeared and one attesting that only "May E. McCloud" appeared are *prima facie*
evidence that someone in Flagstar Bank and/or Matrix Financial Corporation was
and continues to forge documents in this matter. Such behavior and actions are
consistent with the acts and behaviors of both companies in the past. Plaintiffs
possess both these documents as they were produced by both companies to
Respondents when Plaintiffs filed their Response to Respondents Preliminary
Objections and the Petition to Quiet Title.   All Rights Reserved.

12

22. All documents supporting, refuting. or otherwise relating to your contention that Matrix is not the genuine party of interest in the matter, as alleged in Paragraph 19 of the New Matter and Demurrer.

**Response:**

All documentary evidence produced in the form of Agreements/Contracts do not contain Matrix Financial Corporation. The documents per se evidence such.

All Rights Reserved.

23. All documents supporting, refuting, or otherwise relating to your contention of unclean hands, as alleged in Paragraph 20 of the New Matter and Demurrer.

**Response:**

Again, the transaction as a whole as evidence by the documents presented by Matrix Financial is prima facie evidence of Matrix Financial and Flagstar Bank engaging in commerce with unclean hands.

All Rights Reserved.

# 3715844 v. 1

24.   All documents supporting, refuting, or otherwise relating to your

Counterclaim for Unjust Enrichment.

**<u>Response:</u>**

The fraudulent contracts speak for themselves. Matrix Financial Corporation and
Flagstar engaged in fraudulent, unconscionable and predatory loan scheming. As a
result, documents as part of the scheme were forged and presented as the owner in
fees approval and signature. The result of this scheme has placed undue emotional
distress on Respondents. Additionally, as a result of the hypothecation of the
unlawful loan, Plaintiffs have enriched themselves and others through the scheme.

Plaintiffs themselves have verified that they received monthly payments from
Respondent McCloud for repayment of an "alleged loan" they have not been able
to support was valid.

As such, the universal laws contract law in the United States as well as protected
under Federal Statutes and Acts, prohibit banks from collecting on such
fraudulently created and engaged deals.

Therefore, Respondents, contend that through the presented fraudulent documents
and numerous Federal Laws violated by Plaintiffs, that Plaintiffs through their
manipulations and unconscionable deceitful actions, Plaintiffs have been unjustly
enriched because no contract exists and therefore they were not entitled to any so
called payments as they have so vehemently contended.

All Rights Reserved.

25,   All documents supporting, refuting, or otherwise relating to your

Counterclaim for Lack of Consideration,

**<u>Response:</u>**

Again, Plaintiffs have not provided any evidence that the alleged loan on the
fraudulent contract was in fact delivered.      All Rights Reserved.

14

26.   All documents supporting, refuting, or otherwise relating to your
      Counterclaim of Fraud.

      **Response:**

      Again, the documents presented by Plaintiff were forged. Responded never
      provided her signature and never met with or even applied for a loan.

      All Rights Reserved.

27.   All documents supporting, refuting, or otherwise relating to your
      Counterclaim for Violation of Fair Debt Collection Act.

      **Response:**

      Again, Plaintiffs provided fraudulent forged documents under the guise of the
      signatures and initials belonging to Respondent Jones. As a result of said fraudulent
      actions, Plaintiffs engaged in abusive debt collecting measures by contacting
      Respondents at all times during the day and night. Further, upon information that
      an alleged mortgage existed, Respondent Jones took steps to inquire and requested
      evidence as proof of the alleged mortgage. Plaintiffs ignored Respondent Jones'
      request until the Pennsylvania Attorney General's office received a complaint and
      became involved. At all times, Respondent disputed knowledge of the mortgage and
      at no time did Flagstar cease collection efforts and make attempts to schedule a
      meeting with Respondent. These are all required actions when collecting an alleged
      debt.

      Additionally, as a result of these debt collection efforts and foreclosure actions,
      Respondents' credit has been damaged. Because the information that Plaintiffs have
      included are unequivocally false including the signatures and any contention that
      Respondent Jones knowingly, willingly and voluntarily entered into a Mortgage
      agreement with them, Plaintiffs have defamed Respondent Jones and have perjured
      themselves.

      Fair Debt Collection Practices Acts is initiated once an alleged borrower has
      allegedly defaulted on a debt and contact is initiated by a new servicer.

d 3715844 v. 1

It is believed, that since Matrix Financial Corporation is in fact the Plaintiff in suit, that Matrix Financial Corporation is in fact in violation of the FDCPA.
All Rights Reserved.

28.   All documents supporting. refuting, or otherwise relating to your Counterclaim for Violation of RESPA.

**Response:**

Qualified written requests were submitted at numerous times requesting information pertaining to the alleged account and each request was ignored until the Attorney General's office was contacted and became involved.

Additionally, since Plaintiffs have vehemently accused Respondent Jones of being a party to the Mortgage, and using her home as collateral for the loan, Plaintiffs failed to provide Respondent with any and all necessary documents relating to the loan settlement costs and closure process, as well as the transfer, sale, or assignment of mortgage servicing.

Additionally, Respondent Jones never received as required by RESPA an annually itemized charges to be paid by the "borrower" and information concerning what is paid out of the account by servicer.

Plaintiff is aware of the laws and Plaintiff is very much aware that Respondent Jones was never a party to the alleged Mortgage.

All Rights Reserved.

16

29.   All documents and correspondence related to referring or concerning Ms. May-E. McClouds' mental state or mental condition during the time period January 1, 2010 to the present.

**Response:**

HIPAA VIOLATION. Should you desire this information you can directly request this information from her doctor. As her legal Guardian, it is my responsibility to protect her and this includes her medical information as well. I am not at liberty as a CNA to provide you with such information without you submitting a HIPAA form to her doctors.
Additionally, I do not personally possess these documents myself.

All Rights Reserved.

30.   All documents and correspondence related to, referring to, or concerning Ms. May-E. McCloud's medical records from January 1, 2010 to the present.

**Response:**

HIPAA VIOLATION. Should you desire this information you can directly request this information from her doctor. As her legal Guardian, it is my responsibility to protect her and this includes her medical information as well. I am not at liberty as a CNA to provide you with such information without you submitting a HIPAA form to her doctors.
Additionally, I do not personally possess these documents myself.

All Rights Reserved.

31.   With the exception of the loan in this matter, copies of all contracts or agreements entered into by Ms. May-E. McCloud from January 1, 2010 to the present.

**Response:**

At this time, Respondent is without knowledge information concerning the whereabouts of these documents. If such documents come into the possession of Respondent, the documents will be forwarded to Plaintiff.

All Rights Reserved.

32.   All powers of attorney or other agency agreements entered into by Ms.

May-E. McCloud.

**Response:**

At this time, these documents are not knowingly within the possession of Respondent.

All Rights Reserved.

33.   All documents and communications relating to the Loan, Loan Documents, the Note or the Mortgage.

**Response:**

The only documents Respondent is currently aware of that concerns or pertains to this requests are those documents that Plaintiff has provided Respondent. Additional documents attached, that may meet this request are communications with the Pennsylvania Attorney Generals' Office and the Pennsylvania Department of Banking and Securities.

All Rights Reserved.

V1 USED LOAN # 503182676
MIN: 100052330018267605

# NOTE

APRIL 14, 2011                    Philadelphia,                    PENNSYLVANIA
(Date)                            (City)                           (State)

1341 S 46TH ST, PHILADELPHIA, PA 19143-3637
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S.    $70,000.00   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  FLAGSTAR BANK, FSB, A FEDERALLY CHARTERED SAVINGS BANK.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  5.250%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**
I will pay principal and interest by making a payment every month.

I will make my monthly payment on the     1ST   day of each month beginning on  JUNE 1, 2011.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  MAY 1, 2041,       I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
5151 CORPORATE DR
TROY, MI  48098-2639

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**
My monthly payment will be in the amount of U.S.    $386.54.

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any
                                                                          Initials: _____

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200 1/01
© 1999-2007 Online Documents, Inc.                Page 1 of 3                            FRCMOT  C001
                                                                                        04-13-2011 16:00

|||||||||||||503182676

ORIGINAL NOTE-1

V1 GHHD 1286 # 5031826716

sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
(GMD0117) (CDO 14143)   04-12-2011 14:03
Page 3 of 3
© 1999-2003 Online Documents, Inc.

ORIGINAL NOTE-1
5031 82676

VA USED LOAN # 503182676

Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

*Mary E. McClosh*

MAY E. McCLOSH

PAY TO THE ORDER OF
WITHOUT RECOURSE
FLAGSTAR BANK, FSB

BY: *Melinda McNeal*

MELINDA McNEAL
VICE PRESIDENT

[Sign Original Only]

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
© 1999-2007 Online Documents, Inc.            Page 3 of 3                                 F3200NOT  0701
                                                                                         04-13-2011 16:00

503182676

ORIGINAL NOTE-1

WI MERD LOAN # 503182676
MIN: 100035350018267635

## NOTE

APRIL 14, 2011                          Philadelphia,                          PENNSYLVANIA
[Date]                                  [City]                                 [State]

1341 S 60TH ST, PHILADELPHIA, PA 19143-3327
(Property Address)

**1.  BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S.   $70,000.00   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  FLAGSTAR BANK, FSB, A FEDERALLY CHARTERED SAVINGS BANK.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  5.250%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3.  PAYMENTS**

(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.

I will make my monthly payment on the     1ST     day of each month beginning on   JUNE 1, 2011.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    MAY 1, 2041,     I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
5151 CORPORATE DR
TROY, MI  48098-2639

or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments
My monthly payment will be in the amount of U.S.     $386.36.

**4.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any

Initials: _____

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
© 1999-2007 Online Documents, Inc.                 Page 1  of  3                           FNNOTE  0011
                                                                                           04-13-2011 16:00

503182676

ORIGINAL NOTE-1

V1 EDCD LOAN # 503182676

sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of        15        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      5.000%  of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which      Initials: _____

MULTISTATE FIXED RATE NOTE–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200 1/01
© 1999-2007 Online Documents, Inc.                  Page 2 of 3                        FRED0607  CF01
                                                                                       06-13-2011 16:00

503182676

ORIGINAL NOTE-1

VA FHA LOAN # 503182676

Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

*May E. McCloud* (Seal)
MAY E. MCCLOUD

PAY TO THE ORDER OF
WITHOUT RECOURSE
FLAGSTAR BANK, FSB

BY: *Melinda McNeal*
MELINDA MCNEAL
VICE PRESIDENT

[Sign Original Only]

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
© 1999-2007 Online Documents, Inc.                    Page 3 of 3               FX3200NOT 0701
                                                                                06-13-2011 14:09

503182676

ORIGINAL NOTE-1

After Recording Return To:
FLAGSTAR BANK
5151 CORPORATE DRIVE
TROY, MI 48098
FINAL DOCUMENTS, MAIL STOP W-531-1

APN #: 272163000
APN #:

——————————[Space Above This Line For Recording Data]——————————
V1 MSCD LOAN # 503162676

# MORTGAGE

MIN: 100052550316267605

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **APRIL 14, 2011,** together with all Riders to this document.

(B) "Borrower" is **May E. McCloud and Vera L. Jones.**

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has a mailing address of P.O. Box 2026, Flint, MI 48501-2026, and a street address of 1901 E. Voorhees Street, Suite C, Danville, IL 61834. The MERS telephone number is (888) 679-MERS.

(D) "Lender" is **FLAGSTAR BANK, FSB.**

Initials:

PENNSYLVANIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page  1  of 13                    PAEDEED   1011
                                                                            PAEDEDL  1011
                                                                            06-13-2011 14:09

Lender is a FEDERALLY CHARTERED SAVINGS BANK organized and existing under the laws of UNITED STATES OF AMERICA. Lender's address is 5151 CORPORATE DR, TROY, MI 48098-2639.

VI WBCD LOAN # 503182676

(E) "Note" means the promissory note signed by Borrower and dated APRIL 14, 2011. The Note states that Borrower owes Lender ***************SEVENTY THOUSAND AND 00/100 **********************************************Dollars (U.S. $70,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MAY 1, 2041.

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |
| ☐ V.A. Rider | | |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

Initials:

**V1 NBCD LOAN # 303102676**

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the    COUNTY
[Type of Recording Jurisdiction] of   PHILADELPHIA                         [Name of Recording Jurisdiction]:
SEE TITLE
APN #:  272165869

which currently has the address of  1361 S 46TH ST,  PHILADELPHIA,
                                                                                [Street] [City]
Pennsylvania    19143-3927    ("Property Address"):
                   [Zip Code]
      TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
      BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
      THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
      UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
      1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Initials: _____

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                          Page  3  of 13                         PA3039DL  1011
                                                                                     04-13-2011  14:00

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time

Initials: [signature]

Online Documents, Inc.

by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination

services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Initials: [signature]

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at

Initials: [signature]

a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums

VA CASE # 501182676

by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to

PENNSYLVANIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01

Initials:

modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited

Initials:

V1 MBCD LOAN # 803162676

to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, the Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of

Initials:

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.          Page  11  of  13          PA3039L   1011
04-13-2011 16:09

V1 WBCD LOAN # 503162676

acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.

23. Release. Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any

Initials:

V1 MECD LOAN # 503102676

present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

25. Reinstatement Period. Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

26. Purchase Money Mortgage. If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

27. Interest Rate After Judgment. Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____
VelA. L. Jones

_____(Seal)
MAY E. MCCLOUD

Commonwealth of PENNSYLVANIA
County of PHILADELPHIA

On this, the 14 day of April 2011 before me, _____, the undersigned officer, personally appeared _____ May E. McClain _____ known to me (or satisfactorily proven) to be the person whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand and official seal.

My commission expires: 1/20/14      _____
                                      Title of Officer   Public

NOTARIAL SEAL
VELENA SHOUR
Notary Public
LOWER MORELAND TWP., MONTGOMERY COUNTY
My Commission Expires Jan 20, 2014

Certificate of Residence
I, The Subscriber
do hereby certify that the correct address of the within-named Mortgagee is 3151 CORPORATE DR., TROY, MI 48082-2639.

Witness my hand this 14 day of April 2011

_____
Agent of Mortgagee

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3839 1/01
Online Documents, Inc.                    Page 13 of 13          PA8DEDL 1011
                                                                 04-13-2011 14:00

# EXHIBIT A

Case ID: 18120106

Case ID: 181201006

**PENNSYLVANIA**
**COUNTY OF PHILADELPHIA**
**LOAN NO.: 503182676**

PREPARED BY SECURITY CONNECTIONS, INC.
WHEN RECORDED MAIL TO:
SECURITY CONNECTIONS, INC., 240 TECHNOLOGY DRIVE, IDAHO FALLS, ID 83401, Ph. (208)528-9895

## ASSIGNMENT OF MORTGAGE

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt whereof is hereby acknowledged, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), SOLELY AS NOMINEE FOR FLAGSTAR BANK, FSB, ITS SUCCESSORS AND ASSIGNS, located at 1901 E VOORHEES STREET SUITE C, DANVILLE, IL 61834 or P.O. Box 2026, FLINT, MICHIGAN 48501-2026, NOMINEE FOR FLAGSTAR BANK, FSB, ITS SUCCESSORS AND ASSIGNS, to MATRIX FINANCIAL SERVICES CORPORATION located at 601 CARLSON PKWY., STE 1400, MINNETONKA, MN 55305, Assignor, its successors and assigns, that certain Mortgage dated APRIL 14, 2011 executed by MAY E. MCCLOUD AND VERA L. JONES, Mortgagor, to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), SOLELY AS NOMINEE FOR FLAGSTAR BANK, FSB, ITS SUCCESSORS AND ASSIGNS, Original Mortgagee, in the amount of $70,650.00 and recorded on APRIL 27, 2011 in the Office of the Register, Recorder, or County Clerk of PHILADELPHIA County, State of PENNSYLVANIA, as Document No. 52340835, more particularly described and commonly known as:

LEGAL DESCRIPTION: ALL THAT CERTAIN LOT OR PIECE OR GROUND WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED.
SITUATE ON THE NORTHEASTERLY SIDE OF 48TH STREET AT THE DISTANCE OF 478 FEET, 4 INCHES SOUTHEASTWARD FROM THE SOUTHEASTERLY SIDE OF WOODLAND AVENUE IN THE 27TH WARD OF THE CITY OF PHILADELPHIA.
CONTAINING IN FRONT OR BREADTH ON THE SAID 48TH STREET 14 FEET, 4 INCHES AND EXTENDING OF THAT WIDTH IN LENGTH OR DEPTH NORTHEASTWARD 88 FEET IN A CERTAIN ALLEY 3 FEET WIDE.
CITY OF PHILADELPHIA
Property Address: 1561 S 64TH ST, PHILADELPHIA, PA 1943

TOGETHER WITH all rights, title, and interest in and to the premises, accrued or to secure under said Mortgage.
IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this MARCH 16, 2017.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), SOLELY AS NOMINEE
FOR FLAGSTAR BANK, FSB, ITS SUCCESSORS AND ASSIGNS

CRISTINA GOMEZ, VICE PRESIDENT

STATE OF IDAHO           }
                         } ss.
COUNTY OF BONNEVILLE     }

On MARCH 16, 2017, before me, CHRISTY BROWN, personally appeared CRISTINA GOMEZ, known to me to be the VICE PRESIDENT of the corporation that executed the instrument or the person who executed the instrument on behalf of said corporation, and acknowledged to me that such corporation executed the same.

CHRISTY BROWN (COMMISSION EXP.: 02/13/2021)
NOTARY PUBLIC

CHRISTY BROWN
NOTARY PUBLIC
STATE OF IDAHO

Page 1 of 2

MIN #: 100052550318276405
MERS PHONE: 1-888-679-6377

E5800911ZIM - AM - PA

I do hereby certify that the precise address of the Assignee Residence is:
MATRIX FINANCIAL SERVICES CORPORATION, 601 CARLSON PKWY, STE 1400, MINNETONKA, MN 55305

CRISTINA GOMEZ, VICE PRESIDENT

# EXHIBIT B

53187986   Page 2 of 2   03/17/2017 10:14 AM

I do hereby certify that the precise address of the Assignee Residence is:
MATRIX FINANCIAL SERVICES  CORPORATION, 601 CARLSON PKWY, STE 1400, MINNETONKA,
MN 55305

CRISTINA GOMEZ, VICE PRESIDENT

# EXHIBIT B

Case ID: 1812010€

## Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when [ ] the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or [ ] the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

Borrower: [signature] Co-Borrower: ____

### I. TYPE OF MORTGAGE AND TERMS OF LOAN

| | | | | | |
|---|---|---|---|---|---|
| Mortgage Applied for: [ ] VA [ ] FHA | [X] Conventional [ ] USDA/Rural Housing Service | [ ] Other (explain): | | Agency Case Number | Lender Case Number 503782676 |
| Amount $ 10,000.00 | Interest Rate 5.250 % | No. of Months 360 | Amortization Type: [X] Fixed Rate [ ] GPM | [ ] Other (explain): [ ] ARM (type): | |

### II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| | |
|---|---|
| Subject Property Address (street, city, state, & ZIP) 1341 S 46TH ST, PHILADELPHIA, PA 19143-3827 | No. of Units 1 |
| Legal Description of Subject Property (attach description if necessary) SEE EXHIBIT | Year Built 1960 |
| Purpose of Loan [ ] Purchase [X] Refinance [ ] Construction [ ] Construction-Permanent [ ] Other (explain): | Property will be: [X] Primary Residence [ ] Secondary Residence [ ] Investment |

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements [ ] made [ ] to be made |
|---|---|---|---|---|
| 1994 | $ 10,000.00 | $ 37,775.00 | CASHOUT/OTHER | Cost: $ |

| | | |
|---|---|---|
| Title will be held in what Name(s) MAY E. MCCLOUD | Manner in which Title will be held SINGLE WOMAN | Estate will be held in: [X] Fee Simple [ ] Leasehold (show expiration date) |
| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) | | |

### III. BORROWER INFORMATION

| Borrower | | | | Co-Borrower | | | |
|---|---|---|---|---|---|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) MAY E. MCCLOUD | | | | Co-Borrower's Name (include Jr. or Sr. if applicable) | | | |
| Social Security Number [redacted] | Home Phone (incl. area code) [redacted] | DOB (mm/dd/yyyy) 09/06/1934 | Yrs. School 14 | Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School |
| [ ] Married [X] Unmarried (include single, divorced, widowed) [ ] Separated | | Dependents (not listed by Co-Borrower) no. ages | | [ ] Married [ ] Unmarried (include single, divorced, widowed) [ ] Separated | | Dependents (not listed by Borrower) no. ages | |
| Present Address (street, city, state, ZIP) [X] Own [ ] Rent 17Y No. Yrs. 13618 48TH ST PHILADELPHIA, PA 19143 | | | | Present Address (street, city, state, ZIP) [ ] Own [ ] Rent ____ No. Yrs. | | | |
| Mailing Address, if different from Present Address | | | | Mailing Address, if different from Present Address | | | |

If residing at present address for less than two years, complete the following:

| Borrower | Co-Borrower |
|---|---|
| Former Address (street, city, state, ZIP) [ ] Own [ ] Rent ____ No. Yrs. | Former Address (street, city, state, ZIP) [ ] Own [ ] Rent ____ No. Yrs. |

### IV. EMPLOYMENT INFORMATION

| Borrower | | | Co-Borrower | | |
|---|---|---|---|---|---|
| Name & Address of Employer | [ ] Self Employed | Yrs. on this job | Name & Address of Employer | [ ] Self Employed | Yrs. on this job |
| | | Yrs. employed in this line of work/profession | | | Yrs. employed in this line of work/profession |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | Business Phone (incl. area code) | |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Borrower | | | Co-Borrower | | |
|---|---|---|---|---|---|
| Name & Address of Employer | [ ] Self Employed | Dates (from-to) | Name & Address of Employer | [ ] Self Employed | Dates (from-to) |
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | Business Phone (incl. area code) | |
| Name & Address of Employer | [ ] Self Employed | Dates (from-to) | Name & Address of Employer | [ ] Self Employed | Dates (from-to) |
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | Business Phone (incl. area code) | |

Case ID: 1812010€

V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ | $ | $ | Rent | $ | |
| Overtime | | | | First Mortgage (P&I) | 193.99 | 194.98 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | 35.00 | 72.30 |
| Dividends/Interest | | | | Real Estate Taxes | 41.00 | 47.47 |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income" below) | 1,391.00 | | 1,391.00 | Homeowner Assn. Dues | | |
| | 150.00 | | 150.00 | Other | | |
| Total | $ 1,441.00 | $ | $ 1,441.00 | Total | $ 471.00 | $ 305.37 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| Describe Other Income | Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | | Monthly Amount |
|---|---|---|---|
| B/C | | | |
| B | PENSION | | 1,391.00 |
| B | SOCIAL SECURITY | | 150.00 |

VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.    Completed ☐ Jointly ☐ Not Jointly

| ASSETS | Cash or Market Value | LIABILITIES and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | Monthly Pmt. & Mos. Left to Pay | Unpaid Balance |
|---|---|---|---|---|---|
| Description | | LIABILITIES | | | |
| Cash Deposit toward purchase held by | $ | Name and address of Company   (B1) | | $ Pmt./Mos. | |
| List checking and savings accounts below | | FOX VIRGINIA CREDIT U | | 90 | 483 |
| Name and address of Bank, S&L, or Credit Union | | 1677 BELLARD RD RICHER CA 43337 | | /0 | |
| Acct. no. _____3333 | | Acct. no. | | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company   (B1) | | $ Pmt./Mos. | |
| | | SELECT PORTFOLIO SVC | | 399 | 37,775 |
| | | | | /96 | |
| Acct. no. _____3337 | | Acct. no. | | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company   (B1) | | $ Pmt./Mos. | |
| | | CASH/CASH | | 16 | 1,279 |
| | | PO BOX 6697 SIOUX FALLS SD 57117 | | /85 | |
| Acct. no. | | Acct. no. _____3333 | | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | | $ Pmt./Mos. | |
| Acct. no. | $ | Acct. no. | | | |
| Stocks & Bonds (Company name/number & description) | $ | Name and address of Company | | $ Pmt./Mos. | |
| Life insurance net cash value Face amount $ | $ | Acct. no. | | | |
| | | Name and address of Company | | $ Pmt./Mos. | |
| Subtotal Liquid Assets | $ | | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 100,000 | Acct. no. | | | |
| Vested interest in retirement fund | $ | Name and address of Company | | $ Pmt./Mos. | |
| Net worth of business(es) owned (attach financial statement) | $ | | | | |
| Automobiles owned (make and year) | $ | Acct. no. | | | |
| Other Assets (itemize) | | Alimony/Child Support/Separate Maintenance Payments Owed to | | $ | |
| | | Job Related Expense (child care, union dues, etc.) | | $ | |
| | | Total Monthly Payments | | $ | |
| Total Assets a. | $ 100,000 | Net Worth (a minus b) $ | 60,463 | Total Liabilities b. | $ 39,517 |

Uniform Residential Loan Application
Freddie Mac Form 65   7/05 (rev.abc)
Online Documents, Inc.

Fannie Mae Form 1003   7/05 (rev.abc)
GURLA   1004

Case ID: 18120106

## VI. ASSETS AND LIABILITIES (cont.)

Schedule of Real Estate Owned (if additional properties are owned, use continuation sheet)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| SEE ADDENDUM | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | Totals | $ 180,000 | $ 37,775 | $ | $ 393 | $ 76 | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | 37,775.00 |
| e. Estimated prepaid items | 601.82 |
| f. Estimated closing costs | 2,740.27 |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | 41,117.09 |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) | |
| Lender Credit | 950.00 |
| Paid Outside Closing | 350.00 |
| Other Credits Total | 1,300.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 70,000.00 |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 70,000.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | (30,182.91) |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|
| a. Are there any outstanding judgments against you? | | X | | |
| b. Have you been declared bankrupt within the past 7 years? | | X | | |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | |
| d. Are you a party to a lawsuit? | | X | | |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | | |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | |
| h. Is any part of the down payment borrowed? | | X | | |
| i. Are you a co-maker or endorser on a note? | | X | | |
| j. Are you a U.S. citizen? | X | | | |
| k. Are you a permanent resident alien? | | X | | |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | | |
| m. Have you had an ownership interest in a property in the last three years? | X | | | |
| (1) What type of property did you own - principal residence (PR), second home (SH), or investment property (IP)? | PR | | | |
| (2) How did you hold title to the home - solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | S | | | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X [illegible] | [illegible] | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | CO-BORROWER |
|---|---|
| [X] I do not wish to furnish this information | [ ] I do not wish to furnish this information |
| Ethnicity: [ ] Hispanic or Latino [ ] Not Hispanic or Latino | Ethnicity: [ ] Hispanic or Latino [ ] Not Hispanic or Latino |
| Race: [ ] American Indian or Alaska Native [ ] Asian [ ] Black or African American [ ] Native Hawaiian or Other Pacific Islander [ ] White | Race: [ ] American Indian or Alaska Native [ ] Asian [ ] Black or African American [ ] Native Hawaiian or Other Pacific Islander [ ] White |
| Sex: [X] Female [ ] Male | Sex: [ ] Female [ ] Male |

To be Completed by Loan Originator:

This information was provided: [ ] In a face-to-face interview [X] In a telephone interview [ ] By the applicant and submitted by fax or mail [ ] By the applicant and submitted via e-mail or the Internet

| Loan Originator's Signature X | | Date |
|---|---|---|
| Loan Originator's Name (print or type): Bogosa Bedarsan | Loan Originator Identifier: 333132 | Loan Originator's Phone Number (including area code) |
| Loan Origination Company's Name: B & B FINANCIAL, INC. | Loan Origination Company Identifier: 333115 | Loan Origination Company's Address |

Case ID: 1812010€

## CONTINUATION SHEET/RESIDENTIAL LOAN APPLICATION

| | Borrower | Agency Case Number |
|---|---|---|
| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower | MAY E. McCLOUD | |
| | Co-Borrower | Lender Case Number |
| | | 500182676 |

SCHEDULE OF REAL ESTATE OWNED CONT'D

| Property Address | Type Prop | Market Value | Mortgage & Liens | Gross Rnt Income | Mortgage Payments | Mrtnce Taxes | Net Rnt Income |
|---|---|---|---|---|---|---|---|
| 13515 46TH ST   PHILADELPHIA PA 19363 | SFR | 200,000 | 37,773 | | 399 | 76 | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et. seq.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| *Mary E. McCloud* | 4/22/11 | X | |

Uniform Residential Loan Application
Freddie Mac Form 65   7/05 (rev.6/09)
Calyx Documents, Inc.

Page 4 of 4

Fannie Mae Form 1003   7/05 (rev.6/09)
CLRLA 1004

04-13-2011 14:05

Case ID: 1812010

# EXHIBIT C

Case ID: 18120106

*MBH-2758*
*1 of 1*

Record and Return to:
MBA Abstract, Inc.
2337 Philmont Ave, Suite 103
Huntingdon Valley, PA 19006

After Recording Return To:
FLAGSTAR BANK
5151 CORPORATE DRIVE
TROY, MI 48098
FINAL DOCUMENTS, MAIL STOP W-531-1

APN #: 272165800
APN #:



52340885
Page: 1 of 14
04/27/2011 10:03AM

This Document Recorded
04/27/2011
10:03AM
Doc Code- M          Commissioner of Records, City of Philadelphia

Doc Id: 52340885
Receipt #: 1022341
Rec Fee: 170.00

-----[Space Above This Line For Recording Data]-----

V1 NBCD LOAN # 503182676

# MORTGAGE

MIN: 100052550319267605

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated APRIL 14, 2011, together with all Riders to this document.

(B) "Borrower" is May E. McCloud and Vera L. Jones.

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has a mailing address of P.O. Box 2026, Flint, MI 48501-2026, and a street address of 1901 E. Voorhees Street, Suite C, Danville, IL 61834. The MERS telephone number is (888) 679-MERS.

(D) "Lender" is FLAGSTAR BANK, FSB.

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page 1 of 13

Initials:
PAEDEED    PAEDEDL 1011
06-13-2011 14:00

Case ID: 1812010€

Lender is a **FEDERALLY CHARTERED SAVINGS BANK**
laws of **UNITED STATES OF AMERICA**.
**5151 CORPORATE DR, TROY, MI   48098-2639**.

V1 WBCD LOAN # 503182676
organized and existing under the
Lender's address is

(E) "Note" means the promissory note signed by Borrower and dated **APRIL 14, 2011**.
The Note states that Borrower owes Lender **************SEVENTY THOUSAND AND NO/100**
**********************************************Dollars (U.S.   $70,000.00   )**
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt
in full not later than **MAY 1, 2041**.

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider  ☐ Other(s) [specify]
☐ 1-4 Family Rider           ☐ Biweekly Payment Rider
☐ V.A. Rider

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments
and other charges that are imposed on Borrower or the Property by a condominium association,
homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to
debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated
teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds
paid by any third party (other than insurance proceeds paid under the coverages described in Section
5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part
of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as
to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default
on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under
the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As
used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed
in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related
mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether
or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

Initials:

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page 2  of 13                    PAEDEDL 1011
                                                                           06-13-2011 14:00

**TRANSFER OF RIGHTS IN THE PROPERTY**                        V1 WBCD LOAN # 503182676

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the    COUNTY
[Type of Recording Jurisdiction] of    PHILADELPHIA                        [Name of Recording Jurisdiction]:
SEE TITLE
APN #: 272165800

which currently has the address of 1361 S 46TH ST, PHILADELPHIA,
                                                                                              [Street] [City]
Pennsylvania    19143-3827        ("Property Address"):                        [Street] [City]
                      [Zip Code]

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
     THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
     UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
     1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01        Initials:
Online Documents, Inc.                        Page    3    of 13                        PAEDEDL  1011
                                                                                            04-13-2011 14:00

V1 WBCD LOAN # 503182676

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time

Initials:

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page   4  of 13                    PAEEDL  1011
                                                                             04-13-2011 14:00

V1 WBCD LOAN # 503182676

by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page   5   of 13

Initials:
PAEDEDL 1011
04-13-2011 14:00

Case ID: 1812010t

Case 3:21-cv-00006-MHL   Document 3-13   Filed 01/06/21   Page 67 of 100 PageID# 861

V1 WBCD LOAN # 503182676

services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Initials:

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.            Page  6  of  13                       PAEDEDL  1011
                                                                        04-13-2011 14:00

Case ID: 1812010E

**V1 WBCD LOAN # 503182676**

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at

Initials: _____

PENNSYLVANIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.          Page 7 of 13          PAEDEDL 1011
                                                       06-13-2011 14:00

Case ID: 18120106

V1 WBCD LOAN # 503182676

a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured

Initials: _____

PENNSYLVANIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01

Online Documents, Inc.                          Page   8   of   13                          PAE8DDL   1011

04-13-2011 16:00

Case ID: 1812010€

V1 WBCD LOAN # 503182676

by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend,

Initials: _____

PENNSYLVANIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page 9 of 13                    PAE8DDL 1011
04-13-2011 14:00

Case ID: 1812010

VI WBCD LOAN # 503162676

acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.

23. Release. Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any

Initials:

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.          Page 12 of 13          PAEDECL 1011
04-13-2011 14:00

Case ID: 18120106

V1 NBCD LOAN # 503182676

present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**25. Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**26. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**27. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
VERA L. Jones

_____ (Seal)
MAY E. MCCLOUD

Commonwealth of **PENNSYLVANIA**
County of **PHILADELPHIA**

On this, the **14** day of **April 2011** before me, _____, the undersigned officer, personally appeared

**May E McCloud + Vera L Jones**

known to me (or satisfactorily proven) to be the person whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand and official seal.

My commission expires: **1/20/14**

_____
Title of Officer: **Notary public**

NOTARIAL SEAL
YELENA SNIGUR
Notary Public
LOWER MORELAND TWP., MONTGOMERY COUNTY
My Commission Expires Jan 20, 2014

Certificate of Residence

I, **The subscriber**, do hereby certify that the correct address of the within-named Mortgagee is **5151 CORPORATE DR., TROY, MI 48098-2639**

Witness my hand this **14** day of **April 2011**

_____
Agent of Mortgagee

PENNSYLVANIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3039 1/01
Online Documents, Inc.                    Page 13 of 13                    PAEDEDL 1011
                                                                          04-13-2011 14:00

Case ID: 181201...

## VERIFICATION

By my autograph, wet-signature and hand-sealed, I _____ , the living being and womb-man, verify that the factual statements made in Response to the REQUEST FOR PRODUCTION OF DOCUMENTS, presented by _____ , are true, correct and made with honor and free from any misleading information, lies, deceit or untruths, to the best of my knowledge, information and comprehension.

Respondent-Beneficiary, :Vera-L.:Jones:, verify that in accordance with The Most High's Laws, *Jus Cogens* (International Law) and Customary Laws governing International commerce, that the statements presented herein are made with the utmost knowledge and intent to present the TRUTH, without breaching any Confidential and Private Information, and that it is comprehended that having intentionally made any of the within statements with the corrupt mind with the intent to commit nefarious, deceitful and perjurious acts, that such actions cause an understanding for submission to the established **18 Pa.C.S. §4904** relating to unsworn falsifications, that have customarily been codified as per *Jus Cogens*.

By my hand and my seal:

Time Stamped and Dated: *01. 14. 2019*

Autograph of: :VERA-L.:JONES:
In *Propria Persona, Sui Juris;*
The Authorized Representative of
©May E. McCloud™ and the Living
Woman and Being as Created by The
Most High.

~All Rights Reserved~

**FILED**

In the Court of Common Pleas of Philadelphia County

# MOTION FOR EXTRAORDINARY RELIEF

119 MAR -1 PM 3:54

FFICE OF JUDICIAL RECORDS
IST JUDICIAL DISTRICT OF PA

*(Check One Program)*

- [ ] Commerce
- [ ] Day Forward/Major Jury
- [ ] Arbitration Appeal
- [ ] Mass Tort
- [ ] Non-Jury

*CONTROL NUMBER*

19020924    025763

| | | |
|---|---|---|
| *Matrix Financial Services Corp.* | : | *May* TERM, *2017* |
| **Plaintiff(s)** | : | *Month*    Year |
| | : | |
| vs. | : | |
| | : | |
| *Vera L. Jones: et alletive* | : | No.: *03419* |
| **Defendant(s)** | : | |

Filing of: _*Vera L. Jones*_
**Name of Filing Party**

- [ ] Plaintiff
- [ ] Defendant
- [x] Movant
- [x] Respondent

| NAME OF PLAINTIFF AND COUNSEL | NAME OF DEFENDANT AND COUNSEL |
|---|---|
| *Matrix Financial Services Corporation* | *Vera L. Jones: and :Mary E. McCloud:* |
| *Michael S. Bernstein   Abigail Brunner* | *Propid Persona Sui Juris* |
| *Vladimir Palmer      Jennie Shaayder* | |
| *Christopher A. Reese* | |

| ASSIGNED TRACK (Check one) | CURRENT APPLICABLE CASE MANAGEMENT DEADLINES *(Complete all dates subsequent to the date you are asking to be extended)* |
|---|---|
| [ ] Expedited  [ ] Complex | [✓] Discovery Deadline — *January 7, 2019* |
| [ ] Standard   [ ] Extraordinary | [ ] Expert Discovery |
| | [✓] Motion Deadline — *February 4, 2019* |
| | [✓] Settlement Conference — *March 12, 2019* |
| NAME OF JUDICIAL TEAM LEADER | [✓] Pretrial Memo — *March 2, 2019* |
| | [✓] Trial Date — *April 2019  Trial Pool* |

SET FORTH DATES OF ISSUANCE OF ORDERS ON PREVIOUSLY FILED MOTIONS FOR EXTRAORDINARY RELIEF - ATTACH COPIES OF THOSE ORDERS

*On February 25, 2019 Plaintiff's filed a Motion for Extraordinary Relief.*

Matrix Financ Srvc. Vs Mccloud Etal-MTEXR

01-5 (Rev.08/13/2014)



17050341900074

| | |
|---|---|
| MATRIX FINANCIAL SERVICES | IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY |
| Plaintiff, | CIVIL DIVISION – LAW |
| v. | DOCKET NO.  170503419 |
| :MAY-E. MCCLOUD: | |
| -AND- | *025763* |
| :VERA-L. JONES: et al *in Propria Persona Sui Juris* | |
| Respondents. | |

## ORDER

AND NOW, this _____ day of _____, 2019, upon acceptance, comprehension and consideration and any response thereto, it is ORDERED and DECREED that said MOTION FOR EXTRAORDINARY RELIEF is GRANTED, and the Case Management is modified in accordance with 180 days Discovery Extension.

By THE COURT:

_____
J.

**DESCRIBE RELIEF REQUESTED** *(Attach proposed Order, setting forth the current deadlines and proposed deadlines)*

Set forth the efforts made to comply with the applicable deadlines; specify what needs to be done; set forth all relevant activity which has already been scheduled; and length and reason for the time requested.

*SEE Attached.*

A COPY OF THIS MOTION WAS SENT OR WILL BE SENT TO THE FOLLOWING PARTIES OR COUNSEL ON THE FOLLOWING DATES:

*Plaintiff's counsel    Michael S. Bernstein, Abigail Brunner , Christopher K. Reese*
*Vladimir Herman, Jennie Spangler                              03.01.2019*

RESPONSE DATE

Response due: _____ MAR 11 2019 _____ *(within 10 days of filing of Motion)*

OFFICE OF JUDICIAL
RECORDS

I certify the above to be true and correct.

Respectfully submitted,

Date: __3/1/19__

*Vera L. Jones*
_____, Esquire
*Attorney for Plaintiff/Defendant*

01-5 (Reverse)

# VERA L. JONES



1361 S. 46th Street, Philadelphia, PA 19143
267.748.7111
Fax: 1888.696.0367

March 1, 2019

**TO THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY TERRITORY**
**ATTACHMENT TO:**

> **MATTER: MATRIX FINANCIAL SERVICES CORP. V. :VERA L.:JONES: ET**
> **ALLATIVE**
> **MOTION FOR EXTRAORDINARY RELIEF**
> **CONTROL NO: 19020924**
> **MAY TERM, 2017**
> **DOCKET NO: 03419**

Since the initiation of this matter, :Vera L.: Jones: has been very diligent in dealing with the FlagStar aka Matrix Financial Services Corporation situation. Prior to suit, attempts were made to obtain information regarding the alleged Mortgage, which is of issue in this matter to no avail. At all times, Flagstar either did not respond to questions or further delayed by refusing to deal with third parties intervening on my behalf. Since becoming the Legal Guardian of :May E.: McCloud: in February of 2016 all matters concerning the Estate of :May E.: McCloud: have diligently been effectuated. During an accounting of :May E.: McCloud:'s estate and questioning certain automatic reoccurring deductions being made monthly from her account,  is when it was discovered that an alleged Mortgage existed on 1361 S. 46th Street. Thereafter, :Vera L.: Jones: learned that she was joint owner of 1361 S. 46th Street with :May E.:McCloud:. Prior to learning of this information :Vera L.: Jones:, had not knowledge she owned in Fee along with her mother, the property in issue.

Additionally, upon Plaintiffs filing A Petition to Quiet Title on December 10, 2018, :Vera L.: Jones:, for the first time, saw the application for a loan that Plaintiffs provided themselves, but had not previously provided since :Vera L.: Jones: had requested for Plaintiffs' to produce evidence that

she entered into a Mortgage Agreement with FlagStar Bank aka Matrix Financial Services Corporation.

During the submission of the December 10, 2018 complaint, Plaintiffs' additionally submitted a copy of the Notarized Deed of Trust, which :Vera L.: Jones:, at all times vehemently denied executing. The produced document produced and filed with the Courts was substantially and materially different. Specifically, documents produced to the Attorney General as well as the Pennsylvania Department of Securities and Finance lacked :Vera L.: Jones: name as having appeared before the Notary. However, documents produced by Plaintiffs' counsel miraculously included :Vera L.: Jones:, name.

Thereafter, on January 14, 2019, allative Plaintiff's were provided with Discovery, both Interrogatories and Request for Production of Documents were forwarded to Plaintiffs' counsel.

In October of 2018 :Vera L.: Jones: was hospitalized after suffering a neurological episode. Thereafter, The Rights of Indigenous People stepped in and began to take a more active role in assisting a member of the Mund Bareefan Tribe.  :Vera L.: Jones: has been presented with neurological issue due to stress and anxiety and has been unable to tend to the voluminous documents allative Plaintiffs counsel have filed and submitted and demanded.

From the inception of the transaction, :Vera L.: Jones:, was not involved, as is evidenced by ta copy of the Loan application form, Michael S. Bomstein, Esq., produced as an Exhibit with his December 10, 2018 Petition to Quiet Title. Since the inception of this matter, Plaintiffs and their counsel have been informed of Respondents' status as an Indigenous being and have continued to ignore their rights.

Resultingly, Tribal Counsel correspondence was forwarded to Plaintiffs' counsel on January 14, 2019 and January 25, 2019. On February 6, 2019 Michael S. Bomstein filed a Motion for Declaratory Relief asserting "the unauthorized practice of law" by ™ Rhashea Lynn Harmon-El© Esq. . The Motion is pending before this jurisdictional Court. Response to the Motion was filed February 26, 2019.

Further, by correspondence dated February 06, 2019 Michael S. Bomstein, Esq. demanded that both :Vera L.: Jones: and :May E.: McCloud, who has advanced stages of Dementia, appear to be deposed at his office.  Unfortunately, Respondents did not receive NOTICE until subsequent the

date which was scheduled February 14, 2019 and due to :May E.: McClouds': medical condition approval from her doctor and accommodations are necessary.

Additionally, subsequent :Vera L.: Jones:, hospitalization and learning of the (2) two conflicting copies of notarized documents, one containing :Vera L.: Jones: printed appellation and another lacking :Vera L.: Jones: appellation, RLH Ma'at Law & The Rights of Indigenous Peoples resumed communication with the Pennsylvania Attorney General's Office as well as The Pennsylvania Office of Securities and Commission as well as several Federal Agencies to assist with investigating the matter.

At all times, :Vera L.: Jones:, and her Tribal Counsel and other Tribal members, including a Diplomat, have been diligent in their attempts at finding out how :Vera L.: Jones: name and signature were obtained on documents for a Mortgage Loan for a home she had no idea she owned in Fee with a co-owner.

To the date of this Motion for Extraordinary Relief, :Vera L.: Jones:, has not received any response to the Interrogatories or Request for Production of Documents from Plaintiffs. Therefore, additional time is necessary for Plaintiff to produce documents and respond and for Respondent to file additional Motions to Compel Discovery if need.

Additionally, out of the numerous requests for FOIA as well as Foreign Registration Statements request forwarded, Respondents have received responses from some requesting additional time and/or additional information and continues awaiting responses, from the Federal Agencies, which by statute are entitled up to 20 business days to respond.  Therefore, additional time is necessary for Discovery as Respondents await documents that may explain what occurred during the Mortgage Transaction.

Responses from the agencies are attached. In fact in response to Pennsylvania Attorney General's response, Respondents have filed a Counterclaim against allative Counsel who have failed to register with the Attorney General's Office as required by the Foreign Registration Act.

:Vera L.:Jones: request a minimum of 180 days to extend Discovery as well as other deadlines to find all the documents Plaintiff is demanding to be produced and continue working with authorities in Pennsylvania and Federal Agencies to obtain information concerning this matter and the parties involved and alleging to have standing, claim and recourse in this matter.

# EXHIBITS
# A-J

# AFTER VISIT SUMMARY  **Penn Medicine**

**Vera L. Jones**  DoB: 8/1/1958                    🗓 10/21/2018  📍 HUP EDOU RAVDIN 2 215-662-3956

## Instructions
Your personalized instructions can be found at the end of this document.

 **Schedule an appointment with Your neurologist as soon as possible for a visit in 1 month (around 11/22/2018)**

 **Schedule an appointment with Karen Melissa Duckworth, MD as soon as possible for a visit**
Specialty: Family Medicine, Internal Medicine
Contact: 131 E Chelten Ave #9
          Philadelphia PA 19144
          215-685-5745

## Today's Visit
You were seen by Felipe Teran-Merino, MD, STEFANIE B PORGES, MD, and Akosua Nuamah, CRNP, MSN

**Reason for Visit**
Numbness

**Diagnosis**
Paresthesia

## 🔬 Lab Tests Completed
ABL90 VENOUS PANEL
ABO RH TYPE
ANTIBODY SCREEN
AUTOMATED DIFF
BASIC METABOLIC PANEL
GLOMERULAR FILTRATION RATE-ESTIMATED
GLUCOSE POC
HEME PROFILE + ELECT DIFF
L1 URINE DRUG SCREEN
POC UA DIPSTICK
PROTIME/ APTT
TROPONIN-I POC
URINALYSIS MICROSCOPIC

## 🔬 Lab Tests in Progress
TYPE & SCREEN NON-PPMC

*Over Night Hospitalized October 21* (handwritten)



### Imaging Tests
CT HEAD ARTERIOGRAM W AND WO IV CONTRAST
CT HEAD PERFUSION
CT NECK ANGIO W AND WO IV CONTRAST
MR CERVICAL SPINE W AND WO IV CONTRAST
MR HEAD W AND WO IV CONTRAST
XR ANKLE 3+ VIEWS
XR CHEST 1 VIEW
XR FOOT 3+ VIEWS

### ⊞ Done Today
ASPIRATION RISK TOOL (ART)
ED DEPARTURE CONDITION
EEG <1 HR
ELECTROCARDIOGRAM, COMPLETE
HOSPITAL BED REQUEST
INITIATE OBSERVATION STATUS
NO
POC TROPONIN
REASON FOR NO VTE PROPHYLAXIS - HOSPITAL ADMISSION - MEDICATIONS

### ⚕ Medications Given
acetaminophen (TYLENOL) last given 10/22/2018 9:08 AM
gadobenate dimeglumine (MULTIHANCE) last given 10/21/2018 8:15 PM
iopamidol (ISOVUE-370) last given 10/21/2018 4:29 PM
multivitamin last given 10/22/2018 9:09 AM

### Your End of Visit Vitals

| | | | |
|---|---|---|---|
| Blood Pressure **109/72** | BMI **24.60** | Weight **134 lb 7.7 oz** | Height **5' 2"** |
| Temperature (Oral) **98.2 °F** | Pulse **87** | Respiration **16** | Oxygen Saturation **97%** |
| BSA **1.61 m²** | | | |

## What's Next
You currently have no upcoming appointments scheduled.

## Assistance for future appointments

For assistance with scheduling a follow-up appointment with a Penn Medicine physician, please call (267) 414-2208 and indicate that you were seen in the Emergency Department.

# AFTER VISIT SUMMARY

 **Penn Medicine**

**Vera L. Jones** DoB: 8/1/1958     🗓 12/20/2018 2:00 PM   📍 Neurology South Pavilion 215-662-3606

## Instructions from Jon Rosenberg, MD

Please contact the neurology office if you have any new symptoms of numbness, weakness, visual changes.  If your headaches worsen in quality or frequency, please contact us as well.

 **Return if symptoms worsen or fail to improve, for Numbness, weakness, headache.**

## Today's Visit

You saw Jon Rosenberg, MD on Thursday December 20, 2018.

 Blood Pressure
118/63

 BMI
26.08

 Weight
142 lb 9.6 oz

 Height
5' 2"

 Pulse
88

Respiration
20

## What's Next

You currently have no upcoming appointments scheduled.

## You Were Seen At

NEUROLOGY SOUTH PAVILION
A Facility of The Hospital of the University of Pennsylvania

## Schedule Your Appointment

Disposition
Return if symptoms worsen or fail to improve, for Numbness, weakness, headache.





# CITY OF PHILADELPHIA

**DEPARTMENT OF PUBLIC HEALTH**
**AMBULATORY HEALTH SERVICES**
**Health Center 9**
131 East Chelten Avenue
Philadelphia, PA 19144-2153
Tel: (215) 685-5745
Fax: (877) 542-9011

**Thomas A. Farley, MD, MPH**
**Health Commissioner**

**Thomas P. Storey, MD, MPH**
**Executive Director**

**Chanel Conley, MHA**
**Director, Health Center 9**

January 18, 2019

## VERA JONES
## 1818 S ALDEN ST
## PHILADELPHIA, PA 19143-5504

Good Morning,

We regret to inform you that on February 1, 2019, Dr. Mark Bur, Psychologist will no longer be with the City of Philadelphia.

This letter is to let you know that we need to cancel your _February 11, 2019_ appointment.

We are unsure if there will be a replacement for Dr. Bur, but on your appointment with your physician you can ask.

Once again, we are sorry to see Dr. Bur leave us and especially sorry we had to cancel your appointment.

Thank you.

Health Center #9



℞ RLH Ma'at Law ℞
"Enforcing The Rights of the Indigenous People"

P.O. Box 7446
[Philadelphia Territory, Pennsylvania
Commonwealth 19101]
Phone:  401.343.0529
Cell: 267.312.7322

Rhashea Lynn Harmon El, Esquire*

**RLH Ma'at Law**
rlh@rlhmaatlaw.com
Fax: 1.888.696.0367

C/O 1315 Walnut Street, Suite 320
Rhashea Lynn Harmon El, Esquire
[Philadelphia Territory,
Pennsylvania
Commonwealth, 19107]
United States of America

January 14, 2019

On Behalf:
MAY E McCLOUD ESTATE
C/O VERA JONES Authorized Representative and LEGAL GUARDIAN
1818 S. Alden Street
Philadelphia, Pennsylvania 19143-5504

To:
SENT VIA EMAIL mbomstein@gmail.com
and REGULAR MAIL:
Attention: Michael Bomstein, Esq.
The Land and Title Building, Suite 2126
100 S. Broad Street
Philadelphia, Pennsylvania 19110

AND

SENT VIA EMAIL Vpalma@stradley.com & Astutzman@stradley.com
Attention: Vladimir Palma, Esquire
2005 Market Street, Suite 2600
Philadelphia, Pennsylvania 19103

RE:        MATRIX FINANCIAL CORPORATION SERVICES VS.
           MAY E. MCCLOUD ET AL
DOCKET NO:  170503419

Greetings:

This correspondence is to inform you that RLH Ma'at Law & The Rights of Indigenous People's represents the Estate of May McCloud and Vera Lynn Jones in a limited scope regarding the above matter.

The Indigenous firm has been retained to assist in the above matter as well as to assist in the matter concerning the Petition to Quiet Title.

* NY, PA, NJ

Authorized Internationally
"All Rights Reserved"

Legal Balance and Order




*Enforcing The Rights of the Indigenous People*

At this time, the firm will accept all documents from Counsel representing Plaintiffs in the above matter, which are forwarded and mailed to either Vera L. Jones and/or May E McCloud.

All documents, correspondents in an attempt to ease the stressful burden on Respondents shall be forwarded to:

[Address]
c/o RLH Ma'at Law et al
1315 Walnut Street, Suite 320
The Philadelphia Building
Philadelphia, Pennsylvania 19107

And/Or

Email
legaldocs@rlhmaatlaw.com

In an effort to reduce any further delay in responses et cetera in this matter, the following documents:

a) Respondents' Response to Plaintiffs' Requests for Production of Documents;
b) Respondents' Preliminary Objections to Plaintiff's Petition to Quiet Title filed December 10, 2018;
c) Respondents' First Discovery Request Interrogatories and Request For Production of Documents Directed to Plaintiffs,

shall be forwarded to each counsels' email of record on January 14, 2019 and subsequently forwarded by regular mail.

Additionally, let this correspondence reflect Notice of Intent to file a Motion to Extend Discovery as well. Should counsel of record agree or disagree to the extension please advise.

It is our intention to assist Defendants in this matter and to alleviate much of the legal procedural requirements while also acting as an advisor to Respondents.

Additionally, within the limited scope of our representation we are bestowed with the authority to discuss all matters with you as we would with full representation.

* NY, PA, NJ

Authorized Internationally
"All Rights Reserved"

Legal Balance and Order

❦ *RLH Ma'at Law* ❦
*"Enforcing The Rights of the Indigenous People"*

Thank you for your attention to this matter.

Most Sincerely and in Honor,

Without Prejudice U.C.C. 1-308

™R. Lynn Harmon, El©, Esq.
Private Attorney and Trustee of RLH Ma'at Law
and the Rights of the Indigenous Peoples and the
Authorized Representative and Owner for
Rhashea Lynn Harmon Foreign Trust

-All Rights Reserved-

cc:
File
Ms. Vera Lynn Jones

Enclosures.

* NY, PA, NJ

Authorized Internationally
"All Rights Reserved"

Legal Balance and Order

## CERTIFICATE OF SERVICE

By my autograph and seal, and in conformance with the Uniform Postal Act (UPA) and laws governed by the Uniform Postal Union (UPU), I _____, hereby Certify that I have caused the within INTERROGATORIES and REQUEST FOR PRODUCTION OF DOCUMENTS directed to PLAINTIFFS to be served by United States Postal Service (USPS) by First Class CERTIFIED Mail on January 15, 2019 to the following persons, agents, and/or living beings:

**Appellation of Plaintiff's Agent and Title:**
**United States Address/Jurisdiction:**

**MICHAEL S. BOMSTEIN, ESQUIRE**
**The LAND TITLE BUILDING,**
**SUITE 2126**
**100 SOUTH BROAD STREET**
**PHILADELPHIA,         PENNSYLVANIA**
**[19110]** *de facto*
**Email:** mbomstein@gmail.com

**Appellation of Plaintiff's Agent and Title:**
**United States Address/Jurisdiction:**

**VLADIMIR PALMA, ESQUIRE**
**2005 MARKET STREET, SUITE 2600**
**PHILADELPHA,         PENNSYLVANIA**
**[19103]** *de facto*
**Email:** Vpalma@stradley..com and
Astutzman@stradley.com

By my hand and my seal:

Time Stamped and Dated: *01.14. 2019*
*4:12 pm*

Autograph of: :VERA-L.:: JONES:
In *Propria Persona, Sui Juris,*
The Authorized Representative of
©May E. McCloud™ and the
Living Woman and Being as
Created by The Most High.

~All Rights Reserved~



𝕽𝕷𝕳 𝕸𝖆'𝖆𝖙 𝕷𝖆𝖜 & 𝕿𝖍𝖊 𝕽𝖎𝖌𝖍𝖙𝖘 𝖔𝖋 𝕴𝖓𝖉𝖎𝖌𝖊𝖓𝖔𝖚𝖘 𝕻𝖊𝖔𝖕𝖑𝖊𝖘 𝕷𝖆𝖜
𝕿𝖗𝖚𝖘𝖙𝖊𝖊 𝖆𝖓𝖉 𝕷𝖆𝖜𝖞𝖊𝖗
𝕽𝖍𝖆𝖘𝖍𝖊𝖆 𝕷𝖞𝖓𝖓 𝕳𝖆𝖗𝖒𝖔𝖓 𝕰𝖑, 𝕰𝖘𝖖𝖚𝖎𝖗𝖊
𝕽𝖑𝖍@𝕽𝖑𝖍𝖒𝖆𝖆𝖙𝖑𝖆𝖜.𝖈𝖔𝖒
𝕮𝖊𝖑𝖑: 267.312.7322
𝕱𝖆𝖝: 1888.696.0367

February 11, 2019

On behalf of:
Vera L. Jones El and May E. McCloud
C/O
™Rhashea Lynn Harmon- El©, Esquire
RLH Ma'at Law & The Rights of Indigenous Peoples
1315 Walnut Street, Suite 320
Philadelphia Territory, Pennsylvania Commonwealth Republic[19143]

To:

REGULAR MAIL:
Office of the Comptroller of the Currency (OCC)
400 7th Street S.W., Suite 3E-218
Washington Territory, District of Columbia Republic [20219]

RE:   FOIA and REQUEST FOR INDEPENDENT LOAN AND
PRE-FORECLOSURE REVIEW

Greetings Agents et al:

As per correspondence dated January 28, 2019 and Complaint forwarded to the Department of Treasury regarding alleged LOAN: 503182676 asserted as issued by FLAGSTAR BANK, MATRIX FINANCIAL SERVICES CORPORATION and E&E FINANCIAL, INC. this correspondence is presented to you as a request for an Independent Loan Application and Foreclosure Review of the following alleged Loan which is currently in litigation foreclosure suit, initialed by FlagStar Bank, through its alleged assignment to Matrix Financial Services Corporation.

Loan NO.:
503182676
Property Address in Philadelphia Territory:
1361 S. 46th Street, Philadelphia, Pennsylvania Commonwealth [19143]
Loan Servicer:
Matrix Financial Services Corporation
Purported Note Holder:
FlagStar Bank



**Date of alleged Mortgage:**
**April 14, 2011**
**Date of Foreclosure:**
**Currently in Litigation**

We, RLH Ma'at Law and The Rights of Indigenous Peoples represent the interest of the alleged Mortgagor's in this matter. In May 2017, FlagStar and Matrix Financial Services Corporation, which we know is a shell company created by FlagStar to circumvent any MERS violation allegations asserted in defense against Foreclosures, filed suit against: May E. McCloud and Vera L. Jones.

Matrix Financial alleged within their complaint in summary that because both McCloud and Jones executed a Deed of Trust and then subsequently failed to continue submitting Mortgage Payments to FlagStar Bank, that they were empowered with the authority, due to this alleged breach of the Mortgage Agreement, to obtain title to the said brick and mortar identified as 1361 S. 46th Street, which they allege both McCloud and Jones provided as Collateral for the alleged $70,000 Loan.

The compelling and probative reasons supporting a request for an Independent Audit and Review are:

1) Prior to receiving Guardianship Rights in February 2016 over McCloud, Jones was without knowledge, information, or belief regarding any ownership rights in the asserted territorial premises identified as 1361 S. 46th Street.
2) In February 2016 an Orphans' Court Order adjudged May McCloud incapacitated due to critical stages of Dementia and appointed Vera Jones as her legal Guardian.
3) Through an accounting of May McCloud's estate, Vera Jones became aware that both May McCloud and Vera L Jones were owners in fee of the Philadelphia Territory brick and mortar 1361 S. 46th Street as per publicly recorded deed.
4) Thereafter, the property was conveyed to a Private Indigenous Trust.
5) Vera L Jones was later notified that an alleged mortgage for $70,000 existed on the brick and mortar 1361 S. 46th Street.
6) RLH Ma'at Law and The Rights of Indigenous Peoples were contacted regarding the matter.
7) Several Communications were made in vain to contact FlagStar and obtain:
    1. Evidence regarding their rightful claim to the Mortgage, and
    2. Cease and Desist of any and all harassing contacts directed at May E. McCloud and Vera L. Jones at all time during the day and night.
8) The Office of the Pennsylvania Attorney General was contacted and a Complaint was issued.
9) The Office of the Pennsylvania Department of Banking and Securities was contacted and a Complaint was issued.
10) Harassment and violations of the Consumer Credit Protection Act as well as Fraud were asserted and communicated.
11) FlagStar in compliance with a request from the Attorney General's Office as well as the Pennsylvania Department of Banking and Securities produced a copy of:

    1. Deed of Trust,
    2. Promissory Note, and
    3. Payment History.

12) At all times thereafter, Vera L Jones vehemently denied having executed any documents regarding a Mortgage.
13) At all times, Vera L Jones asserted Fraud, Forgery, and Misrepresentation.

14) On December 10, 2018 Matrix Financial initiated a separate law suit to quiet title on the asserted Philadelphia territory brick and mortar identified as 1361 S. 46ᵗʰ Street.

15) Within said documents RLH Ma'at Law and the Rights of Indigenous Peoples on behalf of Vera L. Jones and May E. McCloud observed a significant and material alteration of the documents.

16) Documents produced by FlagStar Bank to the Attorney General and the Department of Banking and Securities and produced by Matrix Financial Services Corporation Attorneys were further **MATERIALLY ALTERED.**

17) Vera L Jones and May E. McCloud received Page 13 of 13 of the Deed of Trust Notarized Page:

  1. **one copy produced by alleged "Creditors" without Vera L Jones name included and written by the Notary, and**
  2. **one copy produced by alleged "Creditors" with "+ Vera L Jones" name added and allegedly written by Notary, but clearly and visibly noticeable of the difference in handwriting.**

18) As the Comptroller of Currency, because these are your subjects who are operating as Foreign Agents under the authority of the United States of America, you have a duty to keep your subjects in accordance with the laws your government has created and established.

Our contention as it has been since the beginning of this falsely contrived and web of lies presented, is that FlagStar and/or Matrix Financial Services Corporation and their Attorneys have knowingly falsely asserted and presented materially altered and fraudulently contrived documents to buttress their claim to property they so desire to acquire for financial gain, and have no lawful claim or right. This is most evident.

Additionally, at no time through continued requests for evidence of payment to May E. McCloud of the $70,000 have either FlagStar Bank or Matrix Financial Services Corporation produced any evidence supporting their contention that funds they allege to have loaned to May E McCloud were in fact delivered.

For your review and analysis we have enclosed the documents attorneys representing Matrix Financial Services Corporation produced upon filing a Petition to Quiet Title on December 10, 2018 within the Jurisdiction and Territory of the First Judicial Court of Common Pleas Philadelphia.

Again, as mentioned, the Treasury Department has recently been provided with correspondence representing a Complaint against those listed in the correspondence along with attachments, however, this correspondence's specific inquiry includes a Freedom of Information Act Request, regarding information outlined above, as well as an Independent Loan and foreclosure review of this matter and perhaps others involving the same participants.

With the high level of public interest involving any and all fraudulent mortgage corrupt practices, this information is not only relevant to the protection of my Tribe but also to others who may have suffered and may be suffering from he same deceptive tactics and systemic practices.

Again, there is clearly wrongdoing in this mortgage matter and it is one that the Pennsylvania Departments and courts appear to not want to get involved or reveal.

We can be reached at:
        legaldocs@rlhmaatlaw.com

-and-

c/o
™ Rhashea Lynn Harmon-El©, Esquire
RLH Ma'at Law & The Rights of Indigenous Peoples
1315 Walnut Street, Suite 320
The Philadelphia Building
Philadelphia Territory, Pennsylvania Commonwealth Republic [19107]

We look forward to your prompt, thorough and timely response.

Most Honorably,

™ Rhashea Lynn Harmon-El©, Esquire
Private Lawyer and Counselor in Law
Trustee for RLH Ma'at Law and The
Rights of Indigenous Peoples
"All Rights Reserved"

Enclosures.

cc:   Internal Revenue Service
      U.S. Postal Inspection Service

      Yamassee Court



*Ma'at Law*
*"Enforcing The Rights of the Indigenous People"*

P.O. Box 7446
[Philadelphia Territory, Pennsylvania
Commonwealth 19101]
Phone:  401.343.0529
Cell: 267.312.7322

Rhashea Lynn Harmon El, Esquire*

C/O 1315 Walnut Street, Suite 320
Rhashea Lynn Harmon El, Esquire
[Philadelphia Territory,
Pennsylvania
Commonwealth, 19107]
United States of America

**RLH Ma'at Law**
rlh@rlhmaatlaw.com
Fax: 1.888.696.0367



January 28, 2019



On Behalf:
VERA L. JONES and MAY E. MCCLOUD
C/O RLH MA'AT LAW AND THE RIGHTS OF INDIGENOUS PEOPLES
1315 Walnut Street, Suite 320
Philadelphia, Pennsylvania 19107

To:
SENT VIA FAX: 325.643.4043
and REGULAR MAIL:
Attention: FEDERAL BUREAU OF INVESTIGATIONS (FBI)
ATTENTION: GENERAL FRAUD AND OTHER CRIMINAL MATTERS
William J. Green Jr. Building
600 Arch Street, 8th Floor
Philadelphia, PA 19106

RE:      MAY E MCCLOUD
         BCP-17-05-000815

**FRAUD AND OTHER CRIMINAL MATTERS COMPLAINT**
**"NOTICE TO PRINCIPAL IS NOTICE TO AGENT; NOTICE TO AGENT IS NOTICE TO PRINCIPAL"**

Greetings:

This correspondence is to represent a second Complaint filed in reference to the above senior citizen May E. McCloud that involves an alleged Mortgage she allegedly executed on April 14, 2011. For purposes of providing you with the necessary information a formal Complaint would request here is the following:

May E. McCloud in her united states corporate legal status, is an elderly living being with an incarnation date of: September 06, 1934.
She resides at: 1361 S. 46th Street
Philadelphia, Pennsylvania Commonwealth Territory 19143.
She is represented by her Legal Guardian and biological daughter, Vera L. Jones as of February 8, 2016 by Order granted through the Philadelphia Orphans' Court because May E. McCloud's Dementia had reached a degree that was substantially interfering with her safety and her natural daily life activities.

* NY, PA, NJ & Mund Barrefan                                    **Legal Balance and Order**

Authorized Internationally
"All Rights Reserved" !

*RLH Ma'at Law at Glace*
*Enhancing The Rights of the Indigenous People*

Vera L. Jones in her corporate legal status, with incarnation date of August 1, 1958. She is domiciled at: 1818 S. Alden Street, Philadelphia, Pennsylvania Commonwealth Territory, 19143 and resides at 1361 S. 46th Street, Philadelphia, Pennsylvania Commonwealth Territory 19143.

Her phone number where she can be reached is: 267.748.7111
She currently resides with May E. McCloud and tends to or monitors her daily care.

RLH Ma'at Law and the Rights of Indigenous Peoples represents both Indigenous beings and is filing a Complaint with the within addressed and carbon copied agencies to seek agency assistance regarding a very dire Fraudulent situation that has been plaguing the mortgage industry since at least 2006. Respondent Jones became aware of the Mortgage in February 2016. More specifically, the matter involving McCloud and Jones involves perhaps two (2) or three (3) tiers of Fraudulent activity that are coupled and comingled with others.

The first involves facts that present the fraudulent Deception of Lending to a Senior with Alzheimer's/Dementia or at a minimum diminished capacity in 2011, while possessing knowledge that the Senior owned property jointly in fee with another and the Lender intentionally failing to contact or obtain a valid execution of the loan agreement, note, and mortgage (Deed of Trust) from Respondent Jones. The second, involves facts that arise once the joint owner in fee, Respondent Jones obtained knowledge of what the alleged Lender had done, recognizing that the signatures on the documents was not hers leading to the conclusion that the alleged Lender falsified the documents by adding the joint owner in fees signature and name solely to the Mortgage Documents. Third, involves facts that involve subsequent additional documents after filing suit, requiring forgery and/or adding Respondent Jones' name to documents to give the appearance that Respondent appeared before the Notary Public on April 14, 2011.

The following summary of events since March 2016 will substantiate the Fraudulent Claim.

The Complaint is filed against:

**FLAGSTAR BANK**
The individual(s) with whom the Complaint was made known is:
Michael Swain, from the Office of the President.
Address: 5151 Corporate Drive, Troy MI 48098-2639

**MATRIX FINANCIAL SERVICES CORPORATION**
Its' counsel listed below.

**LOANCARE, LLC**
Address: P.O. Box 8068
Virginia Beach, VA 23450

**PHELAN, HALLINAN, DIAMOND & JONES, LLP**
The individual(s) with whom the Complaint was made known is:
Michael A. Pellegrino Esq. and Abigail Brunner, Esq.
Address: 1617 JFK Boulevard, Suite 1400
One Penn Center Plaza
Philadelphia, Pennsylvania Commonwealth Territory 19103

* NY, PA, NJ & Mund Barrafan

Authorized Internationally
"All Rights Reserved"



Legal Balance and Order

*At Law*
*"Enforcing The Rights of the Indigenous People"*

**THE LAW OFFICES OF PINNOLA & BOMSTEIN**
The individual(s) with whom the Complaint was made known is:
Michael S. Bomstein, Esquire
Address:   The Land Title Building, Suite 2126
100 S. Broad Street
Philadelphia, Pennsylvania Commonwealth Territory 19110

**STRADLEY, RONON, STEVENS & YOUNG, L.L.P.**
The individual(s) with whom the Complaint was made known are:
Andrew K. Stutzman, Esquire and
Vladimir Palma, Esquire
Address:   2005 Market Street, Suite 2600
Philadelphia, Pennsylvania Commonwealth Territory 19103

**THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA OFFICE OF JUDICIAL RECORDS**
The individual(s) with whom the Complaint was made known is:
Chris Sorte and Lisa Collins (Intake Investigator at the Pennsylvania Human Relations Commission)
Commonwealth Court of Pennsylvania
Supreme Court of Pennsylvania

**THE PENNSYLVANIA HUMAN RELATIONS COMMISSION**
The individual(s) with whom the Complaint was made known is: Stacey Marie Davids and Lisa Collins (Intake Investigator)
CASE#201701873

**THE COMMONWEALTH COURT OF PENNSYLVANIA**
The individual(s) with whom the Complaint was made known is:

**THE SUPREME COURT OF PENNSYLVANIA**
The individual(s) with whom the Complaint was made known is: The Office of the Prothonotary, John W. Person Jr. Esquire
An application for Relief for Mandate and Injunction to Cease Obstructing Access to Filing Documents was filed with the Supreme Court of Pennsylvania.
On December 15, 2017 correspondence was directed to Attorney A. Taylor Williams informing that a Response/Answer was required to be filed on or before December 29, 2017.
Approximately on January 28/29 2018 correspondence and Order was received from the Supreme Court of Pennsylvania Office of the Prothonotary DENYING Respondents' REQUEST FOR RELIEF.
Respondents never received any such response with an opportunity to reply or rebut. The matter was dismissed without providing opinion, reason, or argument.

**SUMMARY OF FACTS:**

On March 3, 2016 correspondence to FlagStar Bank was sent regarding the ceasing of any and all automatic deductions being made to May E. McCloud's Account for purposes of conducting an Accounting of May E. McCloud's Estate. *See Exhibit "A".*

Subsequent receiving NOTICE to cease all automatic deductions while the accounting of the Estate took place, FlagStar failed to comply and cease automatically withdrawing funds from May E. McCloud's account and continued withdrawing funds without authorization for the months of April, May, June, July, August and September.

^RY, PA, NJ & Mund Barrafan
Authorized Internationally
"All Rights Reserved"

Legal Balance and Order

**BRYUM's Law**
*"Enforcing The Rights of the Indigenous People"*

After numerous attempts to cease the automatic withdraws through correspondence and by contacting FlagStar by phone Respondent Jones made internal arrangements with Respondent McCloud's Bank to cease the automatic withdraws being made by Flagstar.

On October 06, 2016, FlagStar contacted Respondent Jones by correspondence notifying Respondent of their inability to withdraw funds from said Account and NOTICED Respondent that her account may be "delinquent" as a result. *See Exhibit "B"*

On October 21, 2016, Respondent Jones initiated the professional services of Mr. Tiger D. Raven Melchiz: El to conduct a Forensic Audit into the alleged Mortgage. *See Exhibit "C".*

On November 18, 2016, Notice was forwarded to Flagstar Bank of Third-Party intermediary assignment to investigate and communicate with FlagStar regarding the alleged Mortgage matter. *See Exhibit "D".*

On December 20, 2016. Respondents filed a Complaint with the Office of Attorney General Consumer Affairs Harrisburg. *See Exhibit "E".*

On December 23, 2016 Respondent Jones in a good faith effort, while continuing to investigate the legality of the Mortgage, forwarded an amount to FlagStar totaling $524.00 by check #3367. Attached to the documents forwarded was an Affidavit of Truth notarized December 23, 2016.  *See Exhibit "F".*

On December 27, 2016 FlagStar forwarded Notice of Declination of Third-Party Authorization noting that FlagStar's "standard Authorization Form was not used". *See Exhibit "G".*

On January 05, 2017, the Pennsylvania Office of Attorney General Consumer Affairs in Harrisburg received a Complaint filed by Respondents. *See Exhibit "E" Time Stamped and Dated "Received Jan 05 2017".*

On January 9, 2017, Correspondence was forwarded to FlagStar because phone calls from FlagStar debt collection department continued at all times of the day and night and FlagStar continued to contact Respondents and ignore Attorney Harmon's correspondence and Notices to Cease contacting and harassing her clients.  *See Exhibit "H".*

On January 11, 2017, the Pennsylvania Office of Attorney General Bureau of Consumer Affairs in Philadelphia received a Complaint filed by Respondents. *See Exhibit "E" Time Stamped and Dated "Received Jan 11 2017".*

On January 18, 2017, Respondent Jones received correspondence informing her that MATRIX FINANCIAL SERVICES CORPORATION was the "mortgage loan servicer" and that "LoanCare" would be engaged to assist with said servicing of the mortgage loan. *See Exhibit "I".*

On January 19, 2017, The Pennsylvania Office of Attorney General Bureau of Consumer Affairs, Philadelphia branch contacted Respondents by correspondents notifying them of the receipt of their Complaint. Complainant was provided file No: BCP-17-05-000815. *See Exhibit "J".*

On January 19, 2017, The Pennsylvania Office of Attorney General Bureau of Consumer Affairs, Philadelphia Branch forwarded correspondence to FlagStar Bank notifying of filed Complaint against them. *See Exhibit "K" executed by Agent Dana L. Price.*

• NY, PA, NJ & Mund Barrofan

Authorized Internationally
"All Rights Reserved"

Legal Balance and Order

*RLH Ma'at Law*
*"Enforcing The Rights of the Indigenous People"*

On January 24, 2017, FlagStar received said Correspondence from Attorney General's Office Consumer Affairs. The contact agent for the Attorney General's Philadelphia Branch is Agent, Dana L. Price. *See Exhibit "L"*.

On February 9, 2017, "LoanCare" was notified of Respondents' experiences with FlagStar by the Pennsylvania Department of Banking and Securities. A Mr. Eric Morris, dba Mortgage Resolution Supervisor was identified and noticed by Crystal Dietrich, dba Consumer Services Specialist, an agent of the Pennsylvania Department of Banking and Securities. *See Exhibit "M"*.

On February 27, 2017, FlagStar forwarded response correspondence to Agent Price informing Agent Price that they were the current servicer of the Loan and Holder of the Note. Within this alleged correspondence the Note, Deed of Trust, and Payment History were enclosed for her review. *See Exhibit "N" Time Stamped and Dated by Office of Attorney General BCP-Phila. "March 06 2017"*.   To this date January 28, 2019, MATRIX FINANCIAL asserts they have standing because they are the "current service providers" while FlagStar continues to forward invoices to Respondent May E. McCloud.

On March 06, 2017, the Office of Attorney General Received FlagStar's correspondence dated February 27, 2017. *See Exhibit "N"*.

On March 17, 2017 Respondent obtained correspondence from Respondent McCloud's Bank, after inquiring into the accountings of her Account. The Correspondence noted and documented that the Account "did not receive a deposit for the amount of $30,000 or the amount $70,000." *See Exhibit "O"*.

On March 17, 2017, Attorney Rhashea Lynn Harmon-El, correspondence was directed to The Philadelphia Branch Office of Attorney General, Attention Agent Dana L. Price and FlagStar Bank informing them of the: 1) continued issues that had not been addressed or resolved and 2) fact that Respondent had not received copies of the alleged enclosed documents. *See Exhibit "P"*.

On March 28, 2017, RLH Ma'at Law received a copy of the requested documents: 1) Note, 2) Deed of Trust, and 3) Assignment that both the Attorney General's Office and the Pennsylvania Department of Banking and Securities received. *See Exhibit "Q"*.

On April 27, 2017, the Office of Attorney General forwarded correspondence noting their inability to resolve the matter. *See Exhibit "R"*.

On June 05, 2017, FlagStar forwarded correspondence to the Pennsylvania Department of Banking and Securities Consumer Services Office in response to their letter of May 30, 2017. *See Exhibit "S"*.

On June 05, 2017, Attorney Rhashea Lynn Harmon, El was contacted by correspondence forwarded by the Pennsylvania Department of Banking and Securities and informed by Crystal Dietrich "I trust that the response addresses your concerns". *See Exhibit "T"*.

The present reason for the refiling of the Fraud Complaint, but this time with the Federal Agency(s), involves the very documents and events Respondents have consistently been complaining to the Pennsylvania Agencies. Plaintiffs have consistently engaged in committing forgery acts and engaging in bad faith transactions with Respondent. Prior to becoming the Legal Guardian of May E. McCloud Respondent Jones had never hear of FlagStar or Matrix Financial and it was ot until sometime subsequently become the Legal Guardian that she learned that what she considered her mother's home, was jointly owned in fee by both she and her mother.

* NY, PA, NJ & Mund Barrafan

Authorized Internationally
"All Rights Reserved"

Legal Balance and Order

*@BRYUMA's Law @*
*"Enforcing The Rights of the Indigenous People"*

Furthermore, prior to contacting FlagStar, regarding Respondent May E. McCloud Estate Accounting, Respondent Jones and FlagStar had never had any previous dealings.

Even when Respondent Jones initially requested copies of documents, FlagStar failed to respond and provide her with copies until Third-parties became involved.

Thereafter, Respondent began receiving materially altered Mortgage documents on May 1, 2018 and then refiled in a separate suit to "Quiet Title" additional materially altered Mortgage documents: Someone, whether it is FlagStar, Matrix Financial Services Company or any one of the other participating Agencies or their Agents, including Attorneys, has committed Fraud including forgery and is concealing or aiding in the continuation of Fraud being committed.

The Foreclosure situation in Philadelphia that my clients are experiencing is not an isolated situation. *See Exhibit "V"*. However, what separates that facts of this matter from others is that at least in the other cases, the Complainants were living in their homes and had knowledge of the Mortgage in some capacity. Here, Respondent Jones, during the entire time her mother resided at 1361 S. 46th Street, had no idea that her name was included on the Deed and that she was a joint owner in fee of the home.

Here the facts clearly reflect, that Respondent Jones had absolutely no knowledge of a Home she owned, therefore, how could she possibly have knowingly and willingly executed Mortgage Documents and put the home up for Collateral without possessing this basic requisite factual information?

Here, in this particular matter, Respondent Jones has contended, based upon first hand knowledge, information and belief, that at no time was she involved in the Mortgage Application Process and had at no time executed her signature on any documents titled Mortgage or containing FlagStar Bank or Matrix Financial Services Corporation or any other Persons claiming to be a creditor or to have an interest in said RES 1361 S. 46TH Street due to a debt owed.

Here, at all times prior to Plaintiffs submitting exhibits in their Complaint to Quiet Title, Respondent had denied having any first hand knowledge of any mortgage or application.

Here, Plaintiff's exhibits submitted in the Action to Quiet Title evidence and support her ongoing and continued denial to the support of her contentions. *See Exhibit "V" Complaint to Quiet Title Filed December 10, 2018 with attached Exhibits "A, B, and C"*. The attached documents are void of Respondents' signature on any of the documents despite Plaintiffs' attorney's contention. *Per Se*, the documents reflect the absence of Respondents' signature on the loan application and on the Note.

Here, throughout this ordeal, Respondent Jones has expressed confusion and perplexion involving this matter since she:

1) Had no idea prior to February of 2016 that she was joint owner in Fee of 1361 S. 46th Street, and
2) Had no idea who FlagStar or Matrix Financial were pertaining to her; and
3) Vehemently denied filling out a mortgage application and/or possessing any knowledge regarding such; and
4) Vehemently denied executing any documents regarding a mortgage of any kind.

Further, here, when Plaintiffs produced documents with a hand drawn line on the mortgage document exhibiting what appeared to be Respondents' handwriting, and then included illegible infinitesimal initials on each page, Respondent knew with absolute certainty that her signature and initials had been forged. *See Exhibit "W"*.

* NY, PA, NJ & Mund Barrefan

Authorized Internationally
"All Rights Reserved"

Legal Balance and Order

01-28-2019

RLH Ma'at Law
"Enforcing The Rights of the Indigenous People"

Further, in Respondents New Matter, Respondent raised issues of Fraud against FlagStar and Matrix Financial. *See Exhibit "X".*

On May 1, 2018 a Certificate of Compliance and Certificate of Service and a Verification form was executed by Michael A. Pellegrino, Esquire. In response to Respondents' New Matter, for the first time, since the communications began between Respondent Jones and Plaintiffs, Plaintiffs submitted ADDITIONAL FRAUDULENT COPIES of the titled Mortgage Document. *See Exhibit "Y" Response and Verification submitted by Michael A. Pellegrino, Esq.*

Here, let us compare the documents produced to The Attorney General's Office by Michael Swain, Office of the President of FlagStar Bank, which evidence the materially altering fact. The last page 13 of 13 of the alleged executed Mortgage documents contain solely "MAY E. MCCLOUD'S" name as having appeared before the Notary on April 14, 2011. Here, there was in fact no one other than MAY E. MCCLOUD who allegedly appeared AND who executed the document. *See Exhibit "Z" letter to Ms. Price from Flag Star enclosing 1) Note, 2) Deed of Trust, and 3) Payment History page 13 of 13 of the Mortgage Document.*

Further, the documents produced as "Exhibit "A"" attached to PLAINTIFF'S REPLY TO DEFENDANTS' NEW MATTER, page 13 of 13 have now included, added, and miraculously appeared "+ VERA L JONES". *See Exhibit "Y" page 13 of 13.* This "+ VERA L JONES" did not appear on the Mortgage documents until SUBSEQUENT Respondent's PRELIMINARY OBJECTIONS were finally filed and DENIED and Respondents were ORDERED to ANSWER PLAINTIFF'S COMPLAINT. Upon Answering Plaintiff's Complaint, Respondents' Counterclaim against Plaintiffs included the explanations and assertions of Fraud based on forgery. *See Already Attached Exhibit "X".*

Again, on December 10, 2018 Plaintiff Michael Bomstein, Esquire, filed a Complaint to Quiet Title and again, the forged copy of the forged copy was again provided. *See Already Attached Exhibit "Y" Mortgage document page 13 of 13.*

Presently, possessing additional evidentiary information that Respondents at the time of submitting and filing the Complaint in 2016/2017 did not possess, Respondents requests the assistance of the Federal Bureau of Investigations and any other United States Federal Governmental Agency to assist in this Fraudulent matter.

Subsequent to MATRIX FINANCIAL SERVICES CORPORATIONS filing suit against Respondents Jones, she has unequivocally informed FlagStar that she had NEVER executed a Note, Mortgage or any documents presented regarding a Mortgage on the RES 1361 S. 46th Street. In fact, prior to becoming the Legal Guardian of Respondent McCloud Respondent Jones, had no knowledge that she was joint owner in fee of the RES 1361 S. 46th Street. Plaintiffs were informed from the very beginning that Respondent Jones was not and did not execute the documents that were forwarded to the Attorney General's Office or the Department of Banking and Financing.

Respondent further informed FlagStar that even at the time Respondent McCloud allegedly entered the Agreement, she may not have been competent considering her state of mind prior to Respondent Jones filing for Legal Guardianship and receiving Legal Guardianship by the Orphan's Court in 2016.

At all times, FlagStar and its allative conspirators have ignored Respondents and have attempted to ignore the legal services provided to Respondents by RLH Ma'at Law & The Rights of Indigenous Peoples. Allative efforts to seek justice in the Pennsylvania Courts have been to no avail and have ended with Complaints that Respondents have filed, arbitrarily being dismissed. *See Exhibits "AA", "BB" and "CC".*

* NY, PA, NJ & Mund Barrofan
Authorized Internationally
"All Rights Reserved"

Legal Balance and Order

01.29.2018